**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, Reg. 41070-074
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

NORRIS HOLDER, Reg. 26902-044
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

BRANDON COUNCIL, Reg. 63961-056
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

CHADRICK FULKS, Reg. 16617-074
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

THOMAS HAGER, Reg. 08596-007
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

CHARLES HALL, Reg. 03766-036
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RICHARD JACKSON, Reg. 16669-058
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JURIJUS KADAMOVAS, Reg. 21050-112
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

Case No. _____

DARYL LAWRENCE, Reg. 66476-061
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

IOURI MIKHEL, Reg. 23675-112
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JAMES ROANE, Reg. 32923-083
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JULIUS ROBINSON, Reg. 26190-177
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RICARDO SANCHEZ, Reg. 75820-004
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

RICHARD TIPTON, Reg. 32922-083
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

JORGE TORREZ, Reg. 16054-084
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

DANIEL TROYA, Reg. 75817-004
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

ALEJANDRO UMAÑA, Reg. 23077-058
U.S.P. Terre Haute SCU-FCC
P.O. Box 33
Terre Haute, IN 47808

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity
as President of the United States,
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

PAMELA J. BONDI, in her official capacity
as Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

JOHN DOE, in their official capacity as
Principal Associate Deputy Attorney General
of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

PAUL R. PERKINS, in his official capacity as
Associate Deputy Attorney General of the
United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

WILLIAM MARSHALL, in his official
capacity as Director of the Federal Bureau
of Prisons,
320 First St. NW
Washington, DC 20534

JOSHUA J. SMITH, in his official capacity as
Deputy Director of the Federal Bureau of
Prisons,
320 First St. NW
Washington, DC 20534

SHANE SALEM, in his official capacity as
Assistant Director of the Correctional
Programs Division of the Federal Bureau
of Prisons,

320 First St. NW
Washington, DC 20534

ERICA STRONG, in her official capacity as
Chief of the Designation and Sentence
Computation
Center of the Federal Bureau of Prisons,
320 First St. NW
Washington, DC 20534

ANDRE MATEVOUSIAN, in his official
capacity as North Central Regional Director
of the Federal Bureau of Prisons,
320 First St. NW
Washington, DC 20534

FEDERAL BUREAU OF PRISONS
320 First Street NW
Washington, DC 20534

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF[1]

(*The illegal Redesignation Directive and Mandatory ADX Policy to indefinitely incarcerate commuted persons at U.S. Penitentiary Florence Administrative Maximum Facility (ADX)*)

---

[1] On April 16, 2025, Plaintiffs filed litigation to halt the Redesignation Directive. *See Taylor v. Trump*, 25 Civ. 01161 ("*Taylor I*"). On October 1, 2025, Plaintiffs moved to suspend briefing on the pending motion to dismiss in *Taylor I*, noting that Plaintiffs who had completed their administrative appeals intended to file a new action given the D.C. Circuit's strict interpretation of the Prison Litigation Reform Act in *Jackson v. District of Columbia*, 254 F.3d 262 (D.C. Cir. 2001). *Taylor I*, ECF 55 at 1-2. Although Plaintiffs do not concede that a failure to exhaust administrative remedies must be cured by filing a new complaint, *see id.*, out of an abundance of caution, Plaintiffs have now voluntarily dismissed their claims in *Taylor I*, and they seek declaratory and injunctive relief in the above-captioned action.

**INTRODUCTION**

1.      This is an action for declaratory and injunctive relief from the Trump Administration's express targeting of Plaintiffs for categorical, unlawful, and unconstitutional punishment of incarceration in conditions of "monstrosity."

2.      Until December 23, 2024, Plaintiffs were each serving federal death sentences. On that day, exercising his Article II powers, President Biden commuted the death sentences of 37 people, including Plaintiffs, "to sentences of life imprisonment without the possibility of parole, leaving intact and in effect for each named person all other conditions and components of the sentences previously imposed upon them." Ex. 1 (Clemency Grant).[2]

3.      Then-President-Elect Trump immediately expressed his fury at these acts of mercy. Less than 48 hours later, in a Christmas Day message on his social media platform, the President-Elect specifically singled out the 37 people, telling them to "GO TO HELL!"[3] This was one of several statements by the President-Elect and his campaign, directing hostility at President Biden, the commutations, and the recipients of the commutations.

4.      Plaintiffs are currently incarcerated in the custody of Defendant Federal Bureau of Prisons ("BOP") at U.S. Penitentiary ("USP") Terre Haute, Special Confinement Unit ("SCU"), the federal death row, in Terre Haute, Indiana. In the days and weeks after President Biden's commutations, BOP officials began working with Plaintiffs' lawyers to reclassify and transfer the 37, according to controlling statutory and policy requirements known as the "redesignation process." BOP officials recommended in the first instance that most Plaintiffs should be

---

[2]  Citations to "Ex. __" are to exhibits to the Declaration of Brian W. Stull filed in support of Plaintiffs' Motion for a Temporary Restraining Order, which is filed contemporaneously with this Complaint.

[3]  *See* Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://archive.ph/qX0nR (emphasis in original).

redesignated from the SCU to maximum security USPs or BOP health care facilities.

5.      On January 20, 2025, as one of his first acts in office, Defendant Trump signed Executive Order 14164 ("EO 14164"). Section 3(e) of EO 14164 singles out the 37 people whose death sentences were commuted and directs the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden, and . . . take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." Ex. 2 (EO) at § 3(e).[4]

6.      On February 5, 2025, her first day in office, Attorney General Bondi directed BOP to immediately implement EO 14164, including § 3(e). Ex. 3 (Bondi Memo).[5] The Bondi Memo was a pretext for a new directive, not permitted by statute or BOP policy, to refer all death row commutees for redesignation to ADX.

7.      EO 14164 and the Bondi Memo instituted a new procedure replacing the usual BOP redesignation process. In defiance of the controlling statutes, regulations, and policies governing the BOP redesignation process, Defendants Trump, Bondi, Doe, and Perkins ordered BOP staff to engage in a new sham process that categorically predetermined that all Plaintiffs—regardless of what the BOP redesignation process had already determined—will be incarcerated indefinitely under the most oppressive conditions in the entire federal prison system at the USP Florence Administrative Maximum Facility ("ADX"), the only federal supermax prison, located in

---

[4] Restoring the Death Penalty and Protecting Public Safety, Exec. Order No. 14164, 90 Fed. Reg. 8,463 (Jan. 20, 2025), https://perma.cc/T7B5-KZG5.

[5] Off. of the Att'y Gen., *Memorandum for All Department of Justice Employees: Restoring a Measure of Justice to the Families of Victims of Commuted Murderers* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388526/dl?inline.

Florence, Colorado. Collectively, EO 14164 and the Bondi Memo are hereinafter referred to as the "Redesignation Directive."

8.      Defendant BOP then began marching through the steps of that predetermined, sham process: the agency adopted a new, unwritten policy that referred all Plaintiffs for redesignation to ADX and conducted administrative hearings that found that all Plaintiffs were "appropriate" for placement in ADX, and by May 30, 2025, it had redesignated all Plaintiffs to that facility. Defendant BOP's new, unwritten policy is hereinafter referred to as the "Mandatory ADX Policy."

9.      As of the date of this Complaint, each of the Plaintiffs has completed the administrative appeals as afforded by Defendant BOP in the "ADX Referral Memo." *See* Ex. 7 (ADX Referral Memo). Defendant BOP has denied all those appeals, thereby making the redesignations final.[6]

10.      Defendants have begun transferring death row commutees from USP-Terre Haute to ADX. On information and belief, Defendants will begin transferring Plaintiffs as soon as October 31, 2025. *See infra* ¶¶ 103-05.

11.      Defendants Trump, Bondi, Doe, and Perkins created, ordered, and implemented the Redesignation Directive. And in the wake of the Redesignation Directive's instruction, Defendants BOP, William Marshall, Joshua J. Smith, Shane Salem, Erica Strong, and Andre Matevousian ("BOP Defendants") adopted the Mandatory ADX Policy—requiring that all Plaintiffs be referred for redesignation to ADX, that all Plaintiffs be redesignated to that facility, and that any appeals

---

[6] As of the date of this Complaint, the final BOP decisions on these appeals, at the BP-11 level, have not yet reached Plaintiffs and/or undersigned counsel. Regardless, BOP's failure to rule, by default, operates as a denial. When an incarcerated person has taken the final administrative appeal and the date for final decision set by the prison has passed, the person has exhausted. 28 C.F.R. § 542.18 ("If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level").

of those redesignations be denied.

12.    Defendant BOP's policies and reports acknowledge ADX's harsh conditions, with a specific process to be followed before transferring people there, including exclusions of people with medical or mental health conditions that could worsen by virtue of the facility's extreme conditions of solitary confinement. S*ee infra* ¶¶ 49-78.

13.    ADX cannot accommodate the serious medical and mental health needs of nine Plaintiffs as required by BOP policies. Plaintiffs █████████████████████████

███████████████████████████████████████████████████

███████ have diagnosed serious medical and/or mental health conditions that require treatment and care far beyond what can be provided at ADX. The transport to ADX alone presents substantial health risks to most of these Plaintiffs as Defendants will have no ability to safely care for their medical and/or mental health needs during a ground commute likely to exceed 18 hours in full restraints.

14.    Defendants' actions violate the following provisions of the U.S. Constitution: the bill of attainder and ex post facto clauses of Article I, § 9; the clemency power clause of Article II, § 2; the equal protection and procedural due process clauses of the Fifth Amendment; and the Eighth Amendment's prohibition on cruel and unusual punishment. The actions of Defendants Bondi, Doe, Perkins, and BOP Defendants also violate the Administrative Procedure Act ("APA"). Categorically condemning Plaintiffs to indefinite incarceration in harsh conditions in response to their receipt of clemency from the previous President exceeds the statutory authority granted to the Attorney General and her designees; is arbitrary, capricious, and an abuse of discretion; was made without proper notice and comment; and/or is otherwise not in accordance with law.

15.    Plaintiffs seek a declaratory judgment holding that Defendants' actions violate the

U.S. Constitution and the APA, and injunctive relief enjoining the Redesignation Directive and the new Mandatory ADX Policy, ordering all Defendants but the President to assign Plaintiffs to BOP facilities and units that BOP had previously determined were appropriate for each Plaintiff according to its statutory process and BOP policy, before the interference and overruling of those determinations by Defendants.

## JURISDICTION AND VENUE

16.    Plaintiffs bring suit under the U.S. Constitution (Art. I, § 9; Art. II, § 2; Fifth Amendment; Eighth Amendment) and the APA. The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and § 1346 (civil action against the United States). The Court has jurisdiction to review final agency actions under 5 U.S.C. § 702.

17.    Venue is appropriate in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(e) because Defendants' acts giving rise to the claims occurred in this District, and Defendants are headquartered in this District.

## PARTIES

**Plaintiffs**

18.    **Plaintiff Rejon Taylor**, age 41, was sentenced to death in December 2008 by the federal district court for the Eastern District of Tennessee. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Taylor was a good candidate for redesignation to the Life Connections Program at a high-security penitentiary, and that he was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Taylor to ADX on May 30, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

19.    **Plaintiff Norris Holder**, age 49, was sentenced to death in April 1998 by the

federal district court for the Eastern District of Missouri. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that he was not appropriate for placement in ADX and would be placed at the Life Connections Program at USP-Terre Haute, a high-security penitentiary. Nevertheless, BOP Defendants redesignated Mr. Holder to ADX on May 27, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

20.    **Plaintiff Brandon Council**, age 40, was sentenced to death in October 2019 by the federal district court for the District of South Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████ Nevertheless, BOP Defendants redesignated Mr. Council to ADX on May 27, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

21.    **Plaintiff Chadrick Fulks**, age 48, was sentenced to death in June 2004 by the federal district court for the District of South Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ███████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ Nevertheless, BOP Defendants redesignated Mr. Fulks to ADX on May 12, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

22.    **Plaintiff Thomas Hager**, age 52, was sentenced to death in November 2007 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Hager was not appropriate for placement in ADX. Nevertheless, BOP Defendants redesignated Mr. Hager to ADX on May 27, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

23.    **Plaintiff Charles Hall**, age 54, was sentenced to death in July 2014 by the federal district court for the Western District of Missouri. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Nevertheless, BOP Defendants redesignated Mr. Hall to ADX on May 28, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

24.    **Plaintiff Richard Jackson**, age 56, was sentenced to death in May 2001 by the federal district court for the Western District of North Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Jackson was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Jackson to ADX on or around June 3, 2025, and have denied all his administrative appeals of that redesignation decision in accordance

with the Redesignation Directive and Mandatory ADX Policy.

25.    **Plaintiff Jurijus Kadamovas**, age 58, was sentenced to death in March 2007 by the federal district court for the Central District of California. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Nevertheless, BOP Defendants redesignated Mr. Kadamovas to ADX on May 30, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

26.    **Plaintiff Daryl Lawrence**, age 50, was sentenced to death in August 2006 by the federal district court for the Southern District of Ohio. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ On information and belief, Defendant BOP initially determined that Mr. Lawrence was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Lawrence to ADX on May 30, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

27.    **Plaintiff Iouri Mikhel**, age 60, was sentenced to death in March 2007 by the federal district court for the Central District of California. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

On information and belief, Defendant BOP initially determined that Mr. Mikhel would be transferred to the Life Connections Program at USP-Terre Haute, a high-security penitentiary. █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ Nevertheless, BOP Defendants redesignated Mr. Mikhel to ADX on May 30, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

28.    **Plaintiff James Roane**, age 59, was sentenced to death in 1993 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ On information and belief, Defendant BOP

initially determined that Mr. Roane was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Roane to ADX on May 30, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

29.    **Plaintiff Julius Robinson**, age 49, was sentenced to death in June 2002 by the federal district court for the Northern District of Texas. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Robinson was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Robinson to ADX on or around June 3, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

30.    **Plaintiff Ricardo Sanchez**, age 41, was sentenced to death in 2009 by the federal district court for the Southern District of Florida. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ███████████████ ████████████████████████████████████████████████████████████ ███████████ On information and belief, Defendant BOP initially determined that, based upon his developmental disabilities, Mr. Sanchez was better suited for the SKILLS Program for people with intellectual disabilities located at a medium or high-security prison, and not appropriate for placement at ADX. ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████ Nevertheless, BOP Defendants redesignated Mr. Sanchez to ADX on May 28, 2025, and have denied all his administrative appeals of that redesignation decision in

accordance with the Redesignation Directive and Mandatory ADX Policy.

