# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REJON TAYLOR, *et al.*,

                *Plaintiffs,*

      v.

DONALD J. TRUMP, *et al.*, in their official capacities,

                *Defendants.*

Case No. _____

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR A TEMPORARY RESTRAINING ORDER

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 1

   I.   BOP's Redesignation Process Pre-Executive Order ........................................ 1

   II.  BOP's Redesignation Process Post-Executive Order ..................................... 3

   III. Transfer to ADX and Harm to Medically and Mentally Vulnerable Plaintiffs.............. 7

PROCEDURAL HISTORY ....................................................................................... 8

LEGAL STANDARD ................................................................................................ 9

ARGUMENT .............................................................................................................. 9

   I.   Plaintiffs Are Likely To Succeed on the Merits............................................... 9

      A.   The Bondi Memo and Mandatory ADX Policy Each Violate the APA .................... 9

         1.   The Bondi Memo Violates the APA ................................................. 10

            a.   The Bondi Memo's Directive Is Arbitrary and Capricious............................ 10

            b.   The Bondi Memo's Directive Exceeds the Attorney General's Statutory Authority.................................................................11

            c.   The Bondi Memo's Directive Violates BOP's Redesignation Procedures .... 13

            d.   The Bondi Memo Departs From Prior Practice Without Reasoned Explanation ..................................................................... 15

         2.   The Mandatory ADX Policy Violates the APA ............................... 15

            a.   The Mandatory ADX Policy Is Contrary to Law........................................... 16

            b.   The Mandatory ADX Policy Violates BOP's Redesignation Procedures...... 16

            c.   The Mandatory ADX Policy Departs From Prior Practice Without Reasoned Explanation ..................................................................... 17

      B.   Categorical Redesignations to ADX Violate Procedural Due Process.................... 18

         1.   Plaintiffs Have a Liberty Interest in Avoiding Redesignation to ADX ............. 18

         2.   Defendants Denied Plaintiffs a Meaningful Opportunity to Contest Their Redesignation to ADX................................................................... 21

      C.   Categorical Redesignations to ADX Violate Equal Protection ............................... 24

      D.   Categorical Redesignations to ADX Constitute Deliberate Indifference to Serious Healthcare Needs in Violation of the Eighth Amendment ...................................... 28

         1.   ADX Is a Care Level 2 Facility That Cannot Safely House People With Serious Medical and Mental Health Needs ................................................................... 28

2.    Defendants Have Acted With Deliberate Indifference to the Mental Health Plaintiffs' Serious Mental Health Needs .............................................................. 30

a.    The Mental Health Plaintiffs' Serious Mental Illness and Intellectual Disability Preclude ADX Placement ................................................................ 30

b.    Transfer to ADX Poses Substantial Risks of Serious Harm to the Mental Health Plaintiffs ............................................................................................ 33

c.    Defendants' Plan To Transfer the Mental Health Plaintiffs Constitutes Deliberate Indifference to Their Mental Health ............................................. 35

3.    Defendants Have Acted With Deliberate Indifference to the Medical Plaintiffs' Serious Medical Needs ...................................................................... 38

a.    The Medical Plaintiffs' Serious Medical Needs Preclude ADX Placement .. 38

b.    Defendants' Plan To Transfer the Medical Plaintiffs Constitutes Deliberate Indifference to Their Medical Needs ............................................. 41

II.    Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted .................................. 42

III.    The Public Interest and the Balance of Equities Sharply Favor Plaintiffs ..................... 44

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Vanguard Corp. v. Jackson*,
    803 F. Supp. 2d 8 (D.D.C. 2011) ................................................................ 12, 13

*Aracely v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) ................................................................ 16

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
    897 F.3d 314 (D.C. Cir. 2018) ...................................................................... 43

*Aref v. Holder*,
    774 F. Supp. 2d 147 (D.D.C. 2011) ................................................................ 22

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ............................................................ 18, 20, 21

*Ashkenazi v. Att'y Gen. of U.S.*,
    246 F. Supp. 2d 1 (D.D.C. 2003) .................................................................. 43

*Ashkenazi v. Att'y Gen. of U.S.*,
    346 F.3d 191 (D.C. Cir. 2003) ...................................................................... 43

*Bernier v. Allen*,
    38 F.4th 1145 (D.C. Cir. 2022) ................................................................ 41, 42

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
    972 F.3d 83 (D.C. Cir. 2020) ........................................................................ 16

*Brown v. District of Columbia*,
    514 F.3d 1279 (D.C. Cir. 2008) .................................................................... 41

*Brown v. Plata*,
    563 U.S. 493 (2011) ...................................................................................... 28

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ...................................................................................... 10

*C.G.B. v. Wolf*,
    464 F. Supp. 3d 174 (D.D.C. 2020) .............................................................. 45

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................ 42, 44

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) ............................................................................................... 27

*Cmty. Treatment Ctrs., Inc. v. City of Westland*,
970 F. Supp. 1197 (E.D. Mich. 1997) ...................................................................... 12

*Colwell v. Bannister*,
763 F.3d 1060 (9th Cir. 2014) .................................................................................. 41

*Damus v. Nielsen*,
313 F. Supp. 3d 317 (D.D.C. 2018) .......................................................................... 13

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ................................................................................ 43

*Debenedetto v. Rardin*,
No. 22 Civ. 1470, 2022 WL 3647823 (D. Minn. Aug. 24, 2022) ............................ 12

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .................................................................................................. 10

*Disability Rts. Montana, Inc. v. Batista*,
930 F.3d 1090 (9th Cir. 2019) .................................................................................. 36

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ............................................................................ 43

*Estelle v. Gamble*,
429 U.S. 97 (1976) .................................................................................................... 28

*Farmer v. Brennan*,
511 U.S. 825 (1994) ............................................................................................ 28, 35

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ...................................................................................... 15, 17, 18

*Finley v. Huss*,
102 F.4th 789 (6th Cir. 2024) ................................................................................... 36

*Goings v. Ct. Servs. & Offender Supervision Agency for D.C.*,
786 F. Supp. 2d 48 (D.D.C. 2011) ............................................................................ 42

*Harrison v. Fed. Bureau of Prisons*,
298 F. Supp. 3d 174 (D.D.C. 2018) .......................................................................... 26

*Hatch v. District of Columbia*,
    184 F.3d 846 (D.C. Cir. 1999)......................................................................... 20

*Heller v. Doe by Doe*,
    509 U.S. 312 (1993)........................................................................................... 27

*Helling v. McKinney*,
    509 U.S. 25 (1993)............................................................................................. 28

*Incumaa v. Stirling*,
    791 F.3d 517 (4th Cir. 2015)............................................................................ 21

*Jasperson v. Fed. Bureau of Prisons*,
    460 F. Supp. 2d 76 (D.D.C. 2006) .................................................................. 43

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    235 F. Supp. 3d 194 (D.D.C. 2017) ................................................................ 42

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020).......................................................................... 42

*Koyce v. U.S. Bd. of Parole*,
    306 F.2d 759 (D.C. Cir. 1962).......................................................................... 25

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)........................................................................................... 12

*Levine v. Apker*,
    455 F.3d 71 (2d Cir. 2006) ............................................................................... 13

*Louisville Gas & Elec. Co. v. Coleman*,
    277 U.S. 32 (1928)............................................................................................. 27

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)........................................................................................... 21

*In re Medley*,
    134 U.S. 160 (1890)........................................................................................... 36

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012)............................................................................ 45

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009)........................................................................ 42

*Mims v. Shapp*,
    744 F.2d 946 (3rd Cir. 1984) ................................................................. 22

*Mitchell v. Cuomo*,
    748 F.2d 804 (2d Cir. 1984) ................................................................. 44

*Palakovic v. Wetzel*,
    854 F.3d 209 (3d Cir. 2017) ................................................................. 36

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ................................................... 43

*Porter v. Clarke*,
    923 F.3d 348 (4th Cir. 2019) ................................................ 35, 36, 37, 44

*Proctor v. LeClaire*,
    846 F.3d 597 (2d Cir. 2017) ..................................................... 22, 23, 24

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ............................................................ 44

*Reynolds v. Quiros*,
    990 F.3d 286 (2d Cir. 2021) ......................................................... 25, 27

*Rezaq v. Nalley*,
    677 F.3d 1001 (10th Cir. 2012) .......................................................... 18

*Roe v. Elyea*,
    631 F.3d 843 (7th Cir. 2011) .............................................................. 41

*Romer v. Evans*,
    517 U.S. 620 (1996) .................................................................... 26, 27

*Royer v. Fed. Bureau of Prisons*,
    933 F. Supp. 2d 170 (D.D.C. 2013) ................................................... 20

*Sandin v. Conner*,
    515 U.S. 472 (1995) .......................................................................... 18

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ..................................................... 45

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ............................................................ 13

*Tanner v. Fed. Bureau of Prisons*,
  433 F. Supp. 2d 117 (D.D.C. 2006) ...................................................................... 44

*Toevs v. Reid*,
  685 F.3d 903 (10th Cir. 2012) .............................................................................. 22

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) .............................................................................. 24, 26, 27

*United States ex rel. Accardi v. Shaughnessy*,
  347 U.S. 260 (1954) .............................................................................................. 13

*Vanover v. Hantman*,
  77 F. Supp. 2d 91 (D.D.C. 1999) ......................................................................... 13

*Washington v. Fed. Bureau of Prisons*,
  No. 16 Civ. 3913, 2018 WL 6061039 (D.S.C. Nov. 20, 2018) ........................... 44

*Wedelstedt v. Wiley*,
  477 F.3d 1160 (10th Cir. 2007) ............................................................................ 13

*Wilkinson v. Austin*,
  545 U.S. 209 (2005) ................................................................................ 19, 21, 22, 24

*Williams v. Sec'y Pa. Dep't of Corr.*,
  117 F.4th 503 (3d Cir. 2024) ............................................................................... 36

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
  774 F. Supp. 3d 86 (D.D.C. 2025) ...................................................................... 43

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................... 9

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
  93 F.3d 910 (D.C. Cir. 1996) ............................................................................... 25

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) .............................................................................................. 20

## Statutes

5 U.S.C. § 706(2) ....................................................................................................... 9

18 U.S.C. § 3621(b) ........................................................................................... *passim*

28 U.S.C. § 509 ........................................................................................................ 12

**Regulations**

28 C.F.R. § 0.95(d) .................................................................................................... 12

28 C.F.R. § 0.96(c) .................................................................................................... 12

**Rules**

Fed. R. Civ. P. 65(c) ................................................................................................. 45