31.     **Plaintiff Richard Tipton**, age 55, was sentenced to death in 1993 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Tipton was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Tipton to ADX on May 28, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

32.     **Plaintiff Jorge Torrez**, age 37, was sentenced to death in May 2014 by the federal district court for the Eastern District of Virginia. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Torrez was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Torrez to ADX on or around June 3, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

33.     **Plaintiff Daniel Troya**, age 42, was sentenced to death in May 2009 by the federal district court for the Southern District of Florida. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. On information and belief, Defendant BOP initially determined that Mr. Troya was not appropriate for placement at ADX. Nevertheless, BOP Defendants redesignated Mr. Troya to ADX on or around June 3, 2025, and have denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

34.    **Plaintiff Alejandro Umaña**, age 42,[7] was sentenced to death in July 2010 by the federal district court for the Western District of North Carolina. President Biden commuted his death sentence to life without the possibility of parole on December 23, 2024. ███████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████    Nevertheless, BOP Defendants redesignated Mr. Umaña to ADX on May 28, 2025, and has denied all his administrative appeals of that redesignation decision in accordance with the Redesignation Directive and Mandatory ADX Policy.

**Defendants**

35.    **Defendant Donald J. Trump** is the President of the United States. He issued EO 14164 on January 20, 2025, and he is responsible for overseeing its implementation. He is sued in his official capacity.

36.    **Defendant Pamela J. Bondi** is the Attorney General of the United States. She oversees the U.S. Department of Justice ("DOJ") and is responsible for the enforcement and implementation of EO 14164. She issued the Bondi Memo, directing DOJ and BOP to implement EO 14164, on February 5, 2025. She is sued in her official capacity.

37.    **Defendant John Doe** is the Principal Associate Deputy Attorney General of the United States. The Principal Associate Deputy Attorney General is responsible for advising and assisting the Attorney General in formulating DOJ policies and programs, and for supervising and

---

[7] Mr. Umaña was born in 1982. BOP records incorrectly show the year of his birth as 1984.

directing all organizational units of DOJ. At the time Defendants began implementation of EO 14164 and the Bondi Memo, Emil Bove served as Principal Associate Deputy Attorney General of the United States. Since then, Defendant Trump appointed Mr. Bove to the United States Court of Appeals for the Third Circuit, the United States Senate confirmed that appointment, and Mr. Bove received his commission on August 20, 2025. Upon Mr. Bove's appointment, Defendant Doe recently assumed his responsibilities, including ensuring that the decision to reverse BOP's original redesignations and send all Plaintiffs to ADX is carried out. They are sued in their official capacity.

38.    **Defendant Paul R. Perkins** is the Associate Deputy Attorney General of the United States. The Associate Deputy Attorney General is responsible for advising and assisting the Attorney General and Deputy Attorney General in formulating DOJ policies and programs. At the time Defendants began implementation of EO 14164 and the Bondi Memo, Defendant Perkins assisted Mr. Bove in ensuring that the decision to reverse Defendant BOP's original redesignations and send all Plaintiffs to ADX was carried out. He is sued in his official capacity.

39.    **Defendant William K. Marshall, III** is the Director of Defendant BOP. The Director of Defendant BOP is responsible for the promulgation of BOP policies and for compliance with federal law and BOP policies. He is responsible for the placement and housing of all people in BOP custody. He is sued in his official capacity.

40.    **Defendant Joshua J. Smith** is the Deputy Director of Defendant BOP. The Deputy Director is responsible for ensuring Defendant BOP's compliance with federal law and BOP policies. Defendant Smith is continuing to carry out activities initiated by Kathleen Toomey, the former Associate Deputy Director of BOP, to ensure compliance with the Redesignation Directive

and Mandatory ADX Policy.[8] He is sued in his official capacity.

41.    **Defendant Shane Salem** is the Assistant Director of the Correctional Programs Division of BOP. He is responsible for overseeing BOP's classification and designation process and case management operations. He also has decisionmaking authority for redesignation of Plaintiffs to ADX. He is sued in his official capacity.

42.    **Defendant Erica Strong** is the Chief of the Designation and Sentencing Computation Center ("DSCC") within Defendant BOP's Correctional Programs Division. At the time Defendants began implementation of the Redesignation Directive, Rick Stover served as Senior Deputy Assistant Director of the DSCC, but he has since left this position. Defendant Strong is responsible for implementing and overseeing Defendant BOP's classification and redesignation process. Defendant Strong signed the denials of the first level of Plaintiffs' administrative appeals. She is sued in her official capacity.

43.    **Defendant Andre Matevousian** is the North Central Regional Director of the Defendant BOP. He is responsible for overseeing the operations and management of multiple BOP institutions in the North Central Region, including ADX. Moreover, he is responsible for concurring with the referrals of Plaintiffs to ADX made by the Warden at USP-Terre Haute. He is sued in his official capacity.

44.    **Defendant Federal Bureau of Prisons** is an agency of DOJ. It is responsible for the custody and care of all federally incarcerated people. It is charged by Congress with the management and regulation of federal penal and correctional institutions.

---

[8] Defendant Smith was sworn in as the Deputy Director on June 9, 2025.

## FACTUAL ALLEGATIONS

### Executive Order 14164 and the Bondi Memo

45.     On his first day in office, January 20, 2025, Defendant Trump issued EO 14164, which sought to punish the 37 people whose death sentences former President Biden had commuted to life without the possibility of parole. In the Executive Order, Defendant Trump directed the Attorney General (a position that was vacant at the time) to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden" to "ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." EO at § 3(e).

46.     EO 14164 makes clear Defendant Trump's contempt for the 37 people whose sentences were commuted (describing the 37 as "vile and sadistic" and "remorseless"). *Id.* at § 1.[9]

47.     EO 14164 also makes clear Defendant Trump's contempt for former President Biden's lawful use of his clemency power, referring to the 37 commutations as "efforts to subvert and undermine capital punishment, defy the laws of our nation, make a mockery of justice, and insult the victims of these . . . crimes." EO at § 1.

48.     On February 5, 2025, her first day as Attorney General, Defendant Bondi issued a memorandum implementing EO 14164 and specifically its provision directing the use of conditions of confinement as additional punishment for the 37 commuted people, including

---

[9] *See also, e.g.*, Dec. 25, 2025 Truth Social ("to the 37 most violent criminals, who . . . were just given, incredibly, a pardon by Sleepy Joe Biden. I refuse to wish a Merry Christmas to those lucky 'souls' but, instead, will say, GO TO HELL!"); Donald J. Trump (@realDonaldTrump), Truth Social, Dec. 24, 2024, https://truthsocial.com/@realDonaldTrump/posts/113707754946279224 ("Joe Biden just commuted the Death Sentence on 37 of the worst killers in our Country. When you hear the acts of each, you won't believe that he did this."); Team Trump Statement on Biden's Abhorrent Pardon Decisions, Dec. 23, 2024 ("These are among the worst killers in the world and this abhorrent decision by Joe Biden is a slap in the face to the victims, their families, and their loved ones."); Bernd Debusmann, Jr., *As Biden commutes death row sentences, how Trump plans to expand executions*, BBC (Dec. 23, 2024), https://perma.cc/X6GR-6G47

Plaintiffs. *See* Bondi Memo. Not only does the Bondi Memo specify that its purpose is "[r]estoring a measure of justice to the families of the victims of commuted murderers"; it continues to target the commutees specifically on the basis of their commutations, stating that the "commutations undermined our justice system[,] . . . subverted the rule of law[,] [and] . . . also robbed the victims' families of the justice promised." *Id.*

### BOP's Standard Process for Individualized Classification and Facility Placement Decisions

#### *The Institutional Designation and Redesignation Process*

49.    Federal law gives Defendant BOP the exclusive authority to determine the institutional placement of every person in its custody. *See* 18 U.S.C. § 3621(b).

50.    Under § 3621(b), Defendant BOP "shall" place a person within 500 miles of their primary residence, "subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons."

51.    Defendant BOP has a policy in place to address when persons may be designated and redesignated. The policy refers to the initial assignment of a person to a particular prison facility as the "designation" process. *See* Ex. 6 (PS 5100.08) at ch. 1, p.1. Defendant BOP uses the term "redesignation" to refer to the reassignment and transfers of people from facility to facility within the system. *Id*. at ch. 2, p.6. Both designation and redesignation use the same risk factors to classify people, although the redesignation process additionally requires BOP officials to "carefully review[]" and consider recent in-custody behavior and program performance while in prison. *Id*. at ch. 1, p.3.

52.    Under Defendant BOP's Program Statement 5100.08 (Inmate Security Designation and Custody Classification), the binding agency policy governing the designation and

redesignation process, BOP facilities are classified into one of five security levels: minimum, low, medium, high, and administrative. *See id.* at ch. 1, p.1.[10] This policy—which was last updated and approved by Defendant Smith's predecessor, Kathleen Toomey, on March 6, 2025, *see id.* at p.1— states that people are assigned to a prison based upon (a) the level of security and supervision they require, and (b) their "program needs," such as "substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment." *Id.* at ch. 1, p.1.

53.      Defendant BOP uses a database system called SENTRY to calculate security and supervision levels for people in its custody, and the scoring methodology is spelled out in Program Statement 5100.08. *See generally id.* at ch. 4 and 6. This policy also requires that Defendant BOP review these classification levels at least annually. *Id.* at ch. 6, p.1. Scoring variables for designation include, but are not limited to, the person's age, educational level, criminal history, history of violence, prior escapes and/or attempts, outstanding detainers from other jurisdictions, time to release, severity of their current offense, whether they voluntarily surrendered, and drug/alcohol abuse history. *Id.* at ch. 4, pp.5-7; ch. 6, pp.2-9. Once the person has been in custody, the SENTRY system also includes scores for review and possible redesignation, which include: percentage of time served, program participation, living skills and behavior in custody, the most serious and recent disciplinary incident reports (if any) for which the person was found guilty, the number of incident reports (if any), and efforts to build or maintain family/community ties. *Id.* at ch. 6, pp.9-16.

---

[10] "United States Penitentiaries (USPs)" are "high security institutions" with "highly secured perimeters (featuring walls or reinforced fences), multiple- and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement." BOP, *About Our Facilities*, https://perma.cc/TRN9-D3TN. An "Administrative Institution" is a facility "with a special mission, where inmates are assigned based on factors other than security and/or staff supervision (for example, medical / mental health, pretrial and holdover)" and are "designed to house all security level inmates." PS 5100.08, ch. 2, p.1.

### *Medical and Mental Health Classifications and Levels of Care*

54.    Defendant BOP classifies each of its prisons with an "Institution Care Level" based on the level of care it can provide to meet the medical and mental health needs of those it incarcerates. Ex. 4 (Care Level Guidance) at 1. BOP also assigns "Inmate Care Levels" to people it incarcerates based on their medical and mental health conditions. *Id.* The goal of these institutional and individual care levels is to ensure that "inmates can be assigned to the BOP institutions that can best meet their health care needs." *Id*.

55.    Institution Care Levels "are based primarily on the clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, e.g. dialysis, oncology, etc." *Id.* The "Inmate Care Levels" are determined by "their medical and/or mental health needs and are based primarily on the chronicity, complexity, intensity, and frequency of interventions and services that are required, as well as an inmate's functional capability." *Id*.

56.    For both people and prisons, Defendant BOP assigns a care level of 1 through 4. *See id.* at 1-3. The higher the number, the greater the medical or mental health needs (in the case of people) and the higher the level of care and services the prison can provide (in the case of institutions). *See id.*

57.    ADX has an Institution Care Level of 2 for both medical and mental health care. USP-Terre Haute, where Plaintiffs are currently incarcerated, has an Institution Care Level of 3 for medical health care and an Institution Care Level of 2 for mental health care.

58.    Defendant BOP defines Medical and Mental Health Care Level of 2 as appropriate for those whose conditions "can be managed through routine, regularly scheduled appointments with clinicians for monitoring." *Id*. at 2. Care Level 2 facilities cannot provide the care and treatment necessary for those who have serious medical or mental health needs, including people classified as having a Medical or Mental Health Care Level of 3 or higher.

59.     Defendant BOP describes the people it classifies as Medical Care Level 3 as "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." *Id.* at 3.

60.     Additionally, people assigned Medical Care Level 3 "may require assistance with some activities of daily living that can be accomplished by [incaceated person] companions," and "stabilization of medical or mental health conditions may require periodic hospitalization." *Id*. Examples of such conditions include, but are not limited to, cancer in partial remission, severe mental illness in remission on medication, severe congestive heart failure, and end stage liver disease. *Id*.

61.     The differences between a Care Level 2 facility and a Care Level 3 facility are significant, and a person may experience serious physical and mental harm if they are improperly placed at a facility that cannot meet their medical needs. Ex. 48 (Turner-Foster Decl.) ¶ 15.