**Other Authorities**

Breanne Deppisch, *EXCLUSIVE: Bondi Transfers Former Death Row Inmates Commuted by Biden to 'Supermax' Prison*, Fox News Channel, (Sept. 24, 2025, 7:49 PM) https://perma.cc/W8Q2-JSMD ................................................................................... 6

*Civil Statistical Tables for the Federal Judiciary -Table C-5*, U.S. Courts (Dec. 31, 2024), https://perma.cc/EH6H-75Z7 .......................................................... 44

Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://perma.cc/4TFL-LVKX .................................................................................. 1

Eric Daugherty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://perma.cc/M7RR-3DQA. ................................................................................ 7

Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment.*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://perma.cc/5EJU-DRTX .................. 11

Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div. & David J. Hickton, U.S. Att'y, W.D. Pa., to Tom Corbett, Gov. of Pa., Re: Investigation of the Pa. Dep't of Corrs.' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), https://perma.cc/CU3K-QF5M ..................................................................................... 37

Letter from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div., to Keith Carson, President, Alameda Cnty. Bd. of Supervisors, et al., Re: Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail (Apr. 22, 2021), https://perma.cc/PD95-XLZ6 ...................................................... 37

Pam Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK. ...... 7

*Policy & Forms*, Fed. Bureau of Prisons, https://perma.cc/H9RF-P77T ...................................... 14

*Sentences Imposed*, Fed. Bureau of Prisons, https://perma.cc/SXW7-49A9 ................................ 21

*Statistics: Restricted Housing*, Fed. Bureau of Prisons, https://perma.cc/JJD5-EDRD ............... 21

U.S. Dep't of Just., Investigation of the Hampton Roads Regional Jail (2018),
    https://perma.cc/9R6Y-CVYU ........................................................................................... 37

U.S. Dep't of Just., Investigation of the Mass. Dep't of Correction 15-19 (2020),
    https://perma.cc/QDT7-5JM5 ............................................................................................ 37

## INTRODUCTION

Like its predecessor,[1] this case is about unlawful retaliation and extra-judicial punishment—but now with an overwhelming factual record and far more urgent stakes. Plaintiffs have exhausted their administrative appeals, and their transfer to the U.S. Penitentiary Florence Administrative Maximum Facility ("ADX") is now scheduled for as early as October 31, 2025. Defendants' retaliatory motive is no longer deniable; the Attorney General's own words confirm it. And the harm has never been abstract; Defendants have always known what awaits Plaintiffs at ADX—"a clean version of hell." Because Plaintiffs are likely to succeed on the merits, because transfer would cause irreparable harm, and because both the equities and public interest favor relief, the Court should grant a temporary restraining order.[2]

## FACTUAL BACKGROUND

### I.    BOP's Redesignation Process Pre-Executive Order

On December 23, 2024, President Biden granted commutations to 37 individuals confined on federal death row, converting their sentences to life imprisonment without the possibility of parole. Ex. 1 (Clemency Grant) at 1-2.[3] President-Elect Trump, enraged by the commutations, took to social media on Christmas Day to tell the commutees to "GO TO HELL!"[4]

During President Biden's final weeks in office, the Federal Bureau of Prisons ("BOP") began the redesignation process to determine where the 37 would be imprisoned. That process

---

[1] Plaintiffs here were plaintiffs in *Taylor v. Trump*, No. 25 Civ. 1161 (D.D.C.) (TJK) ("*Taylor I*"). Earlier today, Plaintiffs voluntarily dismissed their claims in *Taylor I*.

[2] As in *Taylor I*, Plaintiffs would consent to the Court's conversion of this motion for a temporary restraining order to a motion for a preliminary injunction—such that briefing and any argument may proceed on a non-expedited basis—if Defendants would agree to refrain from transferring Plaintiffs to ADX pending the Court's resolution of such a motion.

[3] Citations to "Ex. __" are to the exhibits to the Declaration of Brian W. Stull, filed contemporaneously with this motion.

[4] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 25, 2024, 2:43 PM), https://perma.cc/4TFL-LVKX (emphasis in original).

followed BOP's standard policies and procedures. Under 18 U.S.C.§ 3621(b) and BOP Program Statement 5100.08, a binding agency policy document, when determining where to redesignate and transfer a person within the federal prison system, BOP must engage in an individualized assessment based on the individual's institutional history, program performance, medical and mental health needs, and other factors. *See* Ex. 6 (PS 5100.08) at ch. 7, pp.1-2.

In January 2025, BOP Attorney Christopher Synsvoll met with the commutees' post-conviction counsel and confirmed that the agency was undertaking this individualized review. *See* Ex. 25 (Meredith Decl.) ¶¶ 5, 12; Ex. 26 (Miller Decl.) ¶¶ 1, 8, 10-11; Ex. 28 (Newberry Decl.) ¶¶ 5-6; Ex. 30 (Patti Decl. (Hall)) ¶ 6; Ex. 31 (Patti Decl. (Kadamovas)) ¶ 5. During these meetings, Synsvoll suggested that most commutees would likely be redesignated and transferred to other U.S. penitentiaries ("USPs") or Federal Medical Centers ("FMCs"), and that no commutee would be automatically redesignated to ADX, *see* Ex. 17 (Brown Decl.) ¶ 8; Ex. 20 (Henry Decl.) ¶ 5; Ex. 21 (Kincaid Decl.) ¶¶ 22; Miller Decl. ¶ 1; Meredith Decl. ¶¶ 25-27; Ex. 27 (Mooney Decl.) ¶ 9—a harsh facility reserved for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution," PS 5100.08, ch. 7, p.17. BOP policy requires that no one be redesignated to ADX unless BOP determines that transfer elsewhere "is not appropriate." *Id.*

Before President Trump took office, BOP staff made individualized placement decisions for the commutees consistent with statutory and policy requirements and memorialized them in a spreadsheet identifying where each person would be transferred. *See* Henry Decl. ¶ 8; Meredith Decl. ¶¶ 22, 32; Newberry Decl. ¶ 55. Plaintiffs include 17 of the original 21 *Taylor I* Plaintiffs, all of whom BOP had planned to transfer to facilities other than ADX before Defendants' unlawful actions. *See* Ex. 16 (Brady Decl.) ¶¶ 1, 10; Brown Decl. ¶ 8; Ex. 18 (Childers Decl.) ¶ 3; Ex. 19

2

(Heisey Decl.) ¶ 3; Henry Decl. ¶ 1; Kincaid Decl. ¶¶ 15, 18; Ex. 22 (G. King Decl.) ¶ 6; Meredith Decl. ¶ 1; Miller Decl. ¶ 44; Mooney Decl. ¶ 11; Newberry Decl. ¶ 1; Ex. 29 (Park Decl.) ¶ 10; Patti Decl. (Hall) ¶ 1; Patti Decl. (Kadamovas) ¶ 1; Ex. 33 (Taylor Decl.) ¶¶ 2, 25; Ex. 34 (Villaseñor Decl.) ¶ 1; Ex. 35 (Williams Decl.) ¶¶ 5, 7. The remaining four plaintiffs in *Taylor I* intend to move to intervene in this litigation once they complete the administrative appeal process.

## II.    BOP's Redesignation Process Post-Executive Order

Within hours of taking office, President Trump signed Executive Order 14164 (the "EO"). *See* Ex. 2. Entitled "Restoring the Death Penalty and Protecting Public Safety," the EO railed against President Biden's commutations and directed the Attorney General to "evaluate the places of imprisonment and conditions of confinement for each of the 37 murderers whose Federal death sentences were commuted by President Biden," and "take all lawful and appropriate action to ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." EO § 3(e).

Although BOP had already determined that the vast majority of the commutees would not be redesignated to ADX, the EO placed the agency's redesignation process in a "holding pattern," and BOP received new instructions that all commutee placement decisions would have to be submitted for review and approval by the Office of the Deputy Attorney General ("ODAG"). Ex. 23 (Layer Decl.) ¶ 9; *see also* Ex. 15 (Bizzaro Decl.) ¶ 26; Brady Decl. ¶ 9; Henry Decl. ¶ 8; G. King Decl. ¶ 9; Meredith Decl. ¶ 18; Newberry Decl. ¶ 37. Despite ODAG's new power to veto BOP's placement decisions, *see* Ex. 24 (Lee Decl.) ¶ 16; Newberry Decl. ¶ 47, Synsvoll repeatedly assured post-conviction counsel in the days that followed that placement in facilities less restrictive than ADX remained on the table, *see, e.g.*, Meredith Decl. ¶ 22; Mooney Decl. ¶ 9.

That changed on February 5, 2025, when Attorney General Bondi took office and issued a memorandum entitled "Restoring a Measure of Justice to the Families of Victims of Commuted

Murderers" (the "Bondi Memo"). Ex. 3. The Bondi Memo stated that "President Biden's death sentence commutations undermined our justice system and subverted the rule of law," and "robbed the victims' families of the justice promised." *Id.* With the aim of "achiev[ing] justice for the victims' families," it included a one-sentence directive to BOP to ensure that the commutees' conditions of confinement are "consistent with the security risks those inmates present because of their egregious crimes, criminal histories, and all other relevant considerations." *Id.* Plaintiffs refer to the EO and the Bondi Memo collectively as the "Redesignation Directive." *See* ECF 1, ¶ 7.

BOP's response to the Memo, combined with the Attorney General's public concessions, makes clear that the Memo was a pretextual directive to place the commutees in ADX, no matter the Memo's reference to "conditions of confinement" and "security risks." Under that directive, BOP abandoned its normal redesignation process and adopted a new, *de facto* policy to refer all commutees for redesignation to ADX (the "Mandatory ADX Policy"). Under the Mandatory ADX Policy, on February 11, 2025, BOP began issuing cookie-cutter notices to almost every death row commutee, informing them that they had been referred for redesignation to ADX. *See, e.g.*, Miller Decl. ¶¶ 39-41; Kincaid Decl. ¶ 23. Despite having previously concluded that the vast majority of the commutees should be redesignated to other facilities—a finding that *precludes* an individual's transfer to ADX under existing BOP policy—BOP abruptly reversed course, with every commutee's referral notice citing the same unsupported, boilerplate rationale: "[The inmate's] placement in other correctional facilities creates a risk to institutional security and good order, or poses a risk to the safety of staff, inmates, or others, or to public safety." *See, e.g.*, Ex. 11 (Kadamovas Hrg. Notice) at 2. ███████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████, even though existing policy

makes clear that the medical condition of several commutees should have disqualified them from placement there, *see infra* 7-8, 30. And by mid-April, the commutees all received a nearly identical notice that they had been referred for a hearing for the purpose of "determin[ing] if you should be transferred" to ADX. *See, e.g.*, Kadamovas Hrg. Notice 1.