62.     Mental Health Care Level 3 is for people who have "a mental illness requiring enhanced outpatient mental health care (i.e., weekly mental health interventions) or residential mental health care (i.e., placement in a residential Psychology Treatment Program)." Ex. 5 (PS 5310.16, CN-1) at 8. Defendant BOP classifies people with the following mental health conditions as Mental Health Care Level 3: two or more psychiatric hospitalizations in the past three years; psychotic illness treated with three or more anti-psychotic medications; multiple diagnoses treated with five or more psychotropic medications; or patients requiring outpatient contacts with a prescribing psychiatric clinician more frequently than monthly over an extended time period. Care Level Guidance 14. Defendant BOP classifies the following diagnoses as "serious mental illnesses": Schizophrenia Spectrum and Other Psychotic Disorders, Bipolar and Related Disorders,

and Major Depressive Disorder. PS 5310.16, CN-1, p.2. And Defendant BOP policy specifies that the following diagnoses are "often" classified as serious mental illnesses, "especially if the condition is sufficiently severe, persistent, and disabling": Anxiety Disorders, Obsessive-Compulsive and Related Disorders, Trauma and Stressor-Related Disorders, Intellectual Disabilities and Autism Spectrum Disorders, Major Neurocognitive Disorders, and Personality Disorders. *Id*. at 2-3.

63.     Defendant BOP has separate facilities for people with mental illness, including severe mental illness, including FMCs in Springfield, Butner, Rochester, and Devens; High Security Mental Health Step-Down Units at USP-Atlanta and USP-Allenwood; and the High Security STAGES Program at USP-Florence.[11] It also has a SKILLS program for people with intellectual disabilities and high support needs at the Federal Correctional Institution-Coleman.

64.     Upon information and belief, *see supra* ¶¶ 18-34, Defendant BOP had initially determined that redesignation to one or more of these specialized facilities was appropriate for many of Plaintiffs who display serious mental health symptoms, are diagnosed with serious mental illnesses, and/or have developmental disabilities.

65.     Finally, Care Level 4 is the highest level, for both people and prisons. People with a Medical or Mental Health Care Level of 4 require services that are only available at a BOP Medical Referral Center, "which provides significantly enhanced medical services and limited inpatient care," including for people whose functioning is "so severely impaired as to require 24-hour skilled nursing care or nursing assistance." Care Level Guidance 3. Examples of such conditions include candidates for major joint or certain ligament surgery, renal failure requiring dialysis, functional limitations due to cognitive or physical impairment that prevent successful

---

[11] USP-Florence is a separate facility from ADX.

management in general population and/or require assistance in performing activities of daily living or the use of durable medical equipment, and certain stages of heart failure, among other conditions. *Id*. at Appx.

### BOP Policies Governing the Process for Redesignation to ADX

66.     Program Statement 5100.08 sets forth specific procedures and placement criteria that must be followed before someone can be redesignated from any federal prison to ADX. PS 5100.08 at ch. 7, pp.17-19. ADX's "general population units are designed for male inmates *who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution*." *Id.* at ch. 7, p.17 (emphasis added). Accordingly, "[p]rior to referring an inmate to . . . ADX Florence, redesignation to another high security institution should be considered first." *Id.*; Ex. 8 (Gibson Decl.) at 5 (former BOP classification official of 32 years explaining presumption against ADX placement in BOP policy). As detailed in ¶¶ 7-81, Defendant BOP adhered to this Program Statement immediately following the December 2024 commutations and before the implementation of the Redesignation Directive and Mandatory ADX Policy.

67.     Given that the solitary confinement conditions at ADX are so much more restrictive than conditions in its other prisons, *see infra* ¶¶ 116-31 (describing conditions of confinement at ADX), BOP policy prohibits the referral of people with serious mental illnesses to ADX. *See* PS 5100.08 at ch. 7, p.18; Gibson Decl. at 2, 9.

68.     Defendant BOP also has adopted a separate and additional set of procedures that govern designation or redesignation to ADX. A BOP Memorandum dated October 15, 2012, sets out the procedures to be followed before a person may be designated (or redesignated) to ADX. *See* ADX Referral Memo. It expressly states that the decision to redesignate a person to ADX lies exclusively with BOP: "The [BOP's] Designation and Sentence Computation Center has the

responsibility" for processing referrals to ADX, and "[p]lacement of inmates in the ADX-[General Population] is at the discretion of the Assistant Director [of BOP's Correctional Programs Division in its] Central Office." *Id*. at 1.

69.     The ADX Referral Memo requires that any person referred to ADX's "general population" must meet one or both of the following criteria: that the person's "placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety," and that due to the person's "status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution." *Id.* at Attach. A, p.1; *see also* Gibson Decl. 5.

70.     Recognizing that the conditions of confinement in ADX are much more restrictive than any other BOP facility, Defendant BOP's 2012 ADX Referral Memo provides for multiple levels of review before a person can be redesignated to ADX.

71.     The first step in the ADX redesignation process is for staff at the institution where the person is housed to submit an ADX referral packet to the warden for review. As part of that process, a mental health evaluation is required, including the clinical evaluator's conclusion as to whether any psychological factors would preclude the person's placement at ADX.[12] The packet is only forwarded to the Regional Director for the region in which the person is located if the warden concurs with the referral. ADX Referral Memo, Attach. A, p.3.[13]

---

[12] This is because, ordinarily, seriously mentally ill persons (classified as those with Mental Health Care Level 3 or higher) are excluded from placement at ADX. PS 5310.16, CN-1, p.18; *see also* PS 5100.08, ch. 7, p.18 (requiring "a recent psychiatric or mental health evaluation" as part of the ADX referral packet). ████████████████████████████████████████████████ ████████████████████████

[13] Both ADX and USP-Terre Haute are located in the North Central Region of BOP; Defendant Matevousian is the North Central Regional Director.

72.     Only if the Regional Director concurs with the ADX referral does the process proceed to the next step, which is for staff at Defendant BOP's DSCC to review and consider whether placement at ADX is appropriate. *Id.*

73.     Only if DSCC staff determine that the person warrants consideration for placement in ADX will the DSCC move forward with the referral.[14] At that point, a BOP Hearing Administrator is assigned to conduct a hearing on the appropriateness of the person's placement at ADX. At the same time, in recognition of the harm that the severely isolating conditions of confinement at ADX inflict on people with mental illness, Defendant BOP's Psychology Services office conducts a review of the psychological assessment of the person to determine whether their mental health is such that they are psychologically precluded from placement at ADX. *Id.*

74.     Before the hearing, the person must receive a hearing notice containing "specific evidence which forms the basis for the referral" to ADX. *Id*. at 6. They are also entitled to a copy of the "Administrative Procedures for Transfer to the ADX-General Population." *Id.*

75.     At the hearing, the incarcerated person may be present, make a statement, and present evidence to the Hearing Administrator. *Id.* at 6-7.

76.     After the ADX referral hearing, the Hearing Administrator prepares a written recommendation for the Assistant Director of Defendant BOP's Correctional Programs Division (currently Defendant Salem) as to whether placement at ADX is warranted. *Id*. at 7. The incarcerated person receives a copy of the Hearing Administrator's recommendation. *Id.*

77.     Defendant Salem, the Assistant Director of the Correctional Programs Division, has decisionmaking authority as to whether to accept or reject the Hearing Administrator's

---

[14] If DSCC staff believe that the person is not appropriate for ADX placement, they will notify the referring warden.

recommendation about whether the person should be redesignated to ADX. *Id.* at 8.

78.    If the Assistant Director of the Correctional Programs Division decides to redesignate the person to ADX, the person can appeal that decision. *Id.* at 8. It is longstanding BOP practice not to transfer a person to ADX during the pendency of an administrative appeal of a decision to send him there. *Taylor I*, ECF No. 40 at 22-23.

### BOP Initially Follows Applicable Law and Policy and Concludes That No Plaintiff Should Be Sent to ADX

79.    After President Biden commuted the sentences of the 37 people on federal death row, Defendant BOP began the redesignation process required by statute and BOP policy.

80.    This process is outlined in Program Statement 5100.08. This process has always been the standard course when death sentences are vacated either by courts or presidential clemency. Indeed, on at least 18 prior occasions, Defendant BOP has followed statutory and policy requirements when it considered redesignation for people whose federal death sentences were vacated. Each of them was redesignated from federal death row to other high-security USPs. None of those 18 people was redesignated from federal death row to ADX. Ex. 10 (Patton Decl.) ¶¶ 4-7.

81.    BOP continued its normal redesignation process throughout January and the beginning of February 2025 and found that none of the Plaintiffs were appropriate for transfer to ADX. As required by Program Statement 5100.08, the DSCC, represented by then-Senior Deputy Assistant Director Stover, made the final decision regarding redesignation placement.

82.    Using the process required by statute, regulation, and BOP policy, Defendant BOP concluded that each Plaintiff should be sent to a high-security USP or FMC, including facilities with Institutional Medical and Mental Health Care Levels adequate to provide care and treatment for those Plaintiffs with serious medical and mental health needs, and/or developmental

disabilities. *See supra* ¶¶ 18-34. Despite their high-security classification, these prisons have conditions that are all materially less restrictive than conditions at ADX.

83.    For example, Plaintiff Fulks was classified as Medical Care Level 3. ████



During the redesignation process that took place shortly after his commutation, Mr. Fulks's counsel requested that he be sent to an FMC; they received no indication from Defendant BOP that he would be sent to ADX. Indeed, when Mr. Fulks' counsel asked if ADX could accommodate Mr. Fulks's medical needs, BOP classification staff told him that ADX was not a Care Level 3 facility. Ex. 35 (Williams Decl.) ¶¶ 4, 14.

84.    Plaintiff Hall is also classified as Medical Care Level 3 ████████████

████████████████████████████████. In fact, due to the severity of his medical conditions, prior to his commutation by President Biden, Mr. Hall was incarcerated from December 2021 to May 2023 at FMC-Butner, instead of the SCU at USP-Terre Haute, without any disciplinary incidents. After the commutation, and prior to Defendant Trump's issuance of EO 14164, Defendant BOP told Mr. Hall's counsel that he would be designated to an FMC or another BOP facility equipped to handle patients at Medical Care Level 3. Ex. 30 (Patti Decl. (Hall)) ¶¶ 5-7.

85.    While Defendant BOP preliminarily identified two Plaintiffs (Mr. Hall and Mr. Umaña) as potential candidates for referral to ADX, they were subsequently *excluded* from ADX placement due to their serious medical and/or mental health conditions that cannot be adequately managed there. *See* Ex. 26 (Miller Decl.) ¶¶ 31, 42, 44; Patti Decl. (Hall) ¶¶ 12, 14.

**Effect of EO 14164 and the Bondi Memo on Plaintiffs:**
**The Redesignation Directive and the Mandatory ADX Policy**

86.     According to established BOP policy, the redesignation determinations made by Defendant BOP staff in January and February 2025 for all Plaintiffs should have been final. DSCC has final say on redesignation decisions outside of ADX, and its representative was part of this process. *See supra* ¶¶ 80-81.

87.     Instead, after Defendant Trump issued EO 14164 and Defendant Bondi issued her Memo—and not otherwise permitted by 18 U.S.C. § 3621(b) or Program Statement 5100.08—the Attorney General and the Office of the Deputy Attorney General ("ODAG") inserted themselves into Defendant BOP's redesignation process. Following the issuance of EO 14164, all redesignation placements now needed to be presented to the Attorney General and ODAG for "discussion and approval." Ex. 15 (Bizzaro Decl.) ¶ 26; Ex. 25 (Meredith Decl.) ¶ 18 (explaining that "because of the Executive Order, the BOP had been directed to present to the Office of the Deputy Attorney General ('ODAG') a proposal or plan"). Previously, neither the Attorney General nor ODAG were involved in the BOP redesignation process. Meredith Decl. ¶ 28; Ex. 24 (Lee Decl.) ¶ 16; Gibson Decl. 4 ("In my 14 years working in United States Penitentiaries . . . , I have never known of any of these [referrals] to have been reviewed by any entity outside of [BOP], including by the ODAG, the Attorney General or the President.").

88.     In late January 2025, in a meeting between Defendant BOP staff and ODAG, BOP staff presented its individualized placement redesignation determinations for the commutees, which included recommendations that all Plaintiffs be sent to either USPs or FMCs. Meredith Decl. ¶ 32. On information and belief, Mr. Bove—Defendant Doe's predecessor—and Defendant Perkins orchestrated and oversaw this meeting.

89.     Following that meeting, ODAG unprecedently and unlawfully rejected Defendant

BOP's individualized placement decisions that were made in accordance with Program Statement 5100.08 and ordered that all Plaintiffs be sent to ADX. *Id.*; Ex. 17 (Brown Decl.) ¶ 8; Ex. 16 (Brady Decl.) ¶ 10; Meredith Decl. ¶¶ 33-34; Ex. 31 ((Patti Decl. (Kadamovas)) ¶ 8 ("BOP committee members had been informed that the President and [the] Attorney General's office were indicating that everyone needed to be referred to ADX."); Ex. 27 (Mooney Decl.) ¶ 11 ("Mr. Synsvoll confirmed that prior to President Trump's Executive Order, the BOP had decided to redesignate Mr. Troya to a U.S. Penitentiary. Post-Executive Order, Mr. Synsvoll stated that Mr. Troya should expect designation to ADX."). After the Bondi Memo was issued, all recipients of death sentence commutations received ADX Referrals and were thrown into the redesignation process for a second time. Newberry Decl. ¶ 41.