Despite the supposedly individualized nature of the hearing process, each hearing followed the same pattern and produced the same results. Many of the commutees attended and disputed the bases for referral, including by providing evidence of clean disciplinary records, successful programming, health care needs, and the injuries that would be inflicted if subjected to ADX. *See, e.g.*, Ex. 13 (Taylor Hrg. Rpt.). At the time of the hearings, ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

But because BOP acceded to the Attorney General's insistence that the commutees be transferred to ADX, the hearing administrators issued recommendations that ADX placement was "warranted"—in many cases, within as little as an hour of a hearing's conclusion, *see, e.g.*, G. King Decl. ¶ 13; Taylor Decl. ¶¶ 17, 19—even though BOP had already concluded that the vast majority of the commutee would be redesignated to a less restrictive facility, *see* Brown Decl. ¶8; Kincaid Decl. ¶ 22. In each Plaintiff's case, the hearing administrator reports concluded that the commutees presented a "threat" if they were to "remain at any general population . . . facility . . .

in . . . BOP." *See, e.g.*, Taylor Hrg. Rpt. 4.[5] None of the reports explained BOP's departure from

its prior findings and conclusions that placement at ADX was *not* warranted. *See, e.g.*, *id.*

In meetings with post-conviction counsel following the Bondi Memo, Synsvoll confirmed

that the Memo's pretextual directive commanded the agency to reverse course and carry out the

President's vow to send all commutees to "HELL" by condemning them to ADX. *See* Brown Decl.

¶ 9; G. King Decl. ¶ 11. BOP complied. ████████████████████████████████████████

████████████████████████████████. After the Bondi Memo, "[o]n February 11, 2025, BOP

had been notified by the Attorney General's Office that all the commutees should be referred to

ADX," and that the agency must "complete the ADX referral process within 60 days." Miller Decl.

¶ 40; Patti Decl. (Hall) ¶ 13 (BOP understood the Bondi Memo "to mean that everyone needed to

be referred to ADX"); *see* Newberry Decl. ¶¶ 47, 49; Ex. 55 (Jackson Decl.) ¶ 7 (hearing

administrator told Plaintiff Jackson that he would be recommended for redesignation "no matter

what" and that administrator "had to do what [the Attorney General] directed him to do").[6] And

even if BOP had failed to follow the Attorney General's orders to redesignate everyone to ADX,

the Attorney General would have had a veto power over contrary decisions. Newberry Decl. ¶ 47.

On September 24, 2025, news outlets reported that BOP had moved eight death row

commutees from Terre Haute to ADX.[7] One article explained that "Justice Department officials"

had told the outlet that "[Attorney General] Bondi has prioritized ways to penalize these

---

[5] *Taylor I* plaintiff Basham was referred to ADX along with the other commutees, *see* Layer Decl. ¶¶ 17-18, but he has since been transferred to another facility—an administrative security FMC— for mental health treatment "before further consideration can be given to ADX placement for him." *See Taylor I*, ECF 40-1, ¶ 16. Defendants intend to restore Basham to competency and then subject him to the same ADX placement as the other Plaintiffs, despite his serious mental illness. *See id.*
[6] Plaintiffs pursued administrative appeals, which were denied. Stull Decl. ¶¶ 73-74, 80.
[7] *See, e.g.*, Breanne Deppisch, *EXCLUSIVE: Bondi Transfers Former Death Row Inmates Commuted by Biden to 'Supermax' Prison*, Fox News Channel, (Sept. 24, 2025, 7:49 PM) https://perma.cc/W8Q2-JSMD.

individuals, in coordination with directives from Trump" and "an earlier DOJ memo"—*i.e.*, the Bondi Memo. The "Justice Department source" also stated that "all" of the commutees were "expected to be moved to the facility by early next year." *See supra* n.7. The next day, the Attorney General celebrated the occasion in the Oval Office with the President, proudly announcing the transfers "to supermax facilities"—*i.e.*, ADX—"where they will be treated like they're on death row for the rest of their lives."[8] And despite BOP policy prohibiting "for security reasons" disclosure of a person's redesignation until after the person has been transferred, PS 5100.08, ch. 3, p.6, the Attorney General later made explicit what she had implied in the Bondi Memo, stating that "Joe Biden's last-minute commutations of death row prisoners are a stain on our justice system and a betrayal of the families of victims," and "*[w]e have begun transferring the monsters Biden commuted to Supermax prisons*, where they will spend the rest of their lives in conditions that match their egregious crimes."[9] The Attorney General confirmed the plan to send Plaintiffs to ADX *before* BOP had completed the redesignation process.

## III.     Transfer to ADX and Harm to Medically and Mentally Vulnerable Plaintiffs



. In every case, Defendants overruled this determination, finding that all seven should be dispatched to ADX. *See supra* 4, 10.

---

[8] Video posted by Eric Daugherty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://perma.cc/M7RR-3DQA.

[9] Pam Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK.

████████████████        Dr. Andrea Brockman, a former ADX psychologist with over a decade of experience providing and directing mental healthcare in BOP facilities, ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

Other Plaintiffs will suffer at ADX because of their physical state. ██████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████ ; Patti Decl. (Hall) ¶ 12. Again, Defendants overruled these determinations and ordered transfer to ADX, *see supra* 3-5, where they face grave risk of severe disease or death, Turner-Foster Decl. ¶¶ 82-83; Wong Decl. ¶¶ 18-19; Steinhart Decl. ¶ 39; Ex. 52 (Mosqueda Decl.) ¶ 15.

## **PROCEDURAL HISTORY**

Plaintiffs in *Taylor I* sought declaratory and injunctive relief and moved for a temporary restraining order ("TRO"). *Taylor I*, ECF 1, 2. The Court converted that motion to a motion for a preliminary injunction and denied it for failure to exhaust administrative remedies. *Taylor I*, ECF

50. *Taylor I* remains pending for four individuals who, to the best of their knowledge, have not yet completed their redesignation appeals, but Plaintiffs here have exhausted their remedies. *See* Stull Decl. ¶¶ 73-74, 80. Plaintiffs voluntarily dismissed their claims in *Taylor I* and began this action to pursue relief from Defendants' unlawful referral and redesignation process. Defendants' representations make clear that Plaintiffs will be transferred to ADX as soon as October 31, 2025. *See* Ex. 61 (A. Warden Email); Stull Decl. ¶ 80. To prevent the irreparable harm that would result from Plaintiffs' imminent transfer to ADX, Plaintiffs now move for a TRO.

## LEGAL STANDARD

To obtain a TRO, Plaintiffs must show that: (1) they will likely succeed on the merits; (2) they will likely be irreparably harmed if relief were withheld; (3) the balance of equities tilts their way; and (4) the public interest favors injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs Are Likely To Succeed on the Merits

Plaintiffs challenge the Bondi Memo and the Mandatory ADX Policy under the Administrative Procedure Act (the "APA"). Under the Constitution, Plaintiffs challenge the actions of all Defendants to unlawfully refer and redesignate them to ADX pursuant to the Redesignation Directive and the Mandatory ADX Policy. As explained below, Plaintiffs are likely to succeed on the merits of these claims—Plaintiffs' redesignations are unlawful.

#### A.    The Bondi Memo and Mandatory ADX Policy Each Violate the APA

Defendants' actions are arbitrary and capricious, an abuse of discretion, in excess of statutory jurisdiction, and without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A), (C), (D). Defendants violated the APA in two independent ways. *First*, the Bondi Memo is an unlawful directive to send Plaintiffs to ADX without findings required by law; it

exceeds the Attorney General's statutory authority; and it violates BOP's redesignation procedures without explanation. *Second*, the Mandatory ADX Policy violates the agency's statutory duties and policies without explanation. These two arguments are distinct and independent. Even if the Bondi Memo did not exist, Plaintiffs are likely to succeed on the merits because BOP departed from its prior policy that required individualized determinations before a person could be sent to ADX.

### 1.    The Bondi Memo Violates the APA

Plaintiffs have collected voluminous evidence that the Bondi Memo is an unlawful, pretextual directive that Plaintiffs must be referred for redesignation to ADX. *See supra* 4-7. Less than a week after the Bondi Memo was issued, BOP abandoned the placement decisions that it had previously made and issued cookie-cutter referrals to every death row commutee. *See supra* 4. BOP's own attorney confirmed that the Attorney General's office had instructed the agency to refer all commutees to ADX. *See supra* 3. And now, with transfers underway, the Attorney General has cast aside any remaining pretense, despite longstanding BOP policy prohibiting the disclosure of a person's redesignation until after arrival at the designated facility, and publicly acknowledged that the commutees will be transferred to a "supermax," *i.e.* to ADX. *See supra* n.9. The Bondi Memo's directive to categorically refer the commutees for redesignation to ADX violates the APA.

#### a.    The Bondi Memo's Directive Is Arbitrary and Capricious

Agencies must "disclose the basis" of their actions. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Courts are "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Where an agency offers a pretextual rationale that does not match what the record reveals about the agency's decisionmaking, courts should not "ignore the disconnect between the decision made and the explanation given" and "must demand something better than the explanation offered" to comply with the APA. *Id.* The Bondi Memo fails that test.

As demonstrated by the process that followed its issuance, the Bondi Memo's instruction concerning the conditions of confinement of the death row commutees amounts to an unlawful directive to refer the commutees for redesignation to ADX. *See supra* 4. If there were any doubt, the Attorney General later acknowledged that "[w]e have begun transferring the monsters Biden commuted to Supermax prisons, where they will spend the rest of their lives in conditions that match their egregious crimes." *Supra* n.9. In fact, as early as May 7, 2025, the Attorney General and other DOJ officials disclosed the plan to transfer all commutees to ADX at a DOJ forum with victims' families.[10] That alone warrants vacatur. For courts to exercise meaningful review, agencies cannot provide a pretextual directive to paper over agency action taking place in the shadows.

### b.    The Bondi Memo's Directive Exceeds the Attorney General's Statutory Authority

Congress gave exclusive authority over the redesignation and transfer of individuals in the federal prison system to BOP and set forth the criteria that the agency must consider. BOP is required to engage in an individualized decisionmaking process in determining when and where to redesignate and transfer an individual, and, in doing so, must consider a range of enumerated factors. As required by statute, BOP, not the Attorney General, must consider:

> (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence . . . concerning the purposes for which the sentence to imprisonment was determined to be warranted . . . or recommending a type of penal or correctional facility as appropriate; and (5) any pertinent policy statement issued by the Sentencing Commission.