90.    As a result of interference and overruling by Defendants Bondi, Perkins, and Mr. Bove—Defendant Doe's predecessor who reviewed Defendant BOP's prior redesignation determinations—and in violation of BOP's current redesignation policy, Defendant BOP adopted the Mandatory ADX Policy, a new, unwritten policy to categorically refer all Plaintiffs for redesignation and transfer to ADX. BOP Defendants went through the motions of a review process a second time, under the pretense that ADX redesignations for all Plaintiffs were not a foregone conclusion. ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████

---

[15] Moreover, prior to, or in conjunction with, the sham ADX referral process, ██████████████████

██████████████████████████████████████████████████████

91.    Beginning the first week of April 2025, Defendant BOP issued ADX Hearing Notices for all Plaintiffs. Because Defendants had predetermined that all Plaintiffs would be sent to ADX, these Notices—and the rest of the ADX redesignation process—were a sham.

92.    Some of Plaintiffs' Hearing Notices stated that they now had Security Threat Group ("STG") assignments of "Death Row Inmate." According to Defendant BOP, a Security Threat Group is defined as an "inmate group, gang, or organization acting in concert to promote violence, escape drug, or terrorist activity."[16] Plaintiffs—who no longer have death sentences—had never before been given an STG assignment by Defendant BOP solely because of having once been under a death sentence. These allegations are baseless and untrue for each Plaintiff.

93.    Defendant BOP provided cookie-cutter grounds for ADX referral in Plaintiffs' ADX Hearing Notices. Most of Plaintiffs' ADX Hearing Notices included the following identical grounds for referral to ADX: "The inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety"; "[a]s a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution"; and "[t]he inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting." *See* Ex. 11 (Kadamovas Hrg. Notice). These statements are uniformly false.

94.    Then, beginning in the second week of April 2025, BOP Hearing Administrators conducted ADX hearings by videoconference for each Plaintiff. Many Plaintiffs spoke at their hearings, disputing the bases for referral to ADX; some submitted written statements. Plaintiffs directed the Hearing Administrators to evidence supporting placements other than ADX, such as

---

[16] Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Federal Bureau of Prisons' Management of the National Gang Unit*, at i (2024), https://oig.justice.gov/sites/default/files/reports/24-115.pdf.

their successful programming, clean disciplinary records, healthcare needs, and the injuries they would suffer and the losses they would incur if subjected to extreme isolation at ADX. *See, e.g.*, Ex. 13 (Taylor Hrg. Rpt.).

95.    For example, Plaintiff Jackson arrived at his hearing with information, including a BOP Psychology Services ADX Referral Mental Health Evaluation, demonstrating that he was not a threat to staff or others incarcerated. Mr. Jackson presented this evidence to the Hearing Administrator, Joseph Brian Wilson, and directly asked Mr. Wilson whether he would be recommended for ADX placement regardless of what information was presented at the hearing. Mr. Wilson confirmed that EO 14164 and the Bondi Memo required Mr. Jackson to be referred to ADX. Mr. Wilson said that, as an inferior in the hierarchy of Defendant BOP, he had no choice but to comply with EO 14164 and the Bondi Memo, which ordered all 37 commuted individuals to be recommended for ADX placement regardless of contrary evidence. Ex. 55 (Jackson Decl.) ¶ 8.

96.    Unsurprisingly, following each Plaintiff's hearing, and in some cases within minutes or hours, the Hearing Administrators recommended that ADX placement was "warranted" for every one of them. *E.g.*, Ex. 33 (Taylor Decl.) ¶ 17 ("Just two hours later, I received his recommendation that I be sent to ADX."); *id.* ¶ 19 (referring to himself and nine others with similar hearings: "We all received our respective Hearing Administrator's Report and recommendation for ADX within a few hours after our hearings."); Ex. 22 (G. King Decl.) ¶ 13 ("On April 7, 2025, Mr. Tipton telephoned and informed me that he had attended his hearing that morning and had within hours received a decision from the hearing officer that recommended his designation to ADX.").

97.    Just as most Plaintiffs' Hearing Notices included identical grounds for referral, the

Hearing Administrator's Reports included, invariably, at least three identical grounds for designation: "The inmate's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety"; "[a]s a result of the inmate's status, either before or after incarceration, the inmate may not be safely housed in the general population of another institution"; and "[t]he inmate has notoriety to the extent that the inmate's well-being would be jeopardized in a less secure setting." *E.g.*, Taylor Hrg. Rpt.; *see* Taylor Decl. ¶ 20 ("All of us saw the same placement criteria listed to support our placement in the ADX[.]"). These grounds are baseless and untrue for each Plaintiff.

98.     In turn, in the narrative section under the header "Recommendation," each Report contained similar, cookie-cutter verbiage recommending placement at ADX. This language concluded that President Biden's commutation of any given Plaintiff's death sentence "'does not negate his serious criminal convictions and his inability to safely remain at any general population setting[,] . . . [and] . . . [h]is lengthy record of being housed in solitary confinement would show his inability to safely be housed at any general population setting.'" *See* Taylor Decl. ¶¶ 19-21 (quoting Taylor Hrg. Rpt. and noting that nine other commutees' reports contained similar language).[17] And Defendant BOP never explained why it was reversing its prior conclusions—reached recently and through its existing policy—that Plaintiffs should not be placed in ADX.

99.     These Reports also concluded invariably—and despite the unique circumstances, medical and mental health needs, carceral conduct, and criminal record for each Plaintiff—that "a threat is present if the inmate were to remain at any general population (GP) facility in the Bureau

---

[17] Of course, the determination that, because Plaintiffs have been held in solitary confinement in the SCU, they are unable to be safely housed in open population conditions is further evidence of the sham process engaged in by Defendants. Pursuant to BOP policy, everyone in the SCU—who is there solely by virtue of a death sentence—is held in solitary confinement. *See, e.g.,* First Am. Compl., *Kadamovas v. Dir., Fed. Bureau of Prisons*, No. 23 Civ. 22 (S.D. Ind. Dec. 13, 2023).

of Prisons (BOP)." *Id.* ¶ 21(quoting Taylor Hrg. Rpt.). These grounds are baseless and untrue for each Plaintiff.

100.    Further, some Reports included statements attributed to Plaintiffs that they did not make. For example, Mr. Taylor's Hearing Administrator Report stated that he said that he had been incarcerated for 10 years. He did not say this, as he has been on death row for approximately 16 years. *Id.* ¶ 22. Mr. Lawrence's Hearing Administrator Report also falsely attributed at least three statements to him regarding his criminal conviction, prior substance use, and EO 14164; Mr. Lawrence did not make these statements. Ex. 66 (Lawrence Decl.) ¶¶ 8, 10, 13. The Report also incorrectly stated that Mr. Lawrence was 44 years old when he was 49 years old on the date of his hearing, mischaracterized his religious preferences and incarceration history, and failed to include information he presented at his hearing. *Id.* ¶¶ 6-7, 11-12.

101.    According to BOP policy, Defendant Salem, Assistant Director of Defendant BOP's Correctional Programs Division, needed to accept or reject the Hearing Administrator Report recommendations, "ordinarily within 30 working days of its receipt." ADX Referral Memo 8. As required by the clear direction from the Redesignation Directive, Defendant Salem accepted the Hearing Administrator Report recommendations for all Plaintiffs and ultimately redesignated them to ADX. Plaintiffs began receiving their ADX General Population Placement Decisions on or after June 3, 2025.

102.    Upon information and belief, Defendants had planned to transfer Plaintiffs to ADX in April, but Defendants changed course after Plaintiffs sued to stop the transfers.

103.    Defendants represented to the *Taylor I* Court that they would not initiate transfers until Plaintiffs could complete the administrative appeal process. *See Taylor I*, Defs.' Opp'n to Pls.' Mot. For Prelim. Inj., ECF No. 40. Plaintiffs timely and diligently filed their administrative

appeals. *See* Stull Decl. ¶¶ 67-71, 73-74, 80.

104.    Upon completion of that process, Plaintiffs voluntarily dismissed their claims from *Taylor I* and filed the instant complaint to allow their claims to be heard on the merits and to stop their unlawful transfers to ADX.

105.    Defendants agreed to not transfer Plaintiffs to ADX before October 31, 2025. Stull Decl. ¶ 72.

106.    Indeed, pursuant to the Redesignation Directive and Mandatory ADX Policy, Defendants have already begun to effectuate the transfers of some of the 37 people whose death sentences had been commuted by President Biden, none of whom are Plaintiffs. On September 23, 2025, Defendants transferred eight of those individuals to ADX. Transported by buses that left Terre Haute in the middle of the night, the eight men were fully shackled—with leg irons, handcuffs and black boxes, and belly chains to which their handcuffs were attached—for the entire 18-hour drive. The transfers occurred overnight and in such haste that the people transferred received no inventories of their property.

107.    Defendant Bondi announced her satisfaction in punishing the recipients of President Biden's commutations by transferring them to ADX. On September 25, 2025, Defendant Bondi announced on X, "We have begun transferring the monsters Biden commuted to Supermax prisons,"—*i.e.*, ADX—"where they will spend the rest of their lives in conditions that match their egregious crimes."[18] Additionally, Defendant Bondi proclaimed during an Oval Office press conference with Defendant Trump that "we are now moving the inmates who were on death row who Joe Biden or the autopen commuted their sentences off of death row. We're moving them to

---

[18]  Attorney General Pamela Bondi (@AGPamBondi), X (Sept. 25, 2025, 1:47 PM), https://perma.cc/88AY-XYGW.

supermax facilities where they will be treated like they're on death row for the rest of their lives."[19]

Much like Defendant Trump's social media statements from December 2024 and January 2025, Defendant Bondi expressed Defendants' desire to reverse President Biden's commutations, calling them a "stain on our justice system." Moreover, several Justice Department officials have said it is appropriate to target the commutees for the harshest possible punishment and confirmed that "Bondi has prioritized ways to penalize these individuals, in coordination with the directives from Trump."[20]

108.    These statements—confirming the intent to send Plaintiffs to ADX in order to punish them——were made before any of Plaintiffs had completed the administrative appeal process afforded by the 2012 ADX Referral Memo.

109.    The language of EO 14164, the Bondi Memo, and Defendant Trump and Defendant Bondi's social media posts and public comments show an explicit intent to wantonly inflict additional punishment on Plaintiffs for no reason other than their having received commutations of their death sentences from President Biden, and they reveal the motive behind the predetermined redesignation decisions to ADX for all Plaintiffs. Defendants' redesignations of Plaintiffs to ADX cannot reasonably be said to further nonpunitive purposes. The redesignations of Plaintiffs to extreme solitary confinement conditions at ADX, as described below, despite Defendant BOP's

---

[19]    Eric    Daughterty    (@EricLDaugh),    X    (Sept.    25,    2025,    5:05    PM), https://x.com/EricLDaugh/status/1971320125371691048.

[20]    Breanne Deppisch, *Bondi Transfers Former Death Row Inmates Commuted by Biden to 'Supermax Prison'*, Fox News (Sept. 24, 2025, 7:49 PM), https://perma.cc/2CET-S299; *see also* Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://archive.ph/iy8G5 (noting that then-Assistant Attorney General "[Aaron] Reitz said it was appropriate to single out the convicted murderers Biden commuted. 'We wanted to focus on that very recent, very tangible and particularly gross injustice . . . .'").

prior policy-based determinations that less restrictive USP facilities were appropriate placements for Plaintiffs, were purely for vindictive, punitive purposes.

110.    Even apart from any hostile intent, the Mandatory ADX Policy to redesignate and transfer all Plaintiffs to ADX departs from Defendant BOP's statutory duties and preexisting policy that has not been rescinded.

111.    Under 18 U.S.C. § 3621(b), Defendant BOP is required to engage in an individualized determination that considers a range of enumerated factors when redesignating a person from one facility to another.

112.    Program Statement 5100.08 also requires Defendant BOP to engage in an individualized redesignation process, and it too requires the agency to consider a range of factors, including, among other things, a person's "institutional adjustment and program performance."

113.    Program Statement 5100.08 makes clear that ADX is reserved for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution," and it requires that Defendant BOP consider redesignation to another high security institution before transfer to ADX, which cannot occur unless "transfer to another institution is not appropriate."

114.    Program Statement 5100.08 imposes binding obligations on Defendant BOP and is applied as binding within the agency when redesignating individuals from one facility to another, including ADX. Like all BOP Program Statements, Program Statement 5100.08 prescribes permanent BOP policies and procedures that establish internal, agency-wide instructions and requirements with which the agency strictly complies.

115.    By ordering that Plaintiffs be subjected to "monstrous" conditions of confinement *because* of their receipt of commutations from President Biden, Defendant Trump's Executive

Order also seeks to diminish or impair the effect of his predecessor's exercise of his Article II clemency powers.

**Conditions in ADX Compared to High-Security USPs**

*Conditions in ADX*

116.    DOJ describes ADX as the most restrictive federal penitentiary in the country.[21] ADX is in a remote, high-desert area of Colorado, and its design is intended to force people to live in near-total isolation. People spend 22 to 24 hours a day locked alone in small cells built expressly for severe sensory deprivation and to minimize any human contact, including contact with prison staff. Gibson Decl. 7. Of all people incarcerated in federal prisons, only 0.26% of them are located at ADX.[22]

117.    Defendant BOP denies that it uses solitary confinement, instead preferring the euphemism of "restrictive housing." Yet as noted by Dr. Craig Haney, an expert on the psychological effects of solitary confinement who has visited ADX multiple times, the specific nomenclature is irrelevant, as "the conditions at ADX . . . are solitary confinement by any other name." Ex. 9 (Haney Decl.) ¶ 28. Dr. Haney states "that 'solitary confinement' is a term of art in correctional practice and scholarship. . . . [T]he term is generally used to refer to conditions of extreme (but not total) isolation from others." *Id.*[23]

---

[21] U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing* 38 (2016), https://perma.cc/Q468-5R8J.

[22] There are currently 141,888 individuals in BOP custody and only 378 of them are located at ADX. *See* Fed. Bureau of Prisons, *Statistics: Restricted Housing* (last updated Oct. 16, 2025), https://perma.cc/JJD5-EDRD.