18 U.S.C. § 3621(b)(1)-(5). BOP is also required to consider "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health

---

[10] *See* Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment.*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://perma.cc/5EJU-DRTX.

needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of [BOP]." *Id.* § 3621(b).

The Bondi Memo's extraordinary, pretextual intervention in BOP's redesignation and transfer process violates § 3621(b), which does not authorize the Attorney General to run roughshod over BOP's redesignation process. Under the statute's plain text, that authority is vested exclusively in BOP. And because no other statute vests the Attorney General with that power, she has exceeded her lawful authority by purporting to direct BOP to transfer the commutees to ADX. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that an agency that lacks enabling legislation "literally has no power to act").

In 28 U.S.C. § 509, Congress vested in the Attorney General the functions of agencies within DOJ, which includes BOP. But that statute does not give the Attorney General the power to do what she did here. The Attorney General delegated to BOP any power over the redesignation and transfer of people incarcerated in federal prisons. In 28 C.F.R. § 0.96(c), the Attorney General delegated to BOP's Director the power to "[d]esignat[e] places of imprisonment or confinement" and "order[] transfers from one institution to another." And in 28 C.F.R. § 0.95(d), the Attorney General delegated to the Director the power to direct the "[c]lassification, commitment, control, or treatment of persons" in federal custody. *See, e.g.*, *Cmty. Treatment Ctrs., Inc. v. City of Westland*, 970 F. Supp. 1197, 1202 (E.D. Mich. 1997) (explaining that Attorney General's "power to designate where federal prisoners shall be committed" has been "delegate[d] . . . to the BOP"); *Debenedetto v. Rardin*, No. 22 Civ. 1470, 2022 WL 3647823, at *2 (D. Minn. Aug. 24, 2022).

"[O]nce a regulation has been issued delegating power from one officer to a subordinate, the former may not thereafter invoke the delegated power himself, at least not as long as the regulation remains in effect." *Am. Vanguard Corp. v. Jackson*, 803 F. Supp.2d 8, 13 (D.D.C. 2011);

*see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1954). As a result, the Attorney General cannot invoke or exercise the powers delegated to BOP here—"only [BOP] may take such action," *Am. Vanguard*, 803 F. Supp.2d at 15, and the Attorney General cannot "dictate [BOP's] decision in any manner," *Accardi*, 347 U.S. at 267.

Even if the Attorney General could intervene in BOP's decisionmaking, the Attorney General's pretextual directive to transfer all death row commutes to ADX still exceeds any lawful authority vested by Congress. Under § 3621(b), BOP's discretion to assign people in its custody to an available facility is cabined by the statute's mandatory direction to consider *all* the enumerated factors before arriving at a decision. *See Levine v. Apker*, 455 F.3d 71, 81 (2d Cir. 2006); *Wedelstedt v. Wiley*, 477 F.3d 1160, 1166 (10th Cir. 2007). The Attorney General's instruction to transfer all death row commutes to ADX requires that BOP cast aside this statutory scheme and ignore any statutory factor that might warrant a transfer to a different facility.[11]

### c.     The Bondi Memo's Directive Violates BOP's Redesignation Procedures

An agency must follow its own rules and regulations. *See Accardi*, 347 U.S. at 265-66. That includes "procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). A court may enforce these rules against the agency when "they impose binding norms." *Damus v. Nielsen*, 313 F. Supp.3d 317, 336 (D.D.C. 2018); *see also Vanover v. Hantman*, 77 F. Supp. 2d 91, 103 (D.D.C. 1999).

---

[11] Even on its face, the Bondi Memo violates § 3621(b). The Memo directs BOP to single out the commutes for differential treatment to "restor[e] a measure of justice to the families of victims." Bondi Memo. But § 3621(b) does not permit BOP to use the redesignation process as a vehicle for retribution solely because the person was previously sentenced to death and received presidential clemency, or to "restore justice." The Memo also directs BOP to unduly weigh the commutes' "security risks." But under § 3621(b), BOP's security concerns are only *one* factor that the agency must consider. The Attorney General cannot direct BOP to disregard other statutory requirements.

Here, Program Statement 5100.08 imposes binding requirements on the agency and therefore may be enforced against BOP under the APA. According to BOP, Program Statements prescribe "'permanent' [BOP] policies and procedures" that "are commonly referred to within [BOP] as 'policy.'" Ex. 62 (PS 1221.66) at ch. 2, p.2. Program Statements establish "standard procedures and methods," communicate "[BOP]-wide instructions and requirements," and must be followed within the agency's facilities unless a warden obtains a "formal waiver." *Id.* at ch. 1, p.1; *id.* at ch. 2, p.8. BOP even boasts that it "strict[ly] compli[es]" with its Program Statements,[12] and that a "[f]ailure by employees to follow . . . any . . . [BOP] policy . . . could result in disciplinary action," Ex. 63 (PS 3420.12) at 6.

Consistent with this obligation, Program Statement 5100.08 provides that "[a]ll inmate classification decisions and related actions will be made in accordance with the procedures in this Program Statement." PS 5100.08, p.5. As part of that individualized decisionmaking, BOP must consider the multiple factors set forth in § 3621(b), as well as the person's "institutional adjustment" and "program performance" within their current place of imprisonment. *Id.* at ch. 1, p.3. The Program Statement also explains that ADX is reserved for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution," requiring that BOP consider redesignation to another high security institution before transfer to ADX, which cannot occur unless "transfer to another institution is not appropriate." *Id.* at ch. 7, p.17.

The Attorney General replaced those tailored requirements with her across-the-board directive. By issuing the Bondi Memo, the Attorney General required BOP to treat each commutee's status as a one-way ticket to ADX. *See supra* 3-6. The Attorney General commanded

---

[12] *Policy & Forms*, Fed. Bureau of Prisons, https://perma.cc/H9RF-P77T.

that BOP send all commutees to ADX because President Biden had commuted their death sentences, without regard to whether they "demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operations of the institution." PS 5100.08, ch. 7, p.17. Nor was BOP left with discretion to consider whether a transfer to a less restrictive facility would be "appropriate." *Id.* BOP instead abandoned the placement decisions it had already made. *See supra* 3-4. For this reason, too, the Bondi Memo's directive violates BOP's procedures, and it should be set aside.

> **d.    The Bondi Memo Departs From Prior Practice Without Reasoned Explanation**

Under the APA, an agency cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When an agency replaces an existing policy, it must provide a reasoned explanation "for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516. But the Attorney General—who lacks authority to interfere with BOP's redesignation and transfer decisions—has never purported to replace BOP's redesignation processes. Because the Bondi Memo offers no explanation for departing from longstanding practice, it violates the APA.

> **2.    The Mandatory ADX Policy Violates the APA**

In the wake of the Bondi Memo, BOP deviated from its longstanding procedures governing the redesignation and transfer of incarcerated people. In the process, BOP adopted the Mandatory ADX Policy, an unwritten and unlawful policy to refer Plaintiffs for redesignation and transfer to ADX, evidenced by the agency's swift, categorical, and cookie-cutter treatment of President Biden's death row commutees following the Attorney General's directive. *See supra* 4. That extraordinary, unprecedented deviation from existing policy violates the APA—independent of the Bondi Memo—and should be set aside.

### a.    The Mandatory ADX Policy Is Contrary to Law

As explained above, § 3621(b) sets forth the exclusive statutory authority governing BOP's redesignation and transfer process. *See supra* 11-12. Under the statute, BOP cannot transfer an individual from one facility to another unless it first makes an individualized determination that considers all the criteria set forth in the statute, including "the resources of the facility contemplated," "the nature and circumstances of the offense," and "the history and characteristics of the prisoner." 18 U.S.C. § 3621(b)(1)-(3).

The Mandatory ADX Policy violates § 3621(b). By directing all death row commutees to be transferred to the harshest facility in the federal prison system, BOP failed to consider individual circumstances and ignored the statutory factors. BOP cannot ignore those requirements, and its choice to do so is a final agency action contrary to law. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) ("Agency action generally need not be committed to writing to be final and judicially reviewable."); *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 138-39 (D.D.C. 2018) ("A contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." (quotation marks omitted))..

### b.    The Mandatory ADX Policy Violates BOP's Redesignation Procedures

The Mandatory ADX Policy also violates Program Statement 5100.08, the agency's longstanding policy governing the redesignation and transfer process. *See supra* 12-14. The Mandatory ADX Policy fails to comply with the Program Statement's requirements that any redesignation and transfer decision follow a rigorous decisionmaking process that accounts for a person's individual circumstances, including their "institutional adjustment" and "program performance." PS 5100.08, ch. 1, p.3. The Mandatory ADX Policy also violates the Program Statement's specific requirements for referral and redesignation to ADX, under which ADX is

reserved for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution." PS 5100.08, ch. 7, p.17. BOP's categorical treatment of all commutees does not even attempt to consider whether they have a demonstrated current inability to function in a less restrictive environment, *see* Ex. 44 (Gibson Supp. Decl.) at 6; Ex. 47 (Donson Decl.) at 3, and instead brands each one a threat to institutional security based solely on the fact of a former death sentence. In doing so, the policy also fails to comply with the Program Statement's requirement that BOP consider whether transfer to another high security institution would be appropriate before referring an individual to ADX.[13] *See* PS 5100.08, ch. 7, p.17. A policy that categorically condemns all death row commutees to ADX does not comport with this requirement and violates the APA.

### c.    The Mandatory ADX Policy Departs From Prior Practice Without Reasoned Explanation

Finally, the Mandatory ADX Policy departs from the agency's existing procedures without explanation. *See Fox*, 556 U.S. at 545. BOP abandoned its mandatory redesignation practices as set forth in Program Statement 5100.08 and replaced them with an unwritten policy of referring all death row commutees to ADX. *See supra* 4. BOP originally concluded that none of the Plaintiffs was appropriate for redesignation to ADX. *See supra* 4. But following the Bondi Memo, BOP rapidly abandoned its prior placement decisions and began categorically redesignating each Plaintiff to ADX, regardless of their unique characteristics. *See supra* 4-5. BOP has offered no explanation for its departure from Program Statement 5100.08's requirements for individualized review. To the extent BOP relies on the Bondi Memo for explanation, its sole justification—"to achieve justice for the victims' families"—ignores the individualized factors required by statute

---

[13] This is all the more true for people with serious mental illness. Program Statement 5100.08 specifies that "[i]nmates currently diagnosed as suffering from serious psychiatric illnesses should not be referred for placement . . . at ADX Florence." PS 5100.08, ch. 7, p.18.

and BOP's own Program Statement. Without a more detailed justification, this explanation falls short of the reasoned explanation the APA requires. *Fox*, 556 U.S. at 515-16.