[23] In fact, DOJ itself uses a similar definition, stating that "the terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. . . . An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation." U.S. Dep't of Just., *Letter to the Honorable Tom Corbett Re: Investigation of the State Correctional Institution at*

118.    One man incarcerated at ADX for over a decade described ADX as "a prison where the building becomes the shackles" and described his cell as a "boxcar" and a "cage within a box encased by concrete . . . designed to suppress human sound and constrain the five senses." [24]

119.    In ADX "general population," people live, sleep, eat, bathe, and defecate in cells that measure 7 by 12 feet, smaller than a standard parking space, with solid walls of concrete and steel doors with a small slot for passing food trays; each cell contains a concrete bed with a thin mattress, concrete desk and stool, and a stainless steel sink/toilet and shower that releases water in 90 second increments and can be cut off by staff.[25] As a result, and unlike in state supermax prisons, people in ADX do not leave their cells even for occasional showers.[26] People eat all meals alone in their cells, within arm's reach of their toilets. There is one small window about four inches wide and three feet tall, which allows some diffused natural light but is angled to allow only views of cement and sky.[27]

120.    Cell walls are bare; policies restrict people from hanging any drawings or photos that might humanize or personalize the cell, including photographs of family members, children's artwork, or calendars. Other than a small amount of "designated legal material" totaling three cubic feet, personal property must fit in a designated storage bag. People are not allowed to have more

---

*Cresson and Notice of Expanded Investigation* 5 (May 31, 2013), https://perma.cc/V829-U6BS (citing *Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) and *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990)).

[24] Voices from Solitary, *"Voices from Solitary: A Prison Where the Building Becomes the Shackles,"* Solitary Watch (Nov. 27, 2013), https://perma.cc/G8YJ-U6T8.

[25] Haney Decl. ¶¶ 15-18.

[26] *Id.* ¶ 18; *see* D.C. Corrs. Info. Council, *USP Florence Administrative Maximum Security (ADX) Inspection Report and USP Florence-High Survey Report* 11-12 (Oct. 31, 2018) (hereafter "DC CIC Inspection Report"), https://perma.cc/EDS6-8ZYC.

[27] DC CIC Inspection Report at 12.

than two pencils and two pads of paper in their cells. ADX staff can impose a "property restriction sanction," which forbids a person from having any property in his cell other than a toothbrush, toothpaste, soap, and shampoo. Below are photographs of the sparse cells in which people are confined nearly all day, every day:

 

121.    To the extent there is any programming, such as religious or educational services, or self-improvement treatment like anger management, it occurs over closed-circuit televisions in the cells. No group prayer or congregate religious services are offered; opportunities for religious worship consist of occasional one-on-one cell front visits by clergy.

122.    According to Dr. Haney, the mental health evaluations that are supposed to happen at ADX to identify potential symptoms of mental illness and psychological deterioration from the profound isolation "are typically superficial and pro forma, often lasting for no more than a few minutes and occurring 'cell-front'—that is, through the steel door of the cell. This is especially

---

[28] *Id.* at 11.

[29] Haney Decl. ¶ 18; *see* Amnesty Int'l, *Entombed: Isolation in the U.S. Federal Prison System* 9 (July 2014), https://perma.cc/L65R-A5RQ.

problematic given BOP's own guidelines and criteria state that ADX is not equipped to incarcerate people with serious psychiatric conditions." Haney Decl. ¶ 20. Any interactions with other human beings are with custody or health care staff and are infrequent, sporadic, and routinized, amounting to at most a few minutes a week of verbal exchanges that occur through the solid cell doors. *See* Ex. 45 (E. King Decl.) ¶ 27. There are two layers of doors: an outer solid steel door with a slot for food and an inner door of bars. Haney Decl. ¶ 15.



123.    "Recreation," when custody staff actually offer it, is limited to exercising alone in an indoor room, in an outdoor area with high concrete walls, or in individual outdoor cages referred to as "dog runs" because they resemble animal kennels. The cages only allow one to walk a few steps. While outside, people cannot see the horizon; they may only glimpse the sky above them and even that is through bars. *Id.* ¶¶ 24-25.







124.    Contact with the outside world is also severely restricted at ADX. Incarcerated people may have four 15-minute, monitored and recorded phone calls a month. All "social" (non-legal) visits are conducted on a "non-contact" basis, through a thick glass window and over a phone, so that there is never any physical contact between an incarcerated person and his visitors. Incarcerated people are only permitted five social visits per month, but in practice have much fewer than that due to ADX's remote location, often far from loved ones or family. Below is a photograph of where incarcerated people at ADX sit while having visits.



125.    The same is true of legal visits, which are non-contact and conducted through a thick glass partition. As there are only four legal visiting booths at ADX, legal visits are difficult to schedule, as are legal phone calls (which are often limited to just 30 minutes). Recently, Defendant BOP ADX has adopted a new practice of charging the people incarcerated at ADX for telephone calls with their lawyers.

126.    Many incarcerated people at ADX report that they refuse to go to recreation or discourage people from visiting, because they are subjected to harsh strip searches when leaving and entering their cells. Exercise time is often cancelled, and ADX regulations allow staff to suspend incarcerated people's right to exercise indoors or outdoors for up to three months at a time for a single rule violation, for engaging in acts of self-harm or suicide attempts, or for acting in ways that reflect severe mental health decompensation (for example, smearing feces on their cell walls).

127.    Dr. Haney concludes that "[t]he conditions of confinement that prevail at the federal

41

supermax ADX facility constitute a severe, extreme form of solitary confinement. In fact, the conditions that have been created and the procedures that are followed at ADX are more socially isolating than those at any correctional facility that I have personally toured and inspected or of which I am aware anywhere in the United States." Haney Decl. ¶ 98.

128.    A well-documented and overwhelming scientific consensus confirms that the use of isolation in carceral settings is psychologically and physically harmful, and often inflicts devastating, irreversible harm on people that can persist even after their time in solitary confinement has ended. At times, prolonged solitary confinement can be fatal. *See generally id*. ¶¶ 33-46. As a result, current correctional professional standards strictly limit the use of solitary confinement, *id*. ¶ 78, which is reflected in the detailed BOP policies and regulations around the process for placing people at ADX, and restrictions on its use for people with diagnosed mental illnesses, as described above in ¶¶ 64-76.

129.    Dr. Haney writes that "[t]he prolonged absence of meaningful human contact and social interaction, the enforced idleness and inactivity, the oppressive security and surveillance procedures, and the accompanying hardware and other paraphernalia that are brought or built into these units combine to create harsh, dehumanizing, and deprived conditions of confinement. These conditions predictably impair the psychological and behavioral functioning of many of the prisoners who are subjected to them." *Id*. ¶ 32.

130.    Psychological harm from prolonged isolation has been documented for at least five decades. For example, a landmark report from 1975 studying men placed in isolation in New York prisons found that even if they did not have diagnosed mental illnesses prior to placement in solitary confinement, many developed symptoms of "rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents

of self-harm." *Id.* ¶ 35. Later studies of people subjected to solitary confinement documented other adverse psychological symptoms, including appetite and sleep disturbances, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation. *Id.*

131.    In acknowledgement of the extreme conditions of solitary confinement at ADX, Defendant BOP policy specifies that a psychological evaluation is a required component of all referrals to ADX. That is because people who are "seriously mentally ill"—meaning BOP classified them at a Mental Health Care Level of 3, *see supra* ¶ 58—"are diverted from . . . ADX placement" and people with a Mental Health Care Level of 4 "are not placed" at ADX, as BOP policy specifies that "the appropriate placement for these inmates is a Psychiatric Referral Center." PS 5310.16, CN-1, 18. Also excluded are those whose "placement would interfere with [their] participation in necessary mental health treatment interventions," those whose "mental health disorders or cognitive limitations make it unlikely he/she could successfully progress through the phases of" ADX, and those whose "placement is likely to exacerbate [their] mental health condition." *Id.* The only way that a person with a Mental Health Care Level of 3 or who meets one of the above three criteria can be designated to ADX is if Defendant BOP makes a finding that the person has "extraordinary security needs" that "cannot be managed elsewhere." *Id.*

132.    While the damaging psychological effects of solitary confinement are relatively well-known, the physical effects are no less harmful. For example, a 2020 study of the physical effects of solitary confinement on people in the custody of the State of Washington's Department of Corrections found negative health outcomes including "severe Vitamin D deficiency due to a lack of natural direct light exposure, skin rashes, weight fluctuations, and chronic musculoskeletal

pain and deterioration (which can lead to arthritis, osteoporosis, and muscle weakness) due to the inability to engage in large-muscle exercise or walk more than a few steps in a cell or exercise cage." Haney Decl. ¶ 36. Moreover, this study found "long delays for receiving care (either at the prison or off-site) for chronic medical conditions, due to the security restrictions on movement within the prison, or to travel off-site to hospitals and specialists." *Id.*

### Conditions at High-Security USPs

133.    In contrast to the extreme conditions at ADX, all of which are designed to inflict maximum sensory deprivation and human isolation, in the typical general population unit at a high-security USP, incarcerated people are permitted to be outside their cells nearly all day, every day. Although conditions overall are still highly restrictive, BOP regulations and policies permit them to eat communally, engage in large-muscle exercise outside with others, attend educational and vocational programming in classrooms with others, work prison jobs and earn money, and attend congregate religious services in communion with others. *See, e.g.*, 28 C.F.R. § 544 (setting forth post-secondary and occupational educational programming options). They have access to (monitored) email communications with loved ones via a tablet. They are allowed 300 minutes (five hours) per month of telephone calls, versus ADX's one hour per month, and they are permitted to access a broad range of art and hobby craft supplies.

134.    People incarcerated in USPs have in-person visits with loved ones that allow for physical contact: they can hug their mother or hold their grandchild. Even in administrative detention at USPs, incarcerated people customarily retain these visiting privileges, including contact visits with loved ones. *See* Ex. 65 (PS 5267.09, CN-1) at 14 ("Ordinarily, an inmate retains visiting privileges while in detention or segregation status."). At ADX, all social, non-legal visits are conducted on a non-contact basis, through a thick glass window and over a phone, so that there

44

is never any physical contact between an incarcerated person and his visitors. Conditions at USPs, while harsh, are materially less restrictive than at ADX.

135.    Unlike at ADX, solitary confinement at USPs is also durationally limited. After initial placement in secure housing units ("SHU"), placement is reviewed every thirty days.[30] Indeed, Defendant BOP reports that as of October 16, 2025, out of the 10,679 people housed in secure housing units ("SHU") for disciplinary segregation or administrative detention, only 41 people—0.38%—had been in the SHU for longer than a year.[31]

**Plaintiffs' Serious Medical and Mental Health Conditions
Present Substantial Risk for Placement in and Transfer to ADX**

***Plaintiffs' Serious Mental Health Conditions***

136.    Plaintiffs ███████████████████████████████████ all have mental health conditions that either constitute serious mental illness under BOP policy or are classified by Defendant BOP as Mental Health Care Level 3 or higher.

137.    Plaintiff ████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

---

[30] *See* Fed. Bureau of Prisons, *Program Statement 5270.12 Special Housing Units* at 8-9 (Mar. 5, 2024), https://www.bop.gov/policy/progstat/5270.12.pdf.

[31] *Supra* n22 [Fed. Bureau of Prisons, *Statistics: Restricted Housing*, https://perma.cc/JJD5-EDRD (last accessed Oct. 17, 2025)].

138.   Plaintiff █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

139.   Plaintiff ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

140.   Plaintiff ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

141.  Plaintiff ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

142.  Plaintiff ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

143.   Plaintiff ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████

144.   ADX, which has an Institutional Mental Health Care Level of 2, is unable to provide the necessary mental health care and treatment for Plaintiffs ████████████ ████████████████████████, all of whom have serious mental health conditions. As a Care Level 2 facility, ADX does not have the expertise or sufficient quantity of mental health staff to treat and care for patients with serious mental health conditions.

### Plaintiffs' Serious Medical Health Conditions

145.   Plaintiffs ████████████████████████ all have complex chronic medical conditions requiring ongoing and vigilant care with frequent visits to outside medical professionals.  The medical conditions of these Plaintiffs warrant placement in a BOP institution with an Institutional Medical Care Level of 3 or higher.

146.   Plaintiff ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

48

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ These medical needs

clearly qualify him for Care Level 3, although BOP has classified him as only Care Level 2. █

███████████████████████████████████████████████

██████████████████████████████████

147.    ██████ has multiple chronic medical conditions that require medical attention on

a regular and ongoing basis, ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ If transferred to ADX, ████████ would not receive

the necessary medical attention to treat any of his numerous medical conditions. *Id.*

148.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

149.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ If transferred to ADX, ████

████████ medical treatment will be significantly delayed or cancelled altogether.

150.    Additionally, ADX staff frequently delay medical care visits to outside medical

care professionals for several months—even years—or ignore the need for these visits altogether.

151.    ADX, which has an Institutional Medical Care Level of 2, is unable to provide the

necessary medical care and treatment for Plaintiffs ████████████████████████, all of whom

have high medical care needs. As a Care Level 2 facility, ADX does not have the medical equipment nor the expertise, subspecialization of medical staff, and sufficient quantity of medical staff to treat and care for patients with complex medical conditions.

### *The Transportation Process to ADX Presents a Substantial Risk*

152.    An uninterrupted ground commute between USP-Terre Haute and ADX exceeds 18 hours. All Plaintiffs are considered maximum custody by nature of their ADX designation, which means they will be transported under extremely restrictive custody requirements. These requirements consist of restraints that include leg irons, belly chains, and the use of a "black box," which is a rigid, rectangular, heavy metal box that covers part of each wrist cuff and the entire chain between the wrist cuffs. Ex. 47 (Donson Decl.) at 4. The wearer of a black box can experience prolonged pain as the device cuts into their wrists. It also restricts the ability to use one's hands, making proper hygiene throughout the whole transport, ████████████████ ████████████████████████████████████████████, impossible. *Id*.