## B.    Categorical Redesignations to ADX Violate Procedural Due Process

Even before the administrative appeal process had run its course, the Attorney General announced the results: Plaintiffs would be imprisoned in ADX, a federal facility unmatched in its draconian conditions, "for the rest of their lives." *Supra* n.8. To achieve this result, Defendants scrapped the lawful process and replaced it with a sham process. In doing so, Defendants violated due process by imposing uniquely brutal conditions on Plaintiffs without any meaningful process. Plaintiffs are likely to succeed on this claim because: (1) they have a protected liberty interest in avoiding ADX's harsh and atypical conditions; and (2) Defendants failed to afford them meaningful process. *Aref v. Lynch*, 833 F.3d 242, 252 (D.C. Cir. 2016).

### 1.    Plaintiffs Have a Liberty Interest in Avoiding Redesignation to ADX

Conditions at ADX are "an atypical and significant hardship . . . in relation to the ordinary incidents of prison life," *Sandin v. Conner*, 515 U.S. 472, 484 (1995), and Plaintiffs have a liberty interest in avoiding them. When determining whether conditions pose "an atypical and significant hardship," the D.C. Circuit considers: (1) the confinement conditions relative to routine administrative segregation; (2) the "duration" of the confinement; and (3) the "duration relative to [the] length of administrative segregation routinely imposed on prisoners serving similar sentences." *Aref*, 833 F.3d at 255.[14] The second two factors, focused on duration, are crucial and can be determinative. And, as the *Aref* Court "emphasize[d]," "a liberty interest can potentially arise under less-severe conditions when the deprivation is prolonged or indefinite." *Id.* at 255-57

---

[14] The D.C. Circuit's test is "unique" compared to its sister circuits, and the Court in *Aref* cautioned against "relying too heavily on out-of-circuit precedent" when evaluating due process claims. *Aref*, 833 F.3d at 254. Out-of-circuit cases such as *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012), which apply different standards when addressing ADX transfers, should be given no weight.

(holding plaintiffs had a liberty interest in avoiding conditions "less extreme" than administrative segregation because they were "indefinite" and "selective[]").

*First*, the conditions at ADX are uniquely severe. *See* Ex. 9 (Haney Decl.) ¶ 12(a) (describing ADX conditions as "more socially isolating than those at any correctional facility that [declarant] ha[s] personally toured and inspected or of which [he] [is] aware anywhere in the United States"). The Supreme Court found a liberty interest in avoiding similar conditions at a state "Supermax" facility "under any plausible baseline." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). As in *Wilkinson*, ADX conditions prohibit "almost all human contact." Haney Decl. ¶ 14; *see Wilkinson*, 545 U.S. at 223-24. As in *Wilkinson*, people incarcerated at ADX spend 22 to 24 hours a day confined alone in a cell smaller than an average parking space. *See* Ex. 8 (Gibson Decl.) at 7; Haney Decl. ¶ 15; *Wilkinson*, 545 U.S. at 214. As in *Wilkinson*, cells at ADX have solid metal doors, "which prevent conversation or communication" with other incarcerated people. Haney Decl. ¶ 15; *see Wilkinson*, 545 U.S. at 214. As in *Wilkinson*, people incarcerated at ADX eat all meals alone in their cell and are only permitted limited non-contact visits. *See* Ex. 64 (FLM 5267.08C) at 1, 5; *Wilkinson*, 545 U.S. at 214. And as in *Wilkinson*, people at ADX are "deprived of almost any environmental or sensory stimuli and of almost all human contact." Haney Decl. ¶ 12(a); *see Wilkinson*, 545 U.S. at 214.

By contrast, conditions in administrative segregation, although highly restrictive, do not approach the social isolation of ADX. For example, ADX cells themselves "are more isolating than those in other prisons—*even in comparison to other solitary confinement units*—because they are constructed with two exterior metal doors" and configured to prevent contact with other incarcerated people and even incidental movement in hallways. Haney Decl. ¶ 15 (emphasis added). Unlike most USPs, ADX is located "in a remote area with limited travel and hotel

accommodations in the surrounding area," which makes visits from loved ones a near impossibility. Haney Decl. ¶ 14; Ex. 45 (E. King Decl.) ¶ 25. And even if people do get visits, they are non-contact, *see* FLM 5267.08C at 5, unlike typical administrative segregation at other BOP facilities, *see* Ex. 65 (PS 5267.09) at 12.

*Second*, Plaintiffs' isolation at ADX is "indefinite and could be permanent." *Aref*, 833 F.3d at 257. Duration is a "crucial element" because a liberty interest can arise from "prolonged or indefinite" deprivation even under "less-severe conditions." *Id.* at 255. The Attorney General has announced that, regardless of their in-prison conduct, Defendants intend to isolate Plaintiffs at ADX "for the rest of their lives." *Supra* n.8. And the EO has no end-date. *See* EO § 3(e); *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 190 (D.D.C. 2013) (plaintiff adequately stated a liberty interest based on conditions "intended to remain in place for the duration of his 20-year sentence"); *Zadvydas v. Davis*, 533 U.S. 678, 690, 699 (2001) ("indefinite detention" of non-citizen would raise "a serious constitutional problem" and defining "indefinite" as without "reasonably foreseeable" end). ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████; their mental health conditions are an additional factor trapping them in ADX indefinitely.

*Third*, Plaintiffs' indefinite isolation at ADX is atypical when compared to the "length of administrative segregation routinely imposed on prisoners serving similar sentences." *Aref*, 833 F.3d at 255. This consideration, too, is "significant." *Id.* at 254, 257 (noting that "deprivations are heightened over time"). Even if the court determines the conditions at ADX are "'no more restrictive' than administrative segregation," it is still "required" to determine whether the duration of confinement is "'atypical.'" *Id.* (quoting *Hatch v. District of Columbia*, 184 F.3d 846, 858 (D.C. Cir. 1999)). Plaintiffs' lifetime isolation in ADX is highly atypical compared to routine

administrative segregation at a USP, which generally lasts "for a few weeks." *Aref*, 833 F.3d at 257.[15] Further, as in *Aref*, Plaintiffs' placement at ADX is "selective[]." *Id.* (finding a liberty interest based on "selectivity and duration" not "severity"). According to BOP, 2.5% of federal prisoners are incarcerated with life sentences.[16] Yet less than 0.25% of all federal prisoners are incarcerated at ADX. Stull Decl. ¶ 54. And while others "could be designated" to ADX, only this "handful" of Plaintiffs were singled out by President Trump to be sent to ADX, based solely on the fact that their death sentences were commuted by President Biden. *Aref*, 833 F.3d at 257.

### 2.    Defendants Denied Plaintiffs a Meaningful Opportunity to Contest Their Redesignation to ADX

Plaintiffs' liberty interest in avoiding indefinite isolation at ADX entitles them to due process. The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The *Mathews* balancing test considers: (1) the private interest that will be affected; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the government's interest, including the fiscal or administrative burden that additional process may entail. *See Wilkinson*, 545 U.S. at 224-25. Here, Defendants carried out a sham process solely to effectuate a predetermined result, the antithesis of due process.

*First*, ADX's uniquely isolating environment causes serious mental and physical harm. Haney Decl. ¶¶ 30-61. Plaintiffs' interest in avoiding ADX is therefore "significant," *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015), even when evaluated "within the context of the prison system[,]" *Wilkinson*, 545 U.S. at 225.

---

[15] *Statistics: Restricted Housing*, Fed. Bureau of Prisons, https://perma.cc/JJD5-EDRD (noting that, of 10,858 people in restricted housing, nearly 90% were there fewer than 90 days, and only 43 people were there longer than a year).
[16] *Sentences Imposed*, Fed. Bureau of Prisons, https://perma.cc/SXW7-.

*Second*, the risk of erroneous deprivation runs high, and "additional or alternative procedural safeguards" would demonstrably lower that risk. *See id.* When considering the utility of additional safeguards, this Court has held that the "content and substance" of the process must be "scrutinized" and "prison officials must be prepared to offer evidence that the . . . reviews held are substantive and legitimate, not merely a sham." *Aref v. Holder*, 774 F. Supp. 2d 147, 166 (D.D.C. 2011) (internal citations and quotation marks omitted) (contentions that reviews were "illusory" and meaningless sufficiently alleged a "high risk that the procedures used by the defendants have resulted in erroneous deprivations"). *See also Toevs v. Reid*, 685 F.3d 903, 912 (10th Cir. 2012) (reviews "cannot be a sham or pretext"); *Proctor v. LeClaire*, 846 F.3d 597, 612 (2d Cir. 2017) (review may not be a "hollow formalit[y]"); *Mims v. Shapp*, 744 F.2d 946, 954 (3rd Cir. 1984) (due process bars confinement reviews that are "simply a sham").

Defendants' procedures cannot withstand such scrutiny. After President Biden commuted Plaintiffs' sentences, BOP initiated its statutory redesignation process and determined that each Plaintiff should be transferred either to a USP or FMC. *See supra* 2. The EO and Bondi Memo corrupted this process, with the Attorney General and ODAG overruling the prior BOP determinations and initiating a sham process to reach a predetermined result: redesignation to ADX. *See* Brady Decl. ¶¶ 1, 10; Brown Decl. ¶ 9; Layer Decl. ¶ 18; Meredith Decl. ¶¶ 33-34; Patti Decl. (Hall) ¶¶ 13-14; Patti Decl. (Kadamovas) ¶ 1; Ex. 32 (Renee Decl.) ¶¶ 17, 33, 36. The Attorney General has admitted that Plaintiffs' redesignations were predetermined; as recounted above, she announced the results even before Plaintiffs' administrative appeals had concluded. *See supra* 11. Defendants thus "developed a pre-review conclusion" to transfer Plaintiffs to ADX "no matter what the evidence shows"—the very definition of a sham process. *Proctor*, 846 F.3d at 610.

Moreover, each of Plaintiffs' redesignations relied on the fact that they had been convicted of a capital crime and sentenced to death and failed to account for current or even recent in-custody behavior. Defendant Strong, for instance, noted that Plaintiffs Lawrence and Roane were referred "based on [their] serious and violent criminal history and [their] long-term placement in the Special Confinement Unit." Ex. 56 (Lawrence BP-10); Ex. 59 (Roane BP-10). Strong said Plaintiff Hager was referred "based on [his] serious and violent criminal history and other institutional behavior," Ex. 58 (Hager BP-10), and Plaintiff Hall was referred "based on [his] serious and violent criminal history, the behavior during [his] confinement, and [his] long-term placement in the Special Confinement Unit," Ex. 57 (Hall BP-10).