153.    In addition to the intense discomfort and pain that results from being restrained continuously for 18 or more hours, several Plaintiffs have serious medical conditions that require consistent and proper hygiene for the maintenance of their conditions.

154.    ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

155.    ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

156.    Similarly, the transportation process poses significant short-term and long-term risks to Plaintiffs with serious mental illness and/or cognitive impairments, including Plaintiffs ████████████████████████████████████████ First, the ordinary medication distribution process would be compromised since Plaintiffs will be transferred in maximum custody restraints, which obstruct their ability to take oral medications as needed and prescribed. Second, close confinement with others in an unfamiliar environment may lead to extreme disorientation, which may manifest as yelling, rocking, flailing, or fighting. Brockman Decl. ¶¶ 36. Plaintiffs with serious mental illness or cognitive impairments are also at risk of experiencing a panic attack during transport, which will cause additional stress for the individual and the group. *Id.* ¶ 37. Third, Plaintiffs with cognitive impairments need individualized instructions and stimuli management. *Id.* ¶ 133. Without such safeguards, there is a substantial risk that staff use-of-force responses will follow noncompliance with group instructions. *Id.* ¶ 133. Lastly, the emotional and psychological trauma of the transfer to ADX puts Plaintiffs with serious mental illness and/or cognitive impairments at risk for acute psychiatric symptoms, including self-harm and suicide. *Id.* ¶¶ 38, 125, 132, 134.

157.    Finally, if Plaintiffs are transferred to ADX "general population," according to Defendants it will be for an indefinite period of time. Under ADX policy, the minimum stay in the first phase of ADX is 12 months, as the classification review process occurs once every 12 months. Moreover, while the ADX "step-down" program requires a minimum of two years and three

months, there is no maximum time limit. As recently as 2023, an Assistant United States Attorney represented, and a former BOP official testified, that the average time to step down is five to six years.[32] Some people have been confined at ADX for decades. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

158.    Defendants Trump and Bondi have openly admitted their intent for Plaintiffs to be incarcerated at ADX for the remainder of their lives. Following the September 23, 2025, transfer of eight commutees, Defendant Bondi proudly announced that they were transferred to "supermax facilities where they will be treated like they are on death row for the rest of their lives."[33] On information and belief, if sent to ADX, and without judicial intervention, Plaintiffs will be incarcerated at ADX for at least the duration of the Trump Administration.

159.    In sum, actions taken by Defendants to enforce the mandates of the Redesignation Directive and the Mandatory ADX Policy have resulted in the Plaintiffs being redesignated to ADX, which has and will continue to cause Plaintiffs harm.

---

[32] Trial Tr. (July 26, 2023) at 7, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 24, 2023), ECF 1561; Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529.

[33] Eric Daugherty (@EricLDaugh), [recorded statement of Attorney General Bondi], X, (Sept. 25, 2025, at 5:05 PM) ("As you saw very recently, we are moving the inmates who were on death row who Joe Biden or the auto pen commuted their sentences off of death row. We're moving them to supermax facilities where they will be treated like they are on death row for the rest of their lives."). https://x.com/EricLDaugh/status/1971320125371691048

## CLAIMS FOR RELIEF

### COUNT 1
**Challenge to the Redesignation Directive and the Mandatory ADX Policy
Fifth Amendment to the U.S. Constitution – Procedural Due Process
All Plaintiffs
Against All Defendants in Their Official Capacities**

160.    The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty or property, without due process of law." U.S. Const. amend V.

161.    Defendants' Redesignation Directive and the Mandatory ADX Policy violate Plaintiffs' procedural due process rights under the Fifth Amendment.

162.    Applying due process principles to prisons, the Supreme Court held that incarcerated people have a liberty interest in avoiding confinement conditions that are an "atypical and significant" hardship compared to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Before the government may encroach on such a liberty interest, it must provide incarcerated people with an opportunity to be heard at a meaningful time and in a meaningful manner.

163.    Plaintiffs have a liberty interest in avoiding their transfer to ADX, which is an "atypical and significant" hardship compared to the ordinary incidents of prison life. Conditions at ADX are more severe than routinely imposed in USPs, because conditions at ADX are uniquely isolating and have no durational limit.

164.    For Plaintiffs, the conditions of confinement in ADX are more severe than the conditions of administrative segregation in USPs, both because of the deprivations inherent in ADX confinement and the lengthy and indefinite confinement in ADX. Plaintiffs' confinement is also "atypical" because it is selective: ADX only houses approximately 0.26% of all people

incarcerated in federal prisons,[34] and Plaintiffs, in particular, were hand-picked by Defendant Trump's Executive Order for confinement at ADX.

165.    Plaintiffs' confinement at ADX is also "atypical and significant" because it is indefinite and could be permanent. While ADX has a "step-down" program for good behavior, the Redesignation Directive and the Mandatory ADX Policy have replaced Defendant BOP's ordinary procedures and, on information and belief, will prevent Plaintiffs from progressing through the step-down process.

166.    Plaintiffs' liberty interest in avoiding transfer to ADX entitles them to an opportunity to be heard at a meaningful time and in a meaningful manner. These procedural safeguards follow from Plaintiffs' weighty private interest in avoiding ADX's uniquely isolating conditions; the risk of erroneous deprivation from Defendants' replacement of ordinary procedures with the Redesignation Directive and Mandatory ADX Policy's pre-ordained outcomes; and the lack of a legitimate penological justification for Plaintiffs' placement at ADX. Gibson Decl. at 5; Haney Decl. ¶¶ 88-97.

167.    But BOP Defendants did not provide Plaintiffs a meaningful opportunity to be heard through its ordinary redesignation process. Defendants instead ordered a pre-ordained outcome: every Plaintiff will be sent to ADX. As a result, the ADX hearings conducted by BOP, the redesignations to ADX that followed, and the appeals of those redesignations were a sham. Plaintiffs' hearing notices contained rote language, pretextual assertions of security risks, and assigned them to a Security Threat Group of "Death Row Inmate" for the first time. Several Plaintiffs' Hearing Administrator Reports erroneously attributed statements to Plaintiffs that they never said or failed to include accurate representations of basic documented demographic

---

[34] *See supra* n.22.

information, such as age, incarceration history, and religious denomination. It did not matter what Plaintiffs said at or submitted for their hearings because the outcome was predetermined. Defendants were determined to achieve their desired outcome even if it required attributing false statements to Plaintiffs, and the Hearing Administrators admitted to some Plaintiffs that they had no ability to change the outcome.

168.    This hearing process was an attempt to justify—*post hoc*—Defendants' uncompromising decree to place every Plaintiff at ADX. In doing so, BOP Defendants relied on pretextual rationales for overriding its original and lawful designation decisions.

169.    Because Defendants had predetermined that Plaintiffs would be sent to ADX, the ADX hearings conducted by Defendant BOP and the appeals of Defendant BOP's decisions redesignating them to ADX were a sham. Defendants have denied Plaintiffs the opportunity to be heard in a meaningful time and in a meaningful manner.

170.    Regardless of intent, the Mandatory ADX Policy deviated from Defendant BOP's prior policy without any explanation and without affording Plaintiffs the process to which they are entitled under BOP's current redesignation and transfer policy.

171.    For these reasons, Defendants have violated Plaintiffs' rights to procedural due process under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these due process violations.

<u>**COUNT 2**</u>
**Challenge to the Redesignation Directive and the Mandatory ADX Policy**
**Fifth Amendment to the U.S. Constitution – Equal Protection**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

172.    The Fifth Amendment's Due Process Clause incorporates a guarantee of equal protection of the laws against the United States equivalent to that guaranteed against States by the

Equal Protection Clause of the Fourteenth Amendment.

173.    Defendants' Redesignation Directive and the Mandatory ADX Policy violate the Fifth Amendment's equal protection guarantee.

174.    Prior to the promulgation of the Redesignation Directive and the Mandatory ADX Policy, people under sentence of death in the federal system who were sentenced to life without parole due to a commutation or court action were subject to redesignation by Defendant BOP to determine where they would be housed. Such redesignations have occurred 18 times prior to President Biden's commutations of Plaintiffs' death sentences. Each of those times, Defendant BOP's redesignation occurred according to the process required by statute and BOP policy, which requires an individualized consideration of the demands of public safety, institutional security, the particular needs of the incarcerated person, and the resources of the facility. Not one of the 18 people so redesignated was determined to be appropriate for ADX. All 18 were sent to USPs.

175.    The 18 people who were resentenced from federal death sentences to life without parole prior to the Redesignation Directive and the Mandatory ADX Policy are similarly situated to Plaintiffs, who were also resentenced from federal death sentences to life without parole.

176.    While President Biden was still in office, Defendant BOP began the normal redesignation process for all Plaintiffs and subsequently made determinations for where they would be housed, assuring a federal court that the housing decisions would "lead to similar outcomes" as in the past. Kadamovas Joint Mot. at 2, *Kadamovas v. Dir., Fed. Bureau of Prisons,* No. 23-cv-22 (S.D. Ind. Dec. 30, 2024), ECF No. 147.

177.    After Defendants promulgated the Redesignation Directive and the Mandatory ADX Policy, the process changed completely. The intent of the Redesignation Directive and the Mandatory ADX Policy was clear: to send all Plaintiffs to ADX. As a result of the actions of

Defendant Trump and Defendant Bondi, the BOP Defendants abandoned their prior redesignation efforts and adopted a new policy that was implemented with the intent to redesignate every Plaintiff to ADX. Plaintiffs have thus been subjected to a redesignation process profoundly different from that experienced by their similarly situated peers.

178.    The motivation for the disparate treatment is animus: Defendant Trump has expressed clear animus toward Plaintiffs, telling them in a public social media posting to "GO TO HELL!" and referring to President Biden's "Abhorrent Pardon Decisions." *See supra* ¶ 46. Defendant Trump issued EO 14164 with the intent to punish them and make them suffer. Defendant Bondi's Memorandum was issued to carry out that improper intent, and Defendant Bondi's own statements substantiate it. *See supra* ¶¶ 109, 158.

179.    Animus is not a permissible reason under the equal protection clause to treat similarly situated groups differently. Defendants have no legitimate interests in their disparate treatment of Plaintiffs.

180.    As a result of Defendants' actions, all Plaintiffs have been subjected to an extra-legal process fundamentally different from that experienced by their similarly situated peers and required by statute.

181.    For these reasons, Defendants have violated Plaintiffs' rights to equal protection under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these equal protection violations.

### COUNT 3
**Challenge to the Redesignation Directive and the Mandatory ADX Policy**
**Eighth Amendment to the U.S. Constitution – Cruel and Unusual Punishment**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

182.    The Eighth Amendment prohibits cruel and unusual punishment. The Supreme

Court has held that the Eighth Amendment thus prohibits the unnecessary and wanton infliction of pain, including those punishments that are without penological justification.

183.    The solitary confinement inflicted at ADX is objectively painful and harmful, and it constitutes the type of unnecessary and wanton infliction of pain that gives rise to an Eighth Amendment violation. The courts and scientific literature have long recognized the deleterious effects of prolonged solitary confinement. ADX imposes particularly oppressive conditions designed to eliminate environmental stimulation and meaningful human contact. The indefinite nature of ADX confinement only exacerbates the harm posed by these conditions.

184.    Defendants have no penological justification for isolating the Plaintiffs at ADX. Before the Redesignation Directive and the Mandatory ADX Policy, Defendant BOP officials followed BOP policy and federal statute and determined that each plaintiff would be placed at a high-security USP or medical facility. Following the Redesignation Directive and the Mandatory ADX Policy, applicable only to the Plaintiffs and others whose death sentences were commuted by President Biden, Defendants overrode these determinations. Defendants implemented these overrides solely because Plaintiffs' sentences were commuted by the prior Administration, which advances no rational penological purpose.

185.    The Eighth Amendment also prohibits using prosecutorial power for arbitrary, partisan, or improper ends.

186.    Defendants seek to impose particularly harsh punishment on Plaintiffs due to Defendants' animus against Plaintiffs and President Biden's Administration.

187.    Defendants have therefore violated Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment. As a result of Defendants' actions, in the absence of injunctive relief, Plaintiffs will suffer irreparable harm.

**COUNT 4**
**Challenge to the Redesignation Directive and the Mandatory ADX Policy**
**Eighth Amendment to the U.S. Constitution – Deliberate Indifference to**
**Serious Medical and/or Mental Health Needs**
Plaintiffs ████████████████████████████████████████████
███████████████████████ (the "Health Care Plaintiffs")
**Against All Defendants in Their Official Capacities**

188.     Under the Eighth Amendment, BOP Defendants must provide incarcerated people
in their custody with adequate and necessary health care, for both medical and mental health needs,
that meets accepted standards of care and practice within the medical community.

189.     The Eighth Amendment prohibits deliberate indifference by government officials
to the serious health needs of those people the government chooses to incarcerate. An official who
has knowledge of an incarcerated person's health care needs that would place the person at
substantial risk of serious harm if not treated, and who denies, delays, or otherwise interferes with
the provision of health care, violates the Eighth Amendment.

190.     Plaintiffs ████████████████████████████████████████████████
█████████ (hereafter "Health Care Plaintiffs") have each been diagnosed with serious medical
and/or mental health conditions. Defendants are subjectively aware of the Health Care Plaintiffs'
health care diagnoses and their need for higher levels of medical and mental health care than can
be provided at ADX.