But Defendant Strong neglected to mention that ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ And Defendants cannot rely on "criminal history alone" to support indefinite redesignation to ADX. *Proctor*, 846 F.3d at 612. Such an outcome would make "a mockery of *Hewitt*'s admonition against indefinite confinement" by permitting "the continuation of [confinement] based solely on past events that will never change." *Id.*

The unavoidable conclusion is that the individualized determinations based on the factors specified by law and BOP policy gave way to blanket, pre-ordained results. *Compare* 18 U.S.C. § 3621(b), *with* Meredith Decl. ¶ 34 (recounting Synsvoll's statement that ADX hearings were "driven by President Trump's Executive Order and a related memorandum issued by [Attorney General] Bondi" and "not based on the BOP's assessment of the prisoners' security needs") *and* Jackson Decl. ¶ 7 (Plaintiff Jackson: "I asked Mr. Wilson if he would recommend me to ADX no

matter what I said to him during the hearing. He said yes."); *id.* ¶ 8 (similar). But a "[r]eview with a pre-ordained outcome is tantamount to no review at all." *Proctor*, 846 F.3d at 610.

*Third*, no penological justification supports the categorical redesignation policy. Even if "[p]rison security . . . provides the backdrop of the State's interest," *Wilkinson*, 545 U.S. at 227, BOP already took security considerations into account during the initial redesignation process and determined that each Plaintiff was appropriate for a USP or FMC, *see supra* 7-8. The subsequent redesignations plainly were based not on security needs—the Attorney General has openly flouted BOP's own "security" policy by publicly disclosing Plaintiffs' redesignation to ADX before they have been transferred, PS 5100.08, ch. 3, p.7—but on animus divorced from individualized review. *See* Gibson Decl. at 5 (concluding that "several aspects" of Plaintiff's notice for ADX referral were "contrary to BOP practice" and an "abuse of discretion"); Haney Decl. ¶¶ 88-97 (research shows there is no basis to conclude former death row prisoners are dangerous but rather the opposite). But "the state may not use [administrative segregation] as a charade in the name of prison security to mask indefinite punishment for past transgressions." *Proctor*, 846 F.3d at 611. Nor is there any additional "fiscal [or] administrative burden" on BOP because Plaintiffs here seek reinstatement of BOP's original determinations. *Wilkinson*, 545 U.S. at 225; *see supra* 7.

### C.    Categorical Redesignations to ADX Violate Equal Protection

Naked animus can never justify disparate governmental treatment of similarly situated groups. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Yet, naked animus is precisely what animates Defendants here: until now, no person resentenced from death to life has ever been redesignated directly from death row to ADX.

Plaintiffs are not the first people to have their death sentences set aside by a court or commuted by a President. At least 18 people have passed this way before, and BOP decided that all of them should be transferred to a USP. *See* Ex. 10 (Patton Decl.) ¶¶ 4, 7; *see also* Joint Mot. to

Stay Proceedings at 2, *Kadamovas v. Dir., Fed. Bureau of Prisons,* 23 Civ. 22 (S.D. Ind. Dec. 30, 2024), ECF 147 ("*Kadamovas* Joint Mot."). For example, in 2024 an individual in federal custody resentenced to life was redesignated and transferred to USP Lee. *See Kadamovas* Joint Mot. at 2 n.2. Before the categorical redesignations challenged here, *no one on federal death row whose death sentence was set aside was ever redesignated from death row to ADX*. Patton Decl. ¶ 7.

For equal protection purposes, Plaintiffs are similarly situated to these 18 people. *See, e.g.*, *Koyce v. U.S. Bd. of Parole*, 306 F.2d 759, 762 (D.C. Cir. 1962) ("In determining whether [a prisoner] is being denied equal protection of the law, the class to which he belongs consists of the persons confined as he was confined, subject to the same conditions to which he was subject."). Both groups consist of people no longer under a death sentence whom the BOP must redesignate from death row to another federal prison to serve out their sentences of life without parole.[17]

Under the Equal Protection Clause, the government must "treat similarly situated persons alike." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996). After President Biden commuted Plaintiffs' sentences, BOP showed every indication that it would treat Plaintiffs precisely as it had the prior 18. *See supra* 1-3. Before President Trump took office, BOP represented in court that "it can be reasonably expected that BOP's review" of housing for the people with commuted sentences would "lead to similar outcomes" as in the past. *Kadamovas* Joint Mot. at 2. And had Defendants not commandeered the process, this reasonable expectation would already have come to pass; initially, BOP followed its statutory command and

---

[17] The fact that some of the prior 18 people were commuted and some were resentenced by court order does not make them differently situated from Plaintiffs. Both groups consist of people convicted of capital crimes; the reason for resentencing is irrelevant. *See Reynolds v. Quiros*, 990 F.3d 286, 300-301 & n.64 (2d Cir. 2021) (finding equal protection violation in disparate prison classification for person resentenced from death to life based on unconstitutionality of death penalty as compared to people resentenced from death to life based on trial irregularities).

concluded that the commutees should be redesignated elsewhere. *See supra* 7.[18] When he took office, however, President Trump demanded that Plaintiffs be housed under conditions that matched the "monstrosity" of the underlying crimes. EO § 3(e). The resulting categorical redesignations jettisoned prior placement decisions made by BOP and replaced them with a predetermined result. *See supra* 4-6.

This disparate treatment bears no "rational relationship to a legitimate [governmental] purpose.'" *Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 181 (D.D.C. 2018) (quotation marks omitted). On the contrary, the government's interests were protected by the statutory process Defendants discarded. BOP had already considered "bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns," 18 U.S.C. § 3621(b), and concluded that each Plaintiff should *not* be redesignated to ADX. *Cf. Moreno*, 413 U.S. at 536-37 (existence of provisions in current law to address legitimate interests purportedly motivating disparate treatment "necessarily casts considerable doubt" upon argument that new actions "could rationally have been intended" to accomplish same ends).

The categorical redesignations forced BOP's trained professionals to accede to the retaliatory impulses of political appointees, devaluing correctional expertise and detracting from sound practice. The unprecedented nature of Defendants' actions "is itself instructive; '[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer v. Evans*, 517 U.S. 620, 633

---

[18] Brady Decl. ¶¶ 1, 10; Brown Decl. ¶ 9; Layer Decl. ¶ 18; Meredith Decl. ¶¶ 33-34; Patti Decl. (Hall) ¶¶ 13-14; Patti Decl. (Kadamovas) ¶ 1; Renee Decl. ¶¶ 17, 33, 36.

(1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)). Instead of a legitimate interest, Defendants' actions reflect animus that Defendants have never tried to conceal. On the contrary, they have broadcast it to the world, beginning with President Trump's Christmas Day "GO TO HELL!" message on Truth Social, *see supra* n.9, continuing with his inauguration-day Executive Order, followed by the Bondi Memo, and culminating in the Attorney General's vow that "the monsters" would die in ADX, *supra* n.9.[19]

As the Supreme Court has instructed, "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. "[M]ere negative attitudes" do not constitute legitimate governmental interests. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985). Here, as in *Romer*, the actions of the President and Attorney General "seem[] inexplicable by anything but animus toward the class [they] affect[]" and "lack[] a rational relationship to legitimate state interests." 517 U.S. at 632. Defendants may suggest disingenuously that this is business as usual at BOP, but their words and actions betray them.

In sum, the categorical redesignations violate equal protection because there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993); *see Reynolds*, 990 F.3d at 300-01. Plaintiffs are entitled to the redesignation process required by law and BOP policy, untainted by Defendants' animus.

---

[19] *See also, e.g.*, Bravin, *supra* n.10 ("Paul Perkins, an official in the deputy attorney general's office assigned to oversee the inmates' treatment, told victims' families that he had visited the Colorado prison 'and it was hell,' Heflin recalled. The facility's harrowing description 'kind of made me want them to go there even more,' he said.").

### D. Categorical Redesignations to ADX Constitute Deliberate Indifference to Serious Healthcare Needs in Violation of the Eighth Amendment

Seven Plaintiffs in this action— ███████████████████████████████████

███—have serious and complex healthcare needs that ADX cannot meet, endangering Plaintiffs' lives and health. Defendants are nonetheless determined to send them there, in defiance of the Constitution's prohibition on cruel and unusual punishment. *See Brown v. Plata*, 563 U.S. 493, 510-11 (2011); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Defendants display deliberate indifference to serious medical and mental health needs in violation of the Eighth Amendment if they know of and disregard an excessive risk to an incarcerated person's health. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). Both current harm and the risk of future harm can violate the Amendment. *Helling v. McKinney*, 509 U.S. 25, 33, 34 (1993) (explaining it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"). The redesignation of Plaintiffs ████████████████████████████████████████████ (the "Mental Health Plaintiffs") ███████████████████████ (the "Medical Plaintiffs") to ADX constitutes deliberate indifference because ADX is not equipped to address their healthcare needs; its brutal conditions place them at profound risk of harm; and the transfer process itself will subject them to serious harm.

#### 1. ADX Is a Care Level 2 Facility That Cannot Safely House People With Serious Medical and Mental Health Needs

BOP is required by statute to place incarcerated people in facilities appropriate to their "mental and medical health needs." 18 U.S.C. § 3621(b). BOP facilities are assigned an Institution Care Level based on the "clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, e.g. dialysis, oncology, etc." Care Level 1 institutions have the fewest resources and Care Level 4 the most. Ex. 4 (Care Level Guidance) at 2-3. Dr. Nicoletta Turner-Foster, a former BOP institutional clinical director, explains that higher care level

institutions have higher staffing levels and greater community resources such as nearby medical centers and access to subspecialists. Turner-Foster Decl. ¶¶ 7, 17-18.

USP-Terre Haute, where Plaintiffs are currently housed, is a Care Level 3 facility, *id.* ¶ 14, equipped to provide medical care to "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications," Care Level Guidance 3. Such prisons house patients with "more complex medical conditions" who are "more fragile" and "require frequent clinical contacts with Health Services employees and more visits to community medical specialists" and occasional "hospitalization to stabilize their conditions." *Id.* ¶ 9 (quoting PS 6031.05 at 9).