191.     As detailed *supra* in ¶¶ 49-78, the standard classification and redesignation process
used by Defendant BOP is designed to consider incarcerated people's medical and mental health
needs in determining which prison institutions are suitable and capable of meeting their needs.
According to BOP Defendants' own regulations and policies, ADX is not equipped to incarcerate
people with serious medical or mental health conditions.

192.     Without the appropriate level of necessary medical and mental health treatment at
ADX, the Health Care Plaintiffs will predictably experience the gratuitous infliction of pain and

serious and irreparable physical and psychological harm.

193.    Additionally, the Health Care Plaintiffs with documented diagnoses of serious mental illness and/or cognitive impairments are at heightened risk of irreparable psychological harm due to the severely harsh and punitive conditions of isolation at ADX.

194.    Moreover, the extremely harsh transfer process itself—lengthy transportation in full restraints, minimal hygiene, and extremely limited access to medication and healthcare professionals—will inflict serious harm and expose the Health Care Plaintiffs to substantial risk of serious harm.

195.    The Redesignation Directive and Mandatory ADX Policy promulgated and implemented by Defendants require a categorical determination that all people who received clemency from President Biden should be placed in so-called "monstrous" conditions.

196.    The plain language of EO 14164 and the Bondi Memo, as well as the public comments of Defendant Trump and Defendant Bondi, evince a desire and motivation by Defendant Trump and Defendant Bondi to cause harm to all the recipients of clemency, and a deliberate indifference to the impact of ADX placement on the Health Care Plaintiffs.

197.    Defendants' deliberate actions of denying necessary and appropriate medical and mental health care to the Health Care Plaintiffs demonstrate that they have acted, and will continue to act, with deliberate indifference to the Health Care Plaintiffs' serious health needs, and to the substantial risk of serious harm to these Plaintiffs.

198.    As a result of Defendants' actions described herein, in the absence of injunctive relief, the Health Care Plaintiffs will continue to suffer irreparable harm.

**COUNT 5**
**Challenge to the Redesignation Directive and the Mandatory ADX Policy**
**Article I, § 9 of U.S. Constitution – Bill of Attainder**
**All Plaintiffs**
**Against All Defendants in their Official Capacities**

199.     The Redesignation Directive and the Mandatory ADX Policy constitute impermissible acts of attainder by all Defendants in violation of Article 1, § 9 of the U.S. Constitution.

200.     By issuing and implementing the Redesignation Directive and the Mandatory ADX Policy, Defendants intended to and did inflict retributive punishment on Plaintiffs, and such punishment constituted a bill of pain and penalties. In so doing, Defendants usurped the judicial role of fixing a degree of punishment for no reason other than retribution for President Biden's commutations of Plaintiffs' federal death sentences.

201.     The Redesignation Directive and the Mandatory ADX Policy constitute legislative action by Defendants within the meaning of the Constitution's Bill of Attainder Clause.

202.     The Redesignation Directive and the Mandatory ADX Policy apply to an identifiable, closed group of people, including Plaintiffs: those 37 people who received commutations of their death sentences by President Biden on December 23, 2024.

203.     The punishment imposed by the Redesignation Directive and the Mandatory ADX Policy is vindictive and serves no legitimate penological purpose. But for the Redesignation Directive and the Mandatory ADX Policy, all Plaintiffs would be transferred to other, less restrictive BOP facilities pursuant to decisions made under the statutory BOP process and its own internal policies in its Program Statements.

204.     As a direct and proximate result of Defendants' constitutional violation, Plaintiffs will be irreparably injured. They will suffer irreparable harm unless Defendants are enjoined from continuing their unlawful policies, practices, and customs which have directly and proximately

caused these constitutional violations.

## COUNT 6
### Challenge to the Redesignation Directive and the Mandatory ADX Policy
### Art. I, § 9 of the U.S. Constitution – Ex Post Facto
### All Plaintiffs
### Against All Defendants in their Official Capacities

205.    The Redesignation Directive and the Mandatory ADX Policy constitute impermissible *ex post facto* punishment of all Defendants in violation of Article 1, § 9 of the U.S. Constitution.

206.    At the time of Plaintiffs' alleged crimes, indefinite solitary confinement, possibly for life, was not a possible punishment for capital crimes or for people whose death sentences had been commuted.

207.    At the time of Plaintiffs' executive clemency in December 2024, indefinite solitary confinement, possibly for life, was not a possible punishment for people whose death sentences had been commuted.

208.    By issuing and implementing the Redesignation Directive and the Mandatory ADX Policy, Defendants undertook legislative action that intended to and did retroactively and retributively increase the punishment of Plaintiffs.

209.    The Redesignation Directive and the Mandatory ADX Policy establish a new procedure constituting legislative action that requires that Plaintiffs be placed in indefinite solitary confinement, possibly for life, because their death sentences were commuted. As alleged above, this interrupted the usual process of BOP in making placement determinations for people in federal custody, which does not include a role for either the Attorney General (Defendant Bondi) or her designees (previously Mr. Bove, now Defendants Doe and Perkins).

210.    By issuing and implementing the Redesignation Directive and the Mandatory ADX Policy, Defendants have retroactively increased the punishment of Plaintiffs. Placing Plaintiffs in

indefinite solitary confinement, possibly for life, increases Plaintiffs' punishment because it substantially worsens their conditions of confinement, in violation of the Ex Post Facto clause and longstanding Supreme Court precedent. *In re Medley*, 134 U.S. 160, 170-71 (1890). As alleged above, both the intent and effect of this change are punitive.

211.    As a direct and proximate result of Defendants' constitutional violations, Plaintiffs will be irreparably injured. Plaintiffs will suffer irreparable harm unless Defendants are enjoined from continuing their unlawful conduct, which has directly and proximately caused these constitutional violations.

**COUNT 7**
**Challenge to the Redesignation Directive and the Mandatory ADX Policy**
**Article II, § 2, cl. 1 of the U.S. Constitution – Impairment of the Clemency Power**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

212.    Article II, § 2, cl. 1 of the U.S. Constitution vests the President with the exclusive power to grant clemency. That power is plenary, final, and may not be modified, abridged, or diminished—directly or indirectly—by any other branch or official.

213.    On December 23, 2024, President Biden commuted the death sentences of 37 individuals, including all Plaintiffs, to life imprisonment without the possibility of parole. These commutations were unconditional and imposed no special restrictions or conditions.

214.    Under 18 U.S.C. § 3621(b) and longstanding BOP policy, commutation of a death sentence triggers a redesignation process to determine the appropriate facility for continued incarceration. Defendant BOP initially followed that process and determined that Plaintiffs were appropriate for placement in high-security USPs or FMCs—not ADX.

215.    On January 20, 2025, Defendant Trump issued Executive Order 14164, directing the Attorney General to ensure that the 37 commuted individuals were imprisoned in conditions

"consistent with the monstrosity of their crimes." EO at § 3(e). On February 5, 2025, Defendant Bondi issued a memorandum implementing that directive. BOP Defendants also adopted a new policy, the Mandatory ADX Policy, to carry out those directives.

216.    As a result, Defendant BOP abandoned its prior individualized determinations and subjected Plaintiffs to automatic redesignation to ADX—the most restrictive facility in the federal system—solely because they received clemency from President Biden.

217.    This redesignation was not based on individualized assessments of Plaintiffs' security classifications, medical or mental health needs, or institutional behavior. It was a categorical override imposed in retaliation for the clemency itself.

218.    But for the issuance of Executive Order 14164, the Bondi Memo, and the Mandatory ADX Policy, Plaintiffs would have been redesignated to general population facilities or FMCs, consistent with BOP's initial determinations.

219.    The Constitution prohibits any branch or official from imposing punitive consequences that impair the effect of a clemency grant. That prohibition applies equally to indirect or functional impairments. *See Ex parte Garland*, 71 U.S. (4 Wall.) 333, 380-81 (1866) (loyalty oath requirement to practice in federal court violated Article II because it was indirect means of limiting the effect of pardon granted to ex-Confederate); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 145, 147 (1871) (proviso construing pardon as proof of disloyalty that precluded claim for rightful return of property "impair[ed] the effect of a pardon, and thus infring[ed] the constitutional power of the Executive").

220.    Defendants' actions violate Article II, § 2, cl. 1 by functionally impairing the effect of President Biden's commutations and punishing Plaintiffs for having received clemency.

221.    As a result, Plaintiffs have suffered and will continue to suffer irreparable harm, including indefinite punitive confinement in conditions that are uniquely harsh and entail severe physical and psychological harm.

222.    Plaintiffs do not assert a personal right to clemency. They seek instead to vindicate a structural constitutional limit: a successor President may not punish a former President's lawful exercise of the power to grant clemency. The impairment of Plaintiffs' unconditional commutations violates the separation of powers by undermining the finality of the completed act of clemency and distorting the constitutional allocation of authority under Article II.

223.    Plaintiffs request declaratory and injunctive relief prohibiting Defendants from enforcing or implementing any policy or directive that imposes punitive consequences based solely on the fact of clemency, and requiring BOP Defendants to restore Plaintiffs to the redesignation process that would have applied absent the unconstitutional interference.

### COUNT 8
**Challenge to the Bondi Memo**
**Administrative Procedure Act, 5 U.S.C. § 706**
**Agency Action in Excess of Statutory Jurisdiction or Authority, and Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law**
**All Plaintiffs**
**Against Defendants Bondi, Doe, and Perkins and BOP Defendants in Their Official Capacities**

224.    The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A).

225.    The Bondi Memo is final agency action. The Bondi Memo represents the consummation of the agency decisionmaking process within the Department of Justice and the Office of the Attorney General. The Bondi Memo was adopted by agency leadership and does not contemplate any further consideration by the agency prior to its implementation and enforcement.

Rather than merely clarifying existing duties, the Bondi Memo determines Plaintiffs' rights and has direct and immediate legal consequences.

226.    Agencies must "disclose the basis" of their actions under the APA, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and may not offer a pretextual rationale for agency action that does not match with what the record reveals about the agency's decisionmaking, *see Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

227.    Here, however, the Bondi Memo's one-sentence instruction to Defendant BOP to consider the commutees' conditions of confinement in accordance with their security risks masks the Bondi Memo's true directive: to redesignate all death row commutees to ADX. The Attorney General herself has removed all doubt about the Bondi Memo's true purpose, stating "[w]e have begun transferring the monsters Biden commuted to Supermax prisons, where they will spend the rest of their lives in conditions that match their egregious crimes."[35]

228.    The Bondi Memo is the Attorney General's pretextual attempt to paper over agency action that is taking place in the shadows and must be vacated as arbitrary and capricious.

229.    The Bondi Memo exceeds the Attorney General's statutory authority.

230.    Congress gave exclusive authority over the redesignation and transfer of individuals in the federal prison system to Defendant BOP, and set forth the criteria that the agency must consider. Defendant BOP is required to engage in an individualized decisionmaking process when deciding where to redesignate and transfer an individual, and, in doing so, must consider a range of enumerated factors. Those factors include: "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner;

---

[35] Attorney General Pamela Bondi (@AGPamBondi), X (Sep. 25, 2025, 1:47 PM), [https://perma.cc/DAN5-J4TH] (last visited Oct. 16, 2025).

(4) any statement by the court that imposed the sentence … concerning the purposes for which the sentence to imprisonment was determined to be warranted … or recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission." 18 U.S.C. § 3621(b).

231.     The Bondi Memo's extraordinary, pretextual intervention in BOP's redesignation and transfer process is not authorized by § 3621(b) or any other statute, and therefore, the Bondi Memo exceeds the Attorney General's statutory authority.

232.     Under the statute's plain text, that authority is vested exclusively in Defendant BOP. And because no other statute vests the Attorney General with that power, she has exceeded her lawful authority by purporting to direct BOP to transfer the commutees to ADX. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that an agency that lacks enabling legislation "literally has no power to act").

233.     In 28 U.S.C. § 509, Congress vested in the Attorney General the functions of agencies within DOJ, which includes Defendant BOP. But by regulation, the Attorney General delegated to Defendant BOP any power over the redesignation and transfer of persons incarcerated in the federal prison system.

234.     In 28 C.F.R. § 0.96(c), the Attorney General delegated to BOP's Director the power to "[d]esignat[e] places of imprisonment or confinement" and "order[] transfers from one institution to another."

235.     In 28 C.F.R. § 0.95(d), the Attorney General delegated to the Director the power to direct the "[c]lassification, commitment, control, or treatment of persons committed to the custody of the Attorney General."

236.     The Attorney General cannot invoke or exercise those delegated powers here—

"only [BOP] may take such action," *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 15 (D.D.C. 2011). Once the delegation has been made, the Attorney General cannot "dictate [BOP's] decision in any manner," *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1964). *See also Am. Vanguard*, 803 F. Supp. 2d at 13 ("[O]nce a regulation has been issued delegating power from one officer to a subordinate, the former may not thereafter invoke the delegated power himself, at least not as long as the regulation remains in effect.").

237.    The Attorney General has thereby delegated to BOP authority over the designation and transfer of federal prisoners. *See, e.g., Cmty. Treatment Ctrs., Inc. v. City of Westland*, 970 F. Supp. 1197, 1202 (E.D. Mich. 1997) (explaining that Attorney General's "power to designate where federal prisoners shall be committed" has been "delegate[d] . . . to the BOP"); *Debenedetto v. Rardin*, No. 22 Civ. 1470, 2022 WL 3647823, at *2 (D. Minn. Aug. 24, 2022). Her interference in that process through the Bondi Memo is unlawful.

238.    Even if the Attorney General could intervene in BOP's decisionmaking, the Bondi Memo's pretextual directive to transfer all death row commutees to ADX still exceeds any lawful authority vested by Congress.