ADX, by contrast, is a Care Level 2 facility, Turner-Foster Decl. ¶ 14, equipped to house only "stable outpatients" whose care can be managed through routine appointments, Care Level Guidance 2. Such facilities cannot provide the care and treatment necessary for those with serious medical or mental health needs, including people classified as Care Level 3 or higher. *See* Turner-Foster Decl. ¶¶ 15-26. "Care Level 2 inmates generally self-manage their conditions and need infrequent visits to medical specialists or community facilities." *Id.* ¶ 9 (quoting PS 6031.05 at 9).

ADX housing makes specialty care extremely difficult. Jack Donson, an expert on BOP custodial functions who has worked with people incarcerated in federal prisons for 37 years in case management and transportation capacities, explains that "[g]etting people to outside appointments is complex under ordinary circumstances and becomes even more so with people the BOP has classified at MAX custody," like Plaintiffs.[20] Donson Decl. 1, 10. Up to six staff are needed for

---

[20] Patients needing specialty care in the BOP already face a process that can delay healthcare services for months, and even once a specialty service is approved and scheduled, scheduling issues can cause further delay. Turner-Foster Decl. ¶¶ 22-23.

maximum-custody transports, at least one of whom must be armed, and one must be a lieutenant; they travel in two vehicles. *Id.* at 10. A captain, unit manager, warden, regional manager, and sometimes BOP central office are all involved in the approval process and assignment of staff. *Id.* at 11. Overworked staff, in understaffed units, exert pressure "on medical [staff] to not send people out to community sub-specialists because of the drain on resources" and because they "often involve multiple trips for consultation, follow up, etc." *Id.*

     Patients who need high levels of care at ADX face serious risk of harm from ADX's isolation from community medical services, lower healthcare staffing levels, and the inherent difficulties of MAX custody transportation in an understaffed system. *Id.*

     **2.    Defendants Have Acted With Deliberate Indifference to the Mental Health Plaintiffs' Serious Mental Health Needs**

          **a.    The Mental Health Plaintiffs' Serious Mental Illness and Intellectual Disability Preclude ADX Placement**

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████

     ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████



### b. Transfer to ADX Poses Substantial Risks of Serious Harm to the Mental Health Plaintiffs

According to Dr. Brockman, "placing seriously mentally ill and/or cognitively impaired persons at ADX, and even transporting them there, creates a substantial risk of serious physical harm and long-lasting psychiatric symptoms." *Id.* ¶ 38. Defendants' actions have created a cascading series of risks to the vulnerable Plaintiffs, each compounding the others. *Id.* ¶ 146.

*First*, Defendants have deliberately endangered the Mental Health Plaintiffs by announcing they will be imprisoned at ADX "for the rest of their lives." *Supra* n.8. They are told not only that they will be cast into hell, but that they will be there until they die with no possibility of reprieve. *Id.* This message creates exceptionally high levels of anxiety and generates "the highest risk of suicide and self-harm." Brockman Decl. ¶ 125; *see also id.* ¶¶ 65, 118, 122-24. ██████████████ ███████████████████████████████████████████████████████████ ██████████████████

*Second*, Plaintiffs and Defendants alike know that the conditions of the transfer will be brutally taxing. *See generally* Ex. 68 (Gardiner Decl.) (recounting commutee's September 22-23, 2025 transfer from USP Terre Haute to ADX). As Dr. Brockman states, transferring people who

are mentally ill, likely "in full shackles and a 'black-box' handcuff cover for many hours, with ordinary medication dispensing compromised, and in close proximity to many people in various states of stress," creates "a significant risk of a physical altercation or other use-of-force response to the symptoms of a person with serious mental illness under the stress of a long-distance transfer, with added security and restraints, and a break from the ordinary routines under which prisoners with serious mental illness function best. This creates the risk of an improper, and potentially dangerous, response by untrained staff." Brockman Decl. ¶ 36. Mr. Donson echoes these findings, writing that "[t]here is a good chance, if someone is sufficiently agitated, that their actions may cause staff to use force to restrain them, and then remove and isolate them, possibly in four-point restraints. The potential for disruptive incidents and injuries in such a close, intense, crowded environment is high." Donson Decl. at 8. He concludes that the "operational complexities, severe restraint policies, and lengthy deprivations that transportation will involve would be extremely taxing" and that "[t]he impact on people who have . . . mental health vulnerabilities could be severe." *Id.* at 12.

*Third*, Dr. Brockman warns of the risk confronting these Plaintiffs from the conditions at ADX. "In terms of psychiatric harm, even for those who do not take their lives or attempt to do so, their tenuous connection to reality will become greatly exacerbated by constant isolation in ADX's uniquely severe conditions and without adequate treatment." Brockman Decl. ¶ 38. Particularly given Defendants' vow to keep Plaintiffs at ADX until they die and BOP's findings that each is ███████████████████████ Plaintiffs are at risk of a "complete breakdown of the psyche and disconnection from reality, and collapse and withdrawal from ordinary life." *Id.* ¶ 146; *see id.* ¶¶ 25-26, 142 (explaining Plaintiffs are extremely unlikely to receive adequate mental health treatment at ADX); Haney Decl. ¶¶ 80-87, 100.

c.    **Defendants' Plan To Transfer the Mental Health Plaintiffs Constitutes Deliberate Indifference to Their Mental Health**

Defendants have redesignated the Mental Health Plaintiffs to ADX by overruling the findings of their own mental health professional that such placement is improper. *See* Stull Decl. ¶¶ 43-47. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ These claims are as specious as the sham redesignation process itself. ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████[21] *See id.* ¶ 45.

Defendants know that solitary confinement—particularly the extreme isolation at ADX—endangers people who are seriously mentally ill. For this reason, BOP policy specifically *prohibits* the referral or placement of people with "serious psychiatric illnesses" at ADX. *See* PS 5100.08, ch. 7, p.18. These policies constitute "unrebutted evidence of . . . Defendants' awareness" that isolating individuals with serious mental health needs in conditions like those at ADX "can have harmful emotional and psychological effects." *Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019)

The risk of harm in placing people with serious mental illness in solitary confinement is "obvious." *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew

---

[21] ████████████████████████████████████████████████

████████████████████████████████████████████

of a substantial risk from the very fact that the risk was obvious"). "[T]here is . . . a widespread consensus among scientific, mental health, legal, and correctional experts that . . . persons who are mentally ill . . . are at an even greater risk of harm in solitary confinement and, therefore, should never be placed there." Haney Decl. ¶ 80. These risks, which include exacerbation of chronic conditions such as depression, amplified mood swings, diminished impulse control, and psychotic breaks as well as suicide and self-harm, *id.* ¶¶ 38, 83, have been well established for over 130 years. *See In re Medley*, 134 U.S. 160, 168 (1890) (explaining that prisoners in solitary confinement quickly "fell . . . into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide")[22]

Indeed, "the extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement that has emerged in recent years provides circumstantial evidence that the risk of such harm was so obvious that it had to have been known." *Porter*, 923 F.3d at 361-62 (affirming that Virginia policies mandating death-sentenced prisoners be housed in isolation cells for between 23 and 24 hours a day raised Eighth Amendment claims) (citation modified); *see also id.* at 355-56 (collecting empirical studies demonstrating the "severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions"); *Palakovic v. Wetzel*, 854 F.3d 209, 225-26 (3d Cir. 2017) (describing "the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement"). Given Defendants' "status as corrections

---

[22] Many courts have recognized that isolating people with serious mental illness in conditions akin to ADX's poses a substantial risk of serious harm. *See, e.g.*, *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 517 (3d Cir. 2024) ("[I]ndividuals with a known history of serious mental illness have a clearly established right not to be subjected to prolonged solitary confinement without penological justification, regardless of their sentence."); *Finley v. Huss*, 102 F.4th 789, 805-07 (6th Cir. 2024); *Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1098 (9th Cir. 2019).

professionals, it would defy logic to suggest that they were unaware of the potential harm" caused by ADX's solitary confinement conditions. *Porter*, 923 F.3d at 361.

Instructively, DOJ has opined that subjecting people to profound isolation for longer than 14 days in Massachusetts prisons violates the Eighth Amendment.[23] This was not an isolated finding: DOJ also found that Pennsylvania's use of solitary confinement on people with serious mental illness exacerbated their conditions and led to serious psychological and physiological harm, including severe mental deterioration, psychotic decompensation, and self-harm in violation of the Eighth Amendment.[24] DOJ further found that Pennsylvania's use of solitary confinement for people with intellectual disabilities caused them harm and violated their constitutional rights. *Id.* at 1. DOJ has made similar findings at prisons and jails in California and Virginia, among others.[25]

The long-term consequences of ADX placement must be considered as well, given the admission ████████████████████████████████████████████ and the Attorney General's vow to keep them there until they die. Long-term confinement in solitary reduces life expectancy, increases stress-related trauma, increases the severity of symptoms, and causes extreme levels of loneliness and suicide. Haney Decl. ¶¶ 38-44.

---

[23] U.S. DEP'T OF JUST., INVESTIGATION OF THE MASS. DEP'T OF CORRECTION 15-19 (2020), https://perma.cc/QDT7-5JM5.

[24] Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div. & David J. Hickton, U.S. Att'y, W.D. Pa., to Tom Corbett, Gov. of Pa., Re: Investigation of the Pa. Dep't of Corrs.' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), at 3, https://perma.cc/CU3K-QF5M.

[25] *See generally, e.g.,* Letter from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just., Civ. Rts. Div., to Keith Carson, President, Alameda Cnty. Bd. of Supervisors, et al., Re: Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail, at 31-32 (Apr. 22, 2021), https://perma.cc/PD95-XLZ6 (use of solitary confinement for people with serious mental illness places them "at increased risk of physical self-harm, extreme mental distress, and unnecessary suffering"); U.S. DEP'T OF JUST., INVESTIGATION OF THE HAMPTON ROADS REGIONAL JAIL 27-28, 31, 33-34 (2018), https://perma.cc/9R6Y-CVYU ("Prisoners with serious mental illness at the Jail are subjected not only to a substantial *risk* of serious harm in its restrictive housing cells, but also to *actual* serious harm following periods of restrictive housing.")

Defendants thus knowingly seek to place the Mental Health Plaintiffs in conditions that will cause them grave harm. In fact, that is their stated goal. *See, e.g.*, EO § 3(e) (ordering the Attorney General to house Plaintiffs "in conditions consistent with the monstrosity of their crimes"). Defendants' own policies reveal their awareness of the risk of harm from placing people with serious mental illness in isolation and at any Care Level 2 prison. *See generally* Care Level Guidance; PS 5100.08, ch. 7, p.18; ADX Referral Memo 2. Despite their knowledge of the risk that ADX placement entails to the Mental Health Plaintiffs, Defendants have nevertheless acted to send them there in deliberate indifference to their serious mental health needs.