239.    Under § 3621(b), BOP's discretion to assign an incarcerated person to an available facility is cabined by the statute's mandatory direction to consider all the enumerated factors before arriving at a decision. *See Levine v. Apker*, 455 F.3d 71, 81 (2d Cir. 2006); *Wedelstedt v. Wiley*, 477 F.3d 1160, 1166 (10th Cir. 2007).

240.    The Memo's instruction to transfer all death row commutees to ADX requires that BOP cast aside this statutory scheme and ignore any statutory factor that might warrant a transfer to a different facility. Even taken at face value rather than as a pretextual directive, the Bondi Memo violates § 3621(b). The Bondi Memo directs BOP to single out the commutees for

differential treatment to "restor[e] a measure of justice to the families of victims." But § 3621(b) does not permit BOP to use the redesignation process as a vehicle for retribution solely because the person was previously sentenced to death and received presidential clemency, or to "restore justice."

241.    The Bondi Memo also directs BOP to unduly weigh the commutees' "security risks." But under § 3621(b), BOP's security concerns are only *one* factor that the agency must consider.

242.    The Attorney General has no power to override a congressionally required process in this manner, and doing so plainly exceeds the Attorney General's authority.

243.    The Bondi Memo also violates BOP's redesignation and transfer procedures.

244.    Agencies must follow their own internal rules and regulations, *see Accardi*, 347 U.S. at 266, 268, including "procedural rules that limit otherwise discretionary actions," *Steenholdt v. FAA*, 314 F.3d 633, 649 (D.C. Cir. 2003).

245.    Defendant BOP's Program Statement 5100.08 imposes binding requirements on the agency regarding its redesignation and transfer process and is therefore enforceable under the APA. According to BOP, Program Statements prescribe "'permanent'" BOP policies and procedures" that "are commonly referred to within [BOP] as 'policy.'" Ex. 62 (PS 1221.66) at ch. 2, p.1. Program Statements establish "standard procedures and methods," "communicate "[BOP]-wide instructions and requirements," and must be followed within the agency's facilities unless a warden obtains a "formal waiver." *Id.* at ch. 1, p.1; ch. 2, p.8.

246.    PS 5100.08 states that "[a]ll inmate classification decisions and related actions will be made in accordance with the procedures in this Program Statement," and sets forth multiple factors BOP must consider including those required by § 3621 and the incarcerated person's "institutional

adjustment" and "program performance" within the incarcerated person's current place of imprisonment. PS 5100.08, p.5, ch. 1, p.3.

247.    PS 5100.08 further states that placement in ADX is reserved for male individuals who are unable to be placed in a less restrictive facility "without being a threat to others, or to the secure and orderly operation of the institution." *Id.* at ch. 7, p.17. Before placing an incarcerated person at ADX, BOP must consider whether redesignation to another high security institution is appropriate. *Id.*

248.    The Bondi Memo directs Defendant BOP to disregard its Program Statements and removes all discretion vested in the BOP to engage in the individualized review the program statement requires. Instead, the Bondi Memo instructs Defendant BOP to disregard the placement decisions it had already made—under which Plaintiffs were to be placed in facilities other than ADX—and redesignate Plaintiffs to ADX without regard for their individual circumstances, their ability to function in less restrictive institutions, or any other factors that would be considered under PS 5100.08.

249.    By directing BOP to disregard its policies and procedures, the Bondi Memo violates those procedures and should be set aside as arbitrary and capricious under the APA.

250.    Finally, an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency replaces an existing policy, it must provide a reasoned explanation "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516.

251.    The Bondi Memo directs BOP to determine the commutes' places of confinement consistent with their security risks "to achieve justice for the victims' families."

252.    But the Attorney General—who lacks authority to interfere with BOP's redesignation and transfer decisions—has never purported to displace BOP's mandatory processes.

71

253.    Because the Bondi Memo offers no explanation or justification for that departure

from longstanding practice, that too violates the APA and requires that the Bondi Memo be set

aside.

254.    Plaintiffs have been "adversely affected or aggrieved by agency action." 5 U.S.C.

§ 702. The Bondi Memo has the direct effect of replacing the BOP's redesignation and transfer

procedures with a directive to redesignate and transfer all death row commutees to ADX, in excess

of the Attorney General's statutory authority and contrary to § 3621. The Bondi Memo should

therefore be held unlawful and set aside.

## COUNT 9
### Challenge to the Mandatory ADX Policy
### Administrative Procedure Act, 5 U.S.C. § 706
### Agency Action in Excess of Statutory Jurisdiction or Authority, or Otherwise Not in Accordance with Law
### All Plaintiffs
### Against BOP Defendants in Their Official Capacities

255.    The APA directs a reviewing court to "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary [and] capricious," "in excess of statutory jurisdiction

[or] authority" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

256.    Plaintiffs have been "adversely affected or aggrieved by agency action." 5 U.S.C.

§ 702.

257.    The Mandatory ADX Policy is final agency action because it is the consummation

of BOP's decisionmaking process from which legal consequences flow to Plaintiffs.  It does not

matter that BOP Defendants have not committed the new policy to writing available to the public.

*See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir.

2020) ("Agency action generally need not be committed to writing to be final and judicially

reviewable.").

258.    BOP Defendants are required to make individualized decisions that consider all the

criteria set forth in the statute, including "the resources of the facility contemplated," "the nature

and circumstances of the offense," and "the history and characteristics of the prisoner," before deciding to redesignate and transfer an individual from one federal facility to another. 18 U.S.C. § 3621(b)(1)-(3).

259.    The Mandatory ADX Policy is contrary to § 3621(b)'s carefully designed scheme governing the redesignation and transfer process.

260.    By treating all death row commutees as a class warranting categorical transfer to the harshest facility in the federal prison system, BOP Defendants fail to consider an individual's circumstances and ignore all the statutory factors to be considered before making a redesignation and transfer decision.

261.    BOP Defendants cannot ignore Congress's statutorily required scheme, and the agency's decision to do so is a final agency action contrary to law. *See Bhd. of Locomotive Eng'rs*, 972 F.3d at 100.

262.    Even apart from § 3621(b), the Mandatory ADX Policy independently violates Program Statement 5100.08, which contains the agency's longstanding procedures governing the redesignation and transfer process.

263.    The Mandatory ADX Policy fails to comply with the Program Statement's requirements that any redesignation and transfer decision involve an individualized decisionmaking process that accounts for an individual's circumstances, including their "institutional adjustment" and "program performance." PS 5100.08, ch. 1, p.3.

264.    The Mandatory ADX Policy violates the Program Statement's specific requirements for referral and redesignation to ADX.

265.    As the Program Statement makes clear, ADX is reserved for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." *Id.* at ch.7, p.17.

266.    BOP Defendants' categorical treatment of all Plaintiffs does not even attempt to consider whether Plaintiffs have a demonstrated inability to function in a less restrictive environment, and instead brands each one a threat to institutional security based solely on the fact

their death sentences were commuted by President Biden.

267.    In doing so, the policy also fails to comply with the Program Statement's requirement that BOP Defendant first consider whether transfer to another high security institution would be appropriate in any particular case. *See id.* ("Prior to referring an inmate to . . . ADX Florence, redesignation to another high security institution should be considered first. If transfer to another institution is not appropriate, Wardens will refer the proposed . . . ADX Florence case to North Central Regional Director.").

268.    A policy that condemns en masse all death row commutees to ADX does not comport with this requirement regardless of Defendants' intent behind the policy, in violation of the APA.

269.    The Mandatory ADX Policy also departs from the agency's existing procedures that are still on the books without any explanation. *See Fox Television*, 556 U.S. at 545 (explaining that an agency cannot "depart from a prior policy sub silentio or simply disregard rules that are still on the books").

270.    BOP Defendants abandoned their mandatory redesignation practices as set forth in Program Statement 5100.08 and replaced them with an unwritten policy of referring all death row commutees to ADX. *See supra* ¶ 90.

271.    After President Biden's commutations, Defendant BOP began its usual redesignation process and determined—based on Plaintiffs' individual characteristics—that none of Plaintiffs was appropriate for redesignation to ADX. *See supra* ¶¶ 79-85.

272.    Following the Bondi Memo, which directed BOP Defendants to determine the appropriate placement for each Plaintiff based on their security risks and other characteristics, BOP Defendants abandoned their non-ADX placement decisions and began going through the motions of redesignating each Plaintiff to ADX regardless of their unique characteristics and security risks. *See supra* ¶¶ 86-115.

273.    BOP Defendants have not offered any explanation at all for their departure from Program Statement 5100.08's requirements for individualized review.

274.    To the extent BOP Defendants rely on the Bondi Memo for explanation, its sole justification—"to achieve justice for the victims' families"—ignores the other individualized factors required by statute and BOP's own Program Statement.

275.    Without a more detailed justification, this explanation falls short of the reasoned explanation the APA requires. *Fox*, 556 U.S. at 516.

276.    The agency action is arbitrary and capricious and should be held unlawful and set aside.

277.    Plaintiffs have been "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The Mandatory ADX Policy departed from BOP's existing redesignation and transfer procedures and replaced it with a policy requiring that all death row commutees be redesignated to ADX, contrary to § 3621 and existing policy. The Mandatory ADX Policy should therefore be held unlawful and set aside.

<u>**COUNT 10**</u>
**Challenge to the Bondi Memo**
**Administrative Procedure Act, 5 U.S.C. § 553(b), (c), (d)**
**Notice and Comment**
**All Plaintiffs**
**Against Defendant Bondi in Her Official Capacity**

278.    The APA requires notice and opportunity for comment prior to the promulgation of rules, 5 U.S.C. § 553(b), (c), and the Court must set aside agency action undertaken "without observance of procedure required by law," *id.* § 706(2)(D).

279.    Defendant Bondi failed to provide notice and an opportunity to comment in a timely manner before publication of the Bondi Memo.

280.    The Bondi Memo is a legislative rule.

281.    The APA requires that a regulation be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendant Bondi failed to publish the Memo 30 days before its effective date.

282.    Defendant Bondi has not articulated reasons sufficient to show good cause why these requirements are inapplicable.

283.    Plaintiffs have been prejudiced by the failure of Defendant Bondi to comply with the notice-and-comment provisions of the APA.

## COUNT 11
### Challenges to Ultra Vires Acts
### All Plaintiffs
### Against All Defendants in Their Official Capacities

284.    This Court has inherent equitable jurisdiction to hear ultra vires claims for "injunctive relief" against "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015). That inherent equitable jurisdiction is rooted in "a long history of judicial review of illegal executive action, tracing back to England," *id.* at 327, and no waiver of sovereign immunity is required for such claims, as "[i]t is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority," *Clark v. Libr. of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).

285.    As alleged in Count 1, Defendants violated due process through their efforts to transfer Plaintiffs to ADX.

286.    As alleged in Count 2, Defendants violated equal protection through their efforts to transfer Plaintiffs to ADX.

287.    As alleged in Count 3, Defendants violated the prohibition against cruel and unusual punishments.

288.    As alleged in Count 4, Defendants acted with deliberate indifference to the Health Care Plaintiffs.

289.    As alleged in Count 5, Defendants violated the Bill of Attainder clause.

290.    As alleged in Count 6, Defendants violated Article 1, § 9 of the U.S. Constitution by imposing an ex post facto punishment on Plaintiffs.

291.    As alleged in Count 7, Defendants impaired the Clemency Power.

292.    As alleged in Counts 8, 9, and 10, Defendants Bondi, Doe, and Perkins and the BOP Defendants violated the APA.

293.    Because Defendants' actions are ultra vires, this Court should enjoin all Defendants in their official capacities except the President from transferring Plaintiffs to ADX. If Defendants' actions are not declared unlawful, set aside, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief:

(A)    Issue a judgment under 28 U.S.C. §§ 2201-02 declaring that the Redesignation Directive and Mandatory ADX Policy violate Plaintiffs' rights under Article I, § 9; Article II, § 2; and the Fifth and Eighth Amendments to the United States Constitution; and that the Bondi Memo and Mandatory ADX Policy violate the Administrative Procedure Act, for the reasons and on the Counts set forth above;

(B)    Enter preliminary and permanent injunctive relief against all Defendants but the President and declaratory relief against all Defendants, including but not limited to enjoining the Bondi Memo and the Mandatory ADX Policy, and ordering Defendants to assign Plaintiffs to housing locations based on the designation decisions that had been reached prior to the issuance of the Redesignation Directive;

(C)    Award Plaintiffs their costs and reasonable attorneys' fees under 28 U.S.C. § 2412, 5 U.S.C. § 504, and 42 U.S.C. § 12205, and any other applicable source of law; and

(D)    Grant any other and further relief this Court deems just, proper, and appropriate.

Dated: October 21, 2025
        Washington, DC

Brian Stull, N.C. 36002*
Claudia Van Wyk, Penn. 95130*
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, NC 27701
Tel: (919) 682-5659
bstull@aclu.org
cvanwyk@aclu.org

Corene T. Kendrick, Cal. 226642*
**ACLU FOUNDATION**
425 California St., Ste. 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546
Miriam Kerler, Colo. 56575
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

Respectfully submitted,

*/s/ Maria V. Morris*
David C. Fathi, Wash. 24893**
Maria V. Morris, D.C. 1697904
Carmen Iguina González, D.C. 1644730
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org
mmorris@aclu.org
cgonzalez@aclu.org

Sara Norman, Cal. 189536*
**LAW OFFICES OF SARA NORMAN**
P.O. Box 170462
San Francisco, CA 94117
Tel: (415) 236-3763
sara@saranormanlaw.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

Martin Totaro*
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
mtotaro@heckerfink.com

*Attorneys for Plaintiffs*

* Pro hac vice application forthcoming
** Not admitted in D.C.; practice limited to federal courts. Pro hac vice application forthcoming.