> **3.    Defendants Have Acted With Deliberate Indifference to the Medical Plaintiffs' Serious Medical Needs**
>
> > **a.    The Medical Plaintiffs' Serious Medical Needs Preclude ADX Placement**

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ Before redesignation to

ADX, BOP planned to send ███ to an FMC or Care Level 3 facility. ███████████████

According to Dr. Nicoletta Turner-Foster, ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

██ ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████



In addition, the transfer process itself poses a substantial risk of serious harm to the Medical Plaintiffs. Travel to ADX will involve a 19-hour drive on a bus or van, shackled at the ankles and wrists, with a belly chain and a "black box" on the handcuffs that virtually eliminates arm and wrist movement. *See* Gardiner Decl. ¶ 3; Donson Decl. 4. These restraints will not be removed during transport, including any bathroom stops. *See* Gardiner Decl. ¶ 3; Donson Decl. 4.

The Medical Plaintiffs are at risk of "potential medical emergencies during the trip, and allowing them to travel on a bus with others without considering their medical needs is almost certain to cause disruptions to the transit process and significant harm." Turner-Foster Decl. ¶ 73; ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████; Gardiner Decl. ¶ 3 (commutee transferred to ADX "did not receive a medical screening when he arrived or in the weeks that followed").

**b.    Defendants' Plan To Transfer the Medical Plaintiffs Constitutes Deliberate Indifference to Their Medical Needs**

Defendants' actions to redesignate Plaintiffs ████████ to ADX—a facility they know is not equipped to manage and treat their serious medical needs—demonstrates deliberate indifference. Deliberate indifference to serious medical needs is shown by a failure "to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety[.]" *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). An official who "intentionally den[ies] or delay[s] access to medical care or intentionally interfere[s] with the treatment once prescribed" acts with deliberate indifference in violation of the Eighth Amendment. *Brown v. District of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008).[27]

As described above, ADX is simply not equipped to provide the level of care the Medical Plaintiffs require, both because it is a Care Level 2 facility with fewer health care staff and limited access to outside specialists and hospital resources, and because of the barriers to outside care

---

[27] The D.C. Circuit has also "assume[d]" that treatment decisions "based exclusively on nonmedical considerations . . . rather than any medical justification can suffice to state an Eighth Amendment deliberate indifference claim." *Bernier*, 38 F.4th at 1151; *see also Colwell v. Bannister*, 763 F.3d 1060, 1063 (9th Cir. 2014) ("[B]lanket, categorical denial of medically indicated surgery solely on the basis of an administrative policy . . . is the paradigm of deliberate indifference"); *Roe v. Elyea*, 631 F.3d 843, 861-63 (7th Cir. 2011) (blanket policy conditioning treatment on sentence length rather than individual needs constitutes deliberate indifference).

presented by the security requirements of moving people housed there. BOP, in knowingly transferring Medical Plaintiffs to ADX, will be unable to provide "timely, available, and appropriate treatment" for their serious medical conditions, placing each one at a substantial risk of serious harm. *See Bernier*, 38 F.4th at 1151.

But that is in fact the goal of the transfer: President Trump told Plaintiffs to "GO TO HELL!"—an apt description of conditions the Mental Health and Medical Plaintiffs will face at ADX—and that is what Defendants are diligently working to accomplish. *Supra* n.4. Despite their knowledge of these Plaintiffs' severe conditions and the grave risk that ADX placement entails, Defendants have redesignated them "based exclusively on nonmedical considerations" and in deliberate indifference to their serious medical needs. *See Bernier*, 38 F.4th at 1151.

## II.    Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted

Defendants plan to begin transferring Plaintiffs within days. *See* A. Warden Email; Stull Decl. ¶ 80. If those plans go forward, Plaintiffs will suffer injuries "both certain and great[,] actual and not theoretical[,]" and so imminent "that there is a clear and present need for equitable relief." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 202-03 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Defendants' actions stripped Plaintiffs of rights protected by the Constitution, and loss of constitutional freedoms "unquestionably constitutes irreparable injury." *Goings v. Ct. Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 78 (D.D.C. 2011) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). Though Defendants argued otherwise in *Taylor I*, the law is against them. *See, e.g., Mills*, 571 F.3d at 1312. Even "a prospective violation of a constitutional right constitutes irreparable injury." *Karem v. Trump*,

960 F.3d 656, 667 (D.C. Cir. 2020) (citation modified).[28]

Defendants also deprived Plaintiffs of their right to an individualized placement assessment. This too constitutes irreparable harm for all of Plaintiffs' claims. In *Jasperson v. Federal Bureau of Prisons*, 460 F. Supp. 2d 76 (D.D.C. 2006), as here, BOP adopted a categorical rule that violated the clear statutory obligation "to make an individualized confinement determination." *Id*. at 90. This Court held that BOP's failure to make an individualized assessment would cause irreparable harm by depriving the plaintiff of a statutory right that would have considered both his individual circumstances and the prospect of more favorable conditions of confinement. *Id*. at 90-91; *accord Ashkenazi v. Att'y Gen. of U.S.*, 246 F. Supp. 2d 1, 9-10 (D.D.C. 2003) (plaintiff irreparably harmed by BOP's "inability to exercise its discretion and place him in the facility it believes is most appropriate"), *vacated as moot*, 346 F.3d 191 (D.C. Cir. 2003). Likewise, here, BOP scrapped its individualized determinations, despite a "clear statutory directive" to undertake them. *Jasperson*, 460 F. Supp. 2d at 90.

Defendants argued in *Taylor I* that the harm is not irreparable because Plaintiffs can be transferred out of ADX if they prevail in this litigation. But the loss of a right not to be placed in a supermax prison unjustly is irreparable the moment it occurs. Even if it were otherwise, Plaintiffs would be forced to endure the brutality of ADX for months or years—risks that are particularly acute for the Medical and Mental Health Plaintiffs who are medically fragile and/or

---

[28] *See also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (where a movant has demonstrated that a violation is "likely," the deprivation of constitutional rights constitutes irreparable injury); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (stating, in the context of a equal protection claim, that "a prospective violation of a constitutional right constitutes irreparable injury"); *Doe v. McHenry*, 763 F. Supp. 3d 81, 89 (D.D.C. 2025) (similar); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (constitutional violations "are sufficient, by themselves, to establish irreparable harm"); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 89 (D.D.C. 2025) (same).

have serious mental or cognitive impairments.[29] Mental health experts overwhelmingly agree that even brief confinement under conditions like those at ADX is psychologically destructive. Haney Decl. ¶¶ 35, 45, 66. And "there is not a single published study [of ADX-like conditions] that failed to result in negative psychological effects." *Porter*, 923 F.3d at 356 (citation omitted). Several courts have held that transfer to a different prison, even less harsh than ADX, may constitute irreparable harm where, as here, the new prison would result in materially worse living conditions. *E.g.*, *Tanner v. Fed. Bureau of Prisons*, 433 F. Supp. 2d 117, 125 (D.D.C. 2006) (prison transfer that interfered with prisoner's ability to complete occupational training constituted irreparable harm); *Washington v. Fed. Bureau of Prisons*, No. 16-3913, 2018 WL 6061039, at *6 (D.S.C. Nov. 20, 2018) (irreparable harm where transfer to different BOP facility would undermine the prisoner's "long-term therapeutic relationship and consistent treatment protocols"); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (upholding finding of irreparable harm based on impending transfer into an "overcrowded" prison). For these reasons, there cannot be "adequate compensatory or other corrective relief . . . available at a later date" if Plaintiffs are transferred to ADX via a redesignation scheme that is later set aside as unlawful under the APA or the Constitution because they will have already spent time, unnecessarily, in ADX's extreme conditions. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

## III.    The Public Interest and the Balance of Equities Sharply Favor Plaintiffs

In cases against the government, the balance of equities and the public interest merge. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). When the government violates the law and subjects plaintiffs to irreparable harm, the equities and public interest weigh

---

[29] *See Civil Statistical Tables for the Federal Judiciary -Table C-5*, U.S. Courts (Dec. 31, 2024), https://perma.cc/EH6H-75Z7 (documenting average times to final dispositions in various case postures).

in plaintiffs' favor—"the Government cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citation modified), and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (citation modified); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same).

The categorical redesignations challenged here deprived Plaintiffs of an opportunity to show why they should not be condemned to a life bereft of human contact, in a cell the size of a parking spot, where they will see nothing out the window but a strip of sky. It stripped BOP of the power to consider and give effect to reasons why this should not occur. It threatens Plaintiffs with the physical and mental torment that years of isolation produce. And it does all this only to give expression to the animus the Attorney General has publicly affirmed. The equities and public interest align on Plaintiffs' side and weigh heavily in favor of a TRO.

## **CONCLUSION**

Plaintiffs respectfully request that the Court grant the Motion, enjoin all Defendants except President Trump from implementing the categorical redesignations and Mandatory ADX Policy in whole or in part, and direct Defendants to enforce the placement designations reached by BOP before the Bondi Memo. The Court should also retain jurisdiction of the matter to ensure that the categorical redesignations and Mandatory ADX Policy are not applied to Plaintiffs in the future and waive a security bond under Rule 65(c). A proposed TRO is attached.

Dated: October 21, 2025
        Washington, DC

Respectfully submitted,

/s/ Maria V. Morris

Brian Stull, N.C. 36002*
Claudia Van Wyk, Penn. 95130*
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, NC 27701
Tel: (919) 682-5659
bstull@aclu.org
cvanwyk@aclu.org

David C. Fathi, Wash. 24893**
Maria V. Morris, D.C. 1697904
Carmen Iguina González, D.C. 1644730
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org
mmorris@aclu.org
ciguinagonzalez@aclu.org

Corene T. Kendrick, Cal. 226642*
**ACLU FOUNDATION**
425 California St., Ste. 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Sara Norman, Cal. 189536*
**LAW OFFICES OF SARA NORMAN**
P.O. Box 170462
San Francisco, CA 94117
Tel: (415) 236-3763
sara@saranormanlaw.com

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546
Miriam Kerler, Colo. 56575
**STUDENT LAW OFFICE
UNIVERSITY OF DENVER
STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL
RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

Martin Totaro*
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
mtotaro@heckerfink.com

*Attorneys for Plaintiffs*

* *Pro hac vice application forthcoming.*
** *Not admitted in D.C.; practice limited to
federal courts. Pro hac vice application
forthcoming.*