**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

*Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*, in their official capacities,

*Defendants*.

Case No. 1:25-cv-03742-TJK

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 3

I. Plaintiffs Are Likely To Succeed on the Merits ..... 3

A. No Statute Bars This Court from Exercising Jurisdiction ..... 3

B. The Bondi Memo and Mandatory ADX Policy Violate the APA ..... 5

1. The Bondi Memo and Mandatory ADX Policy Are Reviewable ..... 7

2. The Bondi Memo Is Unlawful ..... 9

3. The Mandatory ADX Policy Is Unlawful ..... 11

C. Categorical Redesignations to ADX Violate Procedural Due Process ..... 12

1. Plaintiffs Have Demonstrated a Liberty Interest in Avoiding Indefinite Isolation in ADX's Uniquely Harmful Conditions ..... 12

2. Plaintiffs Have Demonstrated that Defendants' Process Is a Pretext Intended To Effectuate a Predetermined Result ..... 15

D. Categorical Redesignations to ADX Violate Equal Protection ..... 17

E. Categorical Redesignations to ADX Constitute Deliberate Indifference in Violation of the Eighth Amendment ..... 21

II. Plaintiffs' Imminent Transfer to ADX Constitutes Irreparable Harm ..... 24

III. The Public Interest and the Balance of Equities Sharply Favor Plaintiffs ..... 25

CONCLUSION ..... 25

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*American Clinical Laboratory Ass'n v. Azar*,
931 F.3d 1195 (D.C. Cir. 2019)........................................................ 5

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000)........................................................ 8

*Aref v. Holder*,
774 F. Supp. 2d 147 (D.D.C. 2011) ........................................................ 16, 17

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)........................................................ 12, 13, 14, 15

*Armstrong v. Manzo*,
380 U.S. 545 (1965)........................................................ 15

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
972 F.3d 83 (D.C. Cir. 2020)........................................................ 8

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986)........................................................ 4

*Brown v. Plata*,
563 U.S. 493 (2011)........................................................ 20

*C.G.B. v. Wolf*,
464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................ 25

*Christian v. N.Y. State Dep't of Lab., Div. of Emp.*,
414 U.S. 614 (1974)........................................................ 4

*Cmty. Hosps. of Cent. Cal. v. NLRB*,
335 F.3d 1079 (D.C. Cir. 2003)........................................................ 18

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)........................................................ 9

*Doe v. McHenry*,
763 F. Supp. 3d 81 (D.D.C. 2025) ........................................................ 5

*Experience Works, Inc. v. Chao*,
267 F. Supp. 2d 93 (D.D.C. 2003) .......... 2

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 24

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) .......... 5

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) .......... 3

*Helling v. McKinney*,
509 U.S. 25 (1993) .......... 22

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015) .......... 16

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986) .......... 4

*Jasperson v. Fed. Bureau of Prisons*,
460 F. Supp. 2d 76 (D.D.C. 2006) .......... 4

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) .......... 2

*Love v. Fed. Bureau of Prisons*,
No. 24 Civ. 2571, 2025 WL 105845 (D.D.C. Jan. 15, 2025) .......... 3

*Make The Rd. N.Y. v. Wolf*,
962 F.3d 612 (D.C. Cir. 2020) .......... 3

*Martin v. Gerlinski*,
133 F.3d 1076 (8th Cir. 1998) .......... 4

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .......... 15

*McNary v. Haitian Refugee Center, Inc.*,
498 U.S. 479 (1991) .......... 4

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
417 F.3d 1272 (D.C. Cir. 2005) .......... 8

*Orr v. Trump*,
778 F. Supp. 3d 394 (D. Mass. 2025) .......... 20

*Perkins Coie LLP v. U.S. Dep't of Just.*,
No. 25 Civ. 716, 2025 WL 1276857 (D.D.C. May 2, 2025)........ 20

*Proctor v. LeClaire*,
846 F.3d 597 (2d Cir. 2017)........ 17

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
758 F.3d 296 (D.C. Cir. 2014)........ 5

*Reynolds v. Quiros*,
990 F.3d 286 (2d Cir. 2021)........ 19

*Rezaq v. Nalley*,
677 F.3d 1001 (10th Cir. 2012)........ 13

*Richmond v. Scibana*,
387 F.3d 602 (7th Cir. 2004)........ 3

*Romer v. Evans*,
517 U.S. 620 (1996)........ 18

*Royer v. Fed. Bureau of Prisons*,
933 F. Supp. 2d 170 (D.D.C. 2013)........ 5, 14

*Sandin v. Conner*,
515 U.S. 472 (1995)........ 12

*Simms v. District of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012)........ 25

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)........ 20

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981)........ 2

*Wilkinson v. Austin*,
545 U.S. 209 (2005)........ 16

*Zadvydas v. Davis*,
533 U.S. 678 (2001)........ 14

**Statutes**

18 U.S.C. § 3621........ 3, 5, 9, 16

18 U.S.C. § 3625 ........ 3, 5

**Regulations**

28 C.F.R. § 0.95(d) ........ 9

28 C.F.R. § 0.96(c) ........ 10

**Other Authorities**

Attorney General Pamela Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK ........ 1

Eric Daughterty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://x.com/EricLDaugh/status/1971320125371691048 ........ 1

Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment.*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://perma.cc/5EJU-DRTX ........ 1

Jessica Schulberg, *Pam Bondi Meets With Victim Family Members As Trump Pushes For New Death Sentences*, HuffPost (May 8, 2024, 9:24 PM), https://www.huffpost.com/entry/pam-bondi-meet-victim-family-member-new-death-sentences_n_681d411ee4b02fbba8e7c258 ........ 1

S. Rep. No. 98-225 (1983) ........ 4

*Statistics: Restricted Housing*, Fed. Bureau of Prisons (Oct. 17, 2025), https://perma.cc/JJD5-EDRD ........ 15

**INTRODUCTION**

Defendants' opposition to Plaintiffs' Motion for a TRO is most notable for what they admit and ignore. While telling this Court that they followed current policy, Defendants then admit that Plaintiffs are being transferred to the supermax ADX not because of any individualized analysis but "by virtue of the unique circumstances under which their death sentences were commuted" by President Biden. Opp. 30, 32 n.17. Indeed, Defendant Bondi recently boasted, "[w]e have begun transferring the monsters Biden commuted to Supermax prisons,"—i.e., ADX—"where they will spend the rest of their lives in conditions that match their egregious crimes."[1] And she later stated that "we are now moving the inmates who were on death row who Joe Biden or the autopen commuted their sentences off of death row. We're moving them to supermax facilities where they will be treated like they're on death row for the rest of their lives."[2]

Defendants concede that the Bureau of Prisons' still-on-the-books policy requires an individualized determination before an incarcerated person can be redesignated and transferred to the ADX supermax. Opp. 3, 5-8.[3] It is uncontested that, before President Trump took office, BOP

---

[1] Attorney General Pamela Bondi (@AGPamBondi), X (Sept. 25, 2025, 5:47 PM), https://perma.cc/8ELX-NJBK.

[2] Eric Daughterty (@EricLDaugh), X (Sept. 25, 2025, 9:05 PM), https://x.com/EricLDaugh/status/1971320125371691048. Similarly, two weeks *before* the Court heard oral argument on Plaintiffs' prior motion on May 22, 2025, when Defendants' counsel represented that BOP was following ordinary redesignation processes and that the *first* of the Plaintiffs had been designated to ADX only the day prior, *see Taylor I,* ECF 50 at 82, the Attorney General held a forum with family members of victims in which the DOJ announced the planned ADX moves for all 37 commutees, and DOJ officials joked about the harshness of the conditions there. *See* Jess Bravin, *Biden Spared 37 Killers from Execution. Trump Ordered Up a Lifetime of Torment.*, Wall St. J. (Oct. 10, 2025, 9:00 PM), https://perma.cc/5EJU-DRTX; Jessica Schulberg, *Pam Bondi Meets With Victim Family Members As Trump Pushes For New Death Sentences*, HuffPost (May 8, 2024, 9:24 PM), https://www.huffpost.com/entry/pam-bondi-meet-victim-family-member-new-death-sentences_n_681d411ee4b02fbba8e7c258.

[3] Under the current, binding procedures, when determining where to redesignate and transfer a person within the federal prison system, BOP must engage in an individualized assessment based on the individual's institutional history, program performance, medical and mental health needs,

staff made individualized placement decisions for the commutees consistent with statutory and policy requirements and memorialized those decisions in a spreadsheet identifying where each person would be transferred.[4] It is undisputed that no Plaintiff's individualized determination included redesignation and transfer to ADX. It is uncontested that, when BOP redesignated Plaintiffs for transfer to ADX, it took [redacted]

Defendants' inability or outright failure to contest this evidence undermines all of their defenses to Plaintiffs' claims. And because Defendants' departure from existing policy violates the Administrative Procedure Act and the U.S. Constitution, Plaintiffs face serious harm from an unlawful transfer to ADX, and the equities otherwise favor Plaintiffs, this Court should grant a temporary restraining order.[5]

---

and other factors, and no person can be transferred to ADX unless no other facility is "appropriate" and they have "demonstrated an inability" to function in a less-restrictive environment. Mot. 1-2 (quoting PS 5100.08).

[4] ECF 4-27 (Meredith Decl.) ¶¶ 5, 12, 25-27; ECF 4-28 (Miller Decl.) ¶¶ 1, 8, 10-11; ECF 4-30 (Newberry Decl.) ¶¶ 5-6; ECF 4-32 (Patti Decl. (Hall)) ¶ 6; ECF 4-33 (Patti Decl. (Kadamovas)) ¶ 5; ECF 4-19 (Brown Decl.) ¶ 8; ECF 4-22 (Henry Decl.); ¶ 5; ECF 4-23 (Kincaid Decl.) ¶ 22; ECF 4-29 (Mooney Decl.) ¶ 9.

[5] Even if Defendants had plausible challenges to some of Plaintiffs' evidence, Plaintiffs would still be entitled to relief. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Karem v. Trump*, 404 F. Supp. 3d 203, 215 n.3 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020); *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) (noting standard for issuing a temporary restraining order and preliminary injunction is the same).

# ARGUMENT

## I. Plaintiffs Are Likely To Succeed on the Merits

### A. No Statute Bars This Court from Exercising Jurisdiction

Defendants urge that this Court lacks jurisdiction to hear Plaintiffs' claims, Opp. 12-18, 20, but under the "well-settled" and "strong" presumption "favoring judicial review of administrative action," there must be "clear and convincing evidence of congressional intent to preclude judicial review." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citation modified). That presumption "is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make The Rd. N.Y. v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020). Defendants cite to 18 U.S.C. § 3625, which precludes APA review of any "determination, decision, or order," including designation determinations and decisions under 18 U.S.C. § 3621(b), and § 3621(b), which states that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court." Defendants mischaracterize the claims and relief sought here. Plaintiffs do not challenge individual BOP determinations or designations, but rather the *across-the-board policies* adopted by Defendants Bondi and BOP to categorically redesignate Plaintiffs for transfer to ADX. Therefore, §§ 3625 and 3621(b) pose no bar to judicial review.

Courts routinely and properly find claims such as these outside the scope of §§ 3625 and 3621(b)'s jurisdiction-stripping provisions when the challenge is to "a broad policy that informs the designation decision." *Love v. Fed. Bureau of Prisons*, No. 24 Civ. 2571, 2025 WL 105845, at *11 (D.D.C. Jan. 15, 2025) (§ 3621); *see Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) ("A placement decision itself is not open to challenge under the APA, *see* 18 U.S.C. § 3625, but [the plaintiff] does not contest his current placement; he contests only the rules that will be used

to decide where he should serve the last few months of his time."); *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) (stating that "§ 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions"); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D.C. 2006) (finding APA claim cognizable under 18 U.S.C. § 3625 where Plaintiff "challenges the rulemaking leading to the BOP policy that informed his confinement determination, rather than challenging the determination itself"); S. Rep. No. 98-225, at 149 (1983) (explaining that "[t]he phrase 'determination, decision, or order' is intended to mean adjudication of specific cases as opposed to promulgating of generally applicable regulations").

Defendants' contrary position ignores the fundamental distinction—recognized by the Supreme Court and the D.C. Circuit—between a permissible policy challenge and an individual factual determination that cannot be challenged under a jurisdiction-stripping provision. In *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), for example, the Supreme Court concluded that a provision barring review of "a determination" did not extend to "a group of decisions or a practice or procedure employed in making decisions." *Id.* at 491-92; *see also id.* at 492 (opining that the jurisdiction-stripping provision applies to "direct review of individual denials" but not "general collateral challenges to . . . practices and policies used by the agency"); *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674-78 (1986) (holding that a statutory bar on judicial review of "any determination" about the "amount" of Medicare benefits or payments did not preclude "challenges mounted against the method by which such amounts are to be determined rather than the determinations themselves"); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 285 (1986); *Christian v. N.Y. State Dep't of Lab., Div. of Emp.*, 414 U.S. 614, 622 (1974) ("the fact that the . . . agency's decision is not statutorily subject to judicial review does not preclude review of the agency's procedure used

to reach that determination").

Similarly, in *American Clinical Laboratory Ass'n v. Azar*, 931 F.3d 1195 (D.C. Cir. 2019), the D.C. Circuit considered whether it had jurisdiction to consider an APA challenge to a rule governing HHS's collection of data on certain private-market reimbursement rates, which HHS would use to inform the setting of reimbursement rates under Medicare. *Id.* at 1198. The district court dismissed the complaint under a provision prohibiting judicial review of "the establishment of payment amounts." *Id.* at 1204-05. The D.C. Circuit reversed, holding that the jurisdiction-stripping provision reached only challenges to specific payment amounts, not challenges to the "practices that precede and inform the setting of those amounts." *Id.* at 1205; *see Grace v. Barr*, 965 F.3d 883, 893 (D.C. Cir. 2020).

As in those cases, here Plaintiffs are not challenging individual determinations or "redesignation decisions," Opp. 16, but instead challenge the process the government has adopted to guide how those determinations or designations for a category of incarcerated persons will be made. No statute precludes those challenges, clearly and convincingly or otherwise.[6]

### B. The Bondi Memo and Mandatory ADX Policy Violate the APA

Both APA counts boil down to a single question: Did the government change the existing policy that requires individualized determinations for redesignations and transfers when it referred all Plaintiffs for redesignation to ADX? If the answer to that is "yes," Plaintiffs are likely to succeed

[6] At a minimum, the Court has jurisdiction to consider Plaintiffs' constitutional claims. "The Supreme Court has long held that a statutory bar to judicial review precludes review of constitutional claims only if there is 'clear and convincing' evidence that the Congress so intended." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 308 (D.C. Cir. 2014). Neither § 3625 nor § 3621(b) is sufficiently explicit to bar consideration of constitutional claims particularly where, as here, the claims are based on government policies rather than individual determinations. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 85 (D.D.C. 2025); *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 181-82 (D.D.C. 2013).

on the merits of their APA claims, and a TRO is warranted without the court deciding any other issue on the merits.

Voluminous evidence already in the record, including concessions by Defendants, show that the government ignored the current BOP redesignation-and-transfer policy and replaced it—without explanation—with new policies that send all Plaintiffs to ADX. Defendants do not meaningfully dispute that evidence. For example, shortly after the Bondi Memo's issuance, "BOP had been notified by the Attorney General's Office that all the commutees should be referred to ADX," and that the agency must "complete the ADX referral process within 60 days." Ex. 26 (Miller Decl.) ¶ 40. Thus, within a week of the issuance, BOP began for the first time the *pro forma* [redacted] Opp. Ex. 2-A; Stull Decl. ¶ 47.[7] Under the new policy for the death-penalty commutees, BOP understood that "everyone needed to be referred to ADX." Patti Decl. (Hall) ¶ 13. Further, BOP acknowledged that the hearing process would not change that outcome. *See* Ex. 22 (G. King Decl.) ¶ 11 (BOP attorney Synsvoll explaining to Plaintiff Tipton that "Mr. Tipton would then have a hearing, with the hearing officer making a recommendation afterward. Mr. Tipton would then be referred to ADX"); Ex. 55 (Jackson Decl.) ¶¶ 7-8 (hearing administrator told Plaintiff Jackson that he would be recommended for redesignation "no matter what" and that administrator "had to do what [the Attorney General] directed him to do"). And the BOP attorney responsible for redesignation and transfer explained that the decisions to categorically send death-row commutees to ADX absent a need to be sent "to medical facilities" was "not based on the BOP's assessment of the prisoners' security needs or of institutional resources," as required under current BOP policy. Ex. 25 (Meredith Decl.) ¶¶ 33-34.

[7] [redacted] Stull Decl. ¶ 46.

Because the government violated basic reasoned decisionmaking requirements when it charted this new course, the Court need not go any further to conclude that Plaintiffs have shown a likelihood of success on the merits of the APA claims. And Defendants' threshold arguments to prevent the Court from deciding whether they unlawfully adopted new policies should be rejected.

**1. The Bondi Memo and Mandatory ADX Policy Are Reviewable**

Defendants offer two other reasons why this Court should not review Plaintiffs' APA claims. Both are meritless.

***First***, Defendants argue that the Bondi Memo and Mandatory ADX Policy are not final agency actions, Opp. 20-23, but that argument asks this Court to accept—contrary to the record evidence—that Defendants followed existing BOP requirements for redesignation and transfer. But the evidence shows that the Bondi Memo did "direct a specific outcome," Opp. 22, *i.e.*, that Plaintiffs must be referred for redesignation to ADX, Mot. 3-7, 9-10. That directive is a final and binding command with a specific and concrete outcome, one with distinct legal obligations and consequences for both BOP and Plaintiffs. Shortly after its issuance, for example, BOP's own attorney stated that "BOP had been notified by the Attorney General's Office that all the commutees should be referred to ADX[]," and "[t]he Attorney General's Office directed BOP to complete the ADX referral process within 60 days for all of the commutees." Miller Decl. ¶ 40. As Defendant Bondi later made clear, BOP is required to "transfer[] the monsters . . . to Supermax prisons"—*i.e.*, to ADX. *Supra* n.2.

Additionally, all Plaintiffs have been redesignated for transfer to ADX. The Bondi Memo accordingly marks the consummation of the agency's decisionmaking regarding the redesignation of the commutees and is an action from which legal consequences flow. Its boilerplate statement that it does not create any legal rights or obligations does nothing to change this outcome. *See*

*Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (disregarding guidance document's non-final "boilerplate").

Even if the Bondi Memo is not final agency action, the Mandatory ADX Policy plainly counts as final under the "pragmatic" and "flexible" nature of the inquiry. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (citation modified). Defendants claim that the Mandatory ADX Policy does not mark the consummation of the agency's decisionmaking process because it preceded the ADX referral notices and individual hearings held by BOP, Opp. 23, but that is how most agency policymaking works. The fact that a policy must be implemented does not mean agency policies can never be final, reviewable actions. As a BOP attorney explained, under the new policy, "almost all of the commuted prisoners would be referred for placement at ADX," and the decision "was not based on the BOP's assessment of the prisoners' security needs or of institutional resources," as required under the current, binding Program Statements. Meredith Decl. ¶¶ 32-34. That is final agency action reviewable under the APA regardless of whether the policy is written down. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020).

***Second***, Defendants argue that "BOP's placement decisions" are within the category of actions committed to agency discretion that are not reviewable, Opp. 23-24, but Defendants again misunderstand Plaintiffs' claims. Plaintiffs do not challenge "BOP's placement decisions." Rather, Plaintiffs challenge the Attorney General's unprecedented interference in BOP's redesignation process and BOP's abandonment of its longstanding policies and procedures without explanation. Mot. 9-18. With respect to *these* two actions, Defendants do not argue that either one is committed to agency discretion by law.

### 2. The Bondi Memo Is Unlawful

The Bondi Memo violates the APA because it is an unlawful directive to refer the commutees for redesignation to ADX; it exceeds her authority; it violates BOP's redesignation procedures; and it departs from prior practice without reasoned explanation. Mot. 10-15. While the Bondi Memo purports to instruct BOP to ensure that the commutees are imprisoned in conditions that match the security risks they present, the Attorney General's words and BOP's actions make clear that the Bondi Memo is nothing more than an unlawful directive to refer all commutees to ADX. *Id.* at 10-11. That alone warrants vacatur because the law requires agencies to disclose the basis for their actions and prohibits agencies from offering a pretextual rationale that does not match what the record reveals about the agency's decisionmaking. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). None of Defendants' arguments to the contrary have merit. *See* Opp. 24-26.

Defendants' opposition offers no response to Plaintiffs' allegations that the Bondi Memo is pretextual, nor explains the Attorney General's repeated public pronouncements that DOJ and BOP are engaged in an unprecedented scheme to redesignate all Plaintiffs to ADX. Defendants have thus forfeited any argument that Plaintiffs are unlikely to succeed on this ground.

Further, the Bondi Memo exceeds the Attorney General's statutory authority. In 18 U.S.C. § 3621(b), Congress vested exclusive authority over the redesignation and transfer of persons within the federal prison system to BOP. Congress did not give that authority to the Attorney General, and therefore Defendant Bondi's interference in the redesignation and transfer process here exceeds her lawful authority in violation of the APA. Mot. 11-13. Although Defendants assert that the Attorney General possesses statutory authority to issue policies for BOP, Opp. 25, the Attorney General delegated away any power over the redesignation and transfer of persons within the federal prison system to BOP by virtue of the regulations set forth in 28 C.F.R. §§ 0.95(d) and

0.96(c). This precludes Defendant Bondi from invoking or exercising those powers in this case.

The Bondi Memo's pretextual, categorical directive also violates BOP's redesignation procedures set forth in Program Statement 5100.08, which requires BOP to engage in an individualized decisionmaking process when redesignating a person within the federal prison system, and which reserves placement at ADX for "male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the [inmate's current] institution." ECF 4-8 (PS 5100.08) at ch. 7, p.17; *see* Mot. 13-15. Defendants disagree, arguing that the Bondi Memo does not violate BOP's redesignation procedures because it merely "directs BOP to consider . . . factors that BOP already would consider." Opp. 25. But Defendants once again overlook Plaintiffs' central argument: The Bondi Memo is a pretextual, categorical directive to refer all commutees for redesignation to ADX in violation of Program Statement 5100.08's requirements. Mot. 3-7, 9-10, 13-15.

Even on its face, the Bondi Memo does not direct BOP to simply "consider" factors that the agency already would consider when making redesignation decisions. It elevates a single factor—"security risks"—over all others, while introducing an additional factor—"achiev[ing] justice for the victims' families"—that finds no place in the relevant enabling statute, BOP policy, or regulations. Those departures from the statutory scheme and the agency's own longstanding procedures violate the APA.

Nor does the Bondi Memo contain any explanation for the Attorney General's directive. Mot. 15. Defendants attempt to argue otherwise, asserting that the Bondi Memo "observes" that "each of the 37 commuted murderers" present "security risks," and therefore directs BOP to "ensure that [their] conditions of confinement" are "consistent with the security risks they present." Opp. 26. But the Bondi Memo does not make *any* such finding. In one sentence, the Attorney

General directs BOP to "ensure that the conditions of confinement for each of the 37 commuted murderers are consistent with the security risks those inmates present." Defendants cannot bootstrap an explanation for that threadbare directive using the language of the directive itself.

### 3. The Mandatory ADX Policy Is Unlawful

As Plaintiffs make clear in their motion, the Mandatory ADX Policy violates the APA on three separate grounds, and this Court should enjoin Defendants from transferring Plaintiffs to ADX on this basis alone. Mot. 16-18. Because Defendants do not offer any defense on these grounds, Defendants have also forfeited any argument that Plaintiffs are unlikely to succeed on the merits here, and the Court may enter injunctive relief. Defendants' only response regarding the Mandatory ADX Policy is to deny its existence altogether. Opp. 26-27. But Plaintiffs have presented a mountain of evidence showing otherwise. Mot. 3-7, and exhibits cited therein.

As support for their contrary view, Defendants point to two commutees who, according to them, have not yet been redesignated. Opp. 26-27. Neither disproves the existence of BOP's policy to refer all commutees for redesignation to ADX. One of those commutees, Brandon Basham, *was* referred for redesignation to ADX, *see* ECF 4-25 (Layer Decl.) ¶¶ 17-18, but he has since been transferred to an administrative security FMC for mental health treatment "before further consideration can be given to ADX placement for him," *see Taylor I*, ECF 40-1 (Salem Decl.) ¶ 16. In other words, Defendants intend to restore Basham to competency and, consistent with the Mandatory ADX Policy, subject him to the same ADX placement as the other Plaintiffs. *See id.*

The other commutee to whom Defendants refer is a commutee who has been transferred to state prison custody. *See Taylor I*, ECF 64-1 (Salem Supp. Decl.) ¶ 5 n.1. The only reason he has not been redesignated to ADX pursuant to the Mandatory ADX Policy is because he is subject to a *separate* directive set forth in the Bondi Memo, which concerns the pursuit of state capital charges against President Biden's commutees. *See* Bondi Memo (directing U.S. Attorney's Offices

to "assist local prosecutors in pursuing death sentences under state law against the 37 commuted inmates"). If this commutee were in BOP custody, there is every reason to believe that he would be redesignated and transferred to ADX, consistent with BOP's Mandatory ADX Policy.

It is abundantly clear on this record that the government changed the existing policy for redesignations and transfers that requires an individualized determination when it referred all Plaintiffs for redesignation to ADX. Plaintiffs are likely to succeed on the merits of their APA claims and a TRO is warranted.

### C. Categorical Redesignations to ADX Violate Procedural Due Process

Plaintiffs are likely to succeed on the merits of their procedural due process claim. Plaintiffs have demonstrated that (1) they have a protected liberty interest in avoiding the "atypical and significant hardship" of indefinite isolation at ADX; and (2) Defendants provided no meaningful opportunity to protect that interest. *Aref v. Lynch*, 833 F.3d 242, 252 (D.C. Cir. 2016) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

#### 1. Plaintiffs Have Demonstrated a Liberty Interest in Avoiding Indefinite Isolation in ADX's Uniquely Harmful Conditions

When determining whether conditions pose "an 'atypical and significant hardship,'" the D.C. Circuit considers: (1) the confinement conditions relative to routine administrative segregation; (2) the "duration" of the confinement; and (3) the "duration relative to [the] length of administrative segregation routinely imposed on prisoners serving similar sentences." *Aref*, 833 F.3d at 255. Defendants do not dispute Plaintiffs' showing on any of these factors. Instead, they misconstrue Plaintiffs' duration arguments and suggest it is "reasonable" to isolate the Plaintiffs at ADX because a small number of other people serving life sentences are isolated there as well. Opp. 28. Defendants' arguments fail.

***First***, Defendants do not dispute that ADX's conditions are uniquely severe. They do not dispute that cells at ADX are more isolating than those in other solitary confinement units. *See* ECF 4-11 (Haney Decl.) ¶ 15. They do not dispute that ADX's remote location, unlike other administrative segregation units, makes receiving visits nearly impossible. *Id.* ¶ 14. And they do not dispute that even if people have visitors, ADX policy prohibits contact visits, ECF 4-16 (FLM 5321.09), at 5, unlike at other administrative segregation units, ECF 4-67 (PS 5267.09, CN-1) at 21.

Defendants' only nod to the conditions at ADX is a citation to the Tenth Circuit's decision in *Rezaq v. Nalley*, 677 F.3d 1001 (10th Cir. 2012)—appearing to suggest in a parenthetical that conditions ADX are comparable to routine administrative segregation. Opp. 28 n.15. But *Rezaq* reached its conclusion without any discussion of comparable conditions, asserting that the conditions at ADX were "comparable" to routine administrative segregation. 677 F.3d at 1015. Moreover, the D.C. Circuit does not follow the Tenth Circuit's approach to procedural due process claims in the prison context. The D.C. Circuit has highlighted "inconsistency in [the Tenth Circuit's] application" of the due process standard, noted the "unique[] considerations" of that circuit, and emphasized that "regardless of which baseline it has used, [the Tenth Circuit] has never held [that] the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest." *Aref*, 833 F.3d at 253 n.7 (citation modified).

***Second***, Defendants do not dispute the "crucial" fact that Plaintiffs' isolation at ADX is "indefinite and could be permanent." *Id.* at 254, 257. Indeed, Defendants assert that Plaintiffs' indefinite isolation at ADX is "due to the commutation of their sentences," Opp. 29, a static factor and apparent concession that Plaintiffs could be isolated at ADX for the rest of their lives. Defendants also misconstrue Plaintiffs' arguments, suggesting that to rule for Plaintiffs would

necessarily mean that isolation at ADX would be unconstitutional for *anyone* with a life sentence. Opp. 29. Not so. Incarcerated people isolated at ADX spend an average of 5-6 years there. Trial Tr. (July 26, 2023) at 7, *United States v. Bowers*, No. 18 Cr. 292 (W.D. Pa. Aug. 23, 2023), ECF 1561; Trial Tr. (July 27, 2023) at 52, *United States v. Bowers*, No. 18 Cr. 292 (W.D. Pa. Aug. 1, 2023), ECF 1529. But Defendants intend to isolate Plaintiffs at ADX indefinitely; the indefiniteness of their isolation at ADX supports a liberty interest here. *See Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 190 (D.D.C. 2013) (plaintiff adequately stated a liberty interest based on conditions "intended to remain in place for the duration of his 20-year sentence"); *Zadvydas v. Davis*, 533 U.S. 678, 690, 699 (2001) (defining "indefinite" as without "reasonably foreseeable" end and noting that "indefinite detention" of a non-citizen would raise "a serious constitutional problem").[8]

***Third***, Defendants do not dispute that Plaintiffs' indefinite isolation at ADX is atypical when compared to the length of routine administrative segregation. *Aref*, 833 F.3d at 255. Instead, Defendants suggest that because Plaintiffs are confined in solitary confinement conditions in the SCU, the conditions at ADX are not "atypical for them." Opp. 29. But that is not the legal standard. Rather, the Court must compare Plaintiffs' indefinite confinement at ADX with the "length of

---

[8] As Defendants acknowledge, placement at ADX is ordinarily temporary, with prisoners given the opportunity to earn their way to a less restrictive institution. *See* ECF 24-2 (Lazariuk Decl.) ¶ 4 (declaration of ADX Associate Warden describing "opportunities to demonstrate improved behavior and the ability, motivation, and willingness to integrate into an open inmate population (*i.e.*, a United States Penitentiary with an open yard and shared cells)"). But not for Plaintiffs; Defendant Bondi has pledged – twice – that regardless of their conduct, Plaintiffs ("the monsters Biden commuted") will be held at ADX for "the rest of their lives." ECF 4-1 at 7 & nn. 8-9. Defendant Bondi's directive demonstrates the irregular and punitive nature of Plaintiffs' impending transfer to ADX. And as a "departure from BOP's ordinary practice," it "support[s] Plaintiffs' argument that the designation process at issue here is hardly business as usual for the Bureau," and makes clear that "someone outside [BOP]" is "calling the shots." *Taylor I*, ECF 50 (Mem. Op.) at 17.

administrative segregation *routinely imposed on prisoners serving similar sentences*." *Aref*, 833 F.3d at 255 (emphasis added). Routine administrative segregation at a USP generally lasts "for a few weeks." *Aref*, 833 F.3d at 257.[9] Plaintiffs will be isolated at ADX for the rest of their lives. *See* Mot. 7 (Defendant Bondi confirming that Plaintiffs will "spend the rest of their lives" in ADX).

Defendants cannot show that Plaintiffs lack a protected liberty interest in avoiding indefinite isolation at ADX. Instead, they assert that because Plaintiffs are serving life sentences, and other people with life sentences are also housed at ADX, it is "not unreasonable" for BOP to isolate them there. Opp. 28. But, again, the question is how ADX conditions compare to conditions "*routinely* imposed on prisoners serving similar sentences." *Aref,* 833 F.3d at 255 (emphasis added). Most people serving life sentences are not at ADX; less than 0.25% of all people incarcerated in federal prisons are isolated there. ECF 4-2 (Stull Decl.) ¶ 54. While many more people in BOP custody "could be designated" to ADX, only this "handful" of Plaintiffs were singled out by Defendants to be sent there. *Aref*, 833 F.3d at 257. This "selectivity" is a critical factor that, combined with the duration of isolation at ADX, gives rise to a liberty interest even absent severity in conditions. *Id.* at 258.

### 2. Plaintiffs Have Demonstrated that Defendants' Process Is a Pretext Intended To Effectuate a Predetermined Result

Plaintiffs have established that Defendants denied them "the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)), by implementing a pretextual process with a predetermined result. The *Mathews* balancing test considers: (1) the private interest that will be affected; (2) the risk of erroneous deprivation and the probable value of additional procedural

[9] *Statistics: Restricted Housing*, Fed. Bureau of Prisons (Oct. 17, 2025), https://perma.cc/JJD5-EDRD (noting that, of 10,582 people in restricted housing, nearly 90% were there fewer than 90 days, and only 42 people were there longer than a year).

safeguards; and (3) the government's interest, including the fiscal or administrative burden that additional process may entail. *See Wilkinson v. Austin*, 545 U.S. 209, 224–25 (2005). Again, Defendants do not dispute many of Plaintiffs' arguments and do little to address the governing law.

***First***, Defendants do not dispute the first and third *Mathews* factors—that Plaintiffs' private interest is weighty, while the government's interest is minimal. Plaintiffs' private interest in avoiding ADX's uniquely isolating environment is "significant." *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015); *see also* Haney Decl. ¶¶ 30–61. Moreover, even if "[p]rison security . . . provides the backdrop of the State's interest," *Wilkinson*, 545 U.S. at 227, those interests have already been considered. Defendants do not dispute that the BOP took standard security considerations into account during their initial designation process and determined that each Plaintiff was appropriate for a USP or FMC. Nor is there any additional "fiscal [or] administrative burdens" on the BOP, *id.* at 225, because Plaintiffs seek reinstatement of the original placement decisions.

***Second***, there is a significant risk of erroneous deprivation, and "additional or alternative procedural safeguards" would demonstrably lower that risk. *See Wilkinson*, 545 U.S. at 225. Here, Defendants' recitation of BOP's standard procedures misses the mark. *See* Opp. 30. Rote reviews do not suffice. Rather, reviews must be "substantive and legitimate, not merely a sham." *Aref v. Holder*, 774 F. Supp. 2d 147, 166 (D.D.C. 2011) (citation modified).

Defendants do not dispute that—before the EO and Bondi Memo—BOP officials reviewed each of the Plaintiffs under § 3621's security-focused criteria and determined each was suitable for a USP or FMC, not ADX.[10] *See* Opp. 17-21, 42. Defendants also do not dispute that only

[10] Shane Salem disputes that any of these prior designations were "finalized" prior to the Redesignation Directive, Salem Supp. Decl. ¶ 17, but does not dispute that each of the Plaintiffs had been determined appropriate for a USP prior to the Redesignation Directive.

following the EO and Bondi Memo was each Plaintiff referred to ADX, interrupting the considered process of BOP officials and substituting the ADX designation process. *Id.* Before the ADX hearings, Defendants "developed a pre-review conclusion" to transfer Plaintiffs to ADX "no matter what the evidence shows"—the very definition of a sham process. *Proctor v. LeClaire*, 846 F.3d 597, 610 (2d Cir. 2017). And blanket ADX designations are exactly what have occurred.

Defendants assert that neither the EO nor the Bondi Memo "on their face" revise the statutorily prescribed factors for placement designations. Opp. 30. This assertion ignores reality. The EO commanded that Plaintiffs be "imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose." ECF 4-4 (EO) at 3. The marching orders were clear.

Nor can Defendant Salem's affidavit validate the pretextual proceedings. He asserts that he made individualized decisions based on the factors outlined in PS 5100.08 and the ADX Referral Memo. Salem Supp. Decl. ¶ 9. He does not dispute, however, that the ultimate ADX redesignations were based on Plaintiffs' capital convictions and President Biden's subsequent commutations without accounting for recent in-custody behavior. *Id.* ¶¶ 9-11, 17; *see also* Mot. 4-5 (discussing disciplinary history of Plaintiffs and rote, repetitious nature of hearing process). Meaningful process "commands a process, not a particular result." *Proctor*, 846 F.3d at 612. As such, Defendants may not rely "solely" on criminal history or "past events that will never change." *Id.*

Plaintiffs have demonstrated that any process here was "illusory" and meaningless, creating a "high risk that the procedures used by the defendants have resulted in erroneous deprivations." *Aref*, 774 F. Supp. 2d at 167. "Review with a pre-ordained outcome is tantamount to no review at all." *Proctor*, 846 F.3d at 610.

### D. Categorical Redesignations to ADX Violate Equal Protection

The Equal Protection claim is straightforward: Plaintiffs are similarly situated to the 18 people in federal custody previously resentenced from death to life without parole, none of whom

were automatically sent to ADX. By contrast, Plaintiffs were automatically referred to ADX, an unprecedented and unlawful deviation from BOP policy and practice. Gibson Supp. Decl. at 6-7.

Defendants do not dispute this core factual disparity. Nor do they offer legitimate penological justifications for treating Plaintiffs differently. Instead, they assert that Plaintiffs are "materially" different because of their "infamy," which "particularly exists by virtue of the unique circumstances under which their death sentences were commuted. Opp. 32 n.17. That is not a neutral distinction; it is a concession that Plaintiffs are being treated differently because of who commuted their sentences. It "is a status-based classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Romer v. Evans*, 517 U.S. 620, 622 (1996). Defendants' contrary arguments lack substance.

***First***, Defendants argue that Plaintiffs are not "more similarly situated to eighteen other former death-row inmates" than to the eight individuals whose sentences were commuted by President Biden and who were recently transferred to ADX. Opp. 32. But Plaintiffs do not dispute that they are similarly situated to the eight people who were recently transferred to ADX. Plaintiffs' common ground with them is the basis for this TRO motion: absent Court intervention, Plaintiffs face exactly the same punishment—automatic ADX placement—for exactly the same reason—Defendants' animus towards President Biden's commutations.

Defendants also argue that the prior 18 individuals are not similarly situated because some received commutations and some were resentenced by a court. Opp. 32 n.17. Not so. Both groups consist of people convicted of and sentenced for capital crimes in federal court. Defendants' argument that their crimes differed enough to justify disparate treatment defies logic and is unsupported by ***any*** evidence—evidence that is uniquely within their control. *See Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1086-87 (D.C. Cir. 2003) (presumption may arise from failure

to produce evidence to which party has access). *Reynolds v. Quiros*, 990 F.3d 286, 300-301 & n.64 (2d Cir. 2021), on which Defendants rely, supports Plaintiffs: the court found that a person resentenced from death to life after the death penalty was found unconstitutional was similarly situated to people resentenced from death to life due to trial irregularities, and the resulting disparate prison classification and housing conditions violated Equal Protection.

And Plaintiffs further allege that prior to the EO they were slated for transfer to various USPs, and it was only Defendants' actions and the Redesignation Directive and Mandatory ADX Policy that resulted in their ADX referrals. Defendants cannot escape the simple truth that out of the 55 people who were convicted of federal capital crimes and had death sentences changed to life without parole in recent years, the 18 before President Biden came into office were treated one way by BOP and the 37 who received commutations from President Biden were treated differently.

***Second***, Defendants claim to follow standard BOP practices, Opp. 33, which not only concedes that blanket redesignations to ADX would constitute disparate treatment, but also is false: President Trump publicly broadcast his hatred of Plaintiffs and directed his Attorney General to intervene in the BOP placement process; Defendant Bondi did so, and her office overturned BOP's considered judgment that no Plaintiff should be sent to ADX; BOP staff issued ADX referrals for every Plaintiff; and the Attorney General recently reaffirmed Defendants' animus and confirmed that Plaintiffs would be sent "to supermax facilities . . . where they will be treated like they're on death row for the rest of their lives." *Supra* n.3.

Defendants' reliance on Plaintiffs' "infamy" and crimes of conviction signals the same animus towards President Biden's clemency that drove these ADX referrals in the first place. Opp. 32 n.17. The [redacted]

[redacted] Stull Decl. ¶ 45 (emphasis added); Gibson Supp. Decl. at 4-5.

That animus rests on uncontroverted evidence, which Defendants simply ignore. They neither acknowledge nor explain Defendant Trump's public exhortation to Plaintiffs to "GO TO HELL!" or his characterization of them as "vile and sadistic." Compl. ¶ 46. The Supreme Court has recognized impermissible animus in far less inflammatory language, including in striking down a benefits restriction based on congressional distaste for "hippie communes." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 530-34 (1973) (the "desire to harm a politically unpopular group cannot constitute a legitimate governmental interest"). Following *Moreno*, district courts have found animus to be the motivating factor in several executive orders issued by President Trump. *See, e.g.*, *Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25 Civ. 716, 2025 WL 1276857, at *3 (D.D.C. May 2, 2025) (targeting law firm); *Orr v. Trump*, 778 F. Supp. 3d 394, 417-18 (D. Mass. 2025) (targeting transgender individuals). The same is true here, as the President wields his power against a politically unpopular group, with no rational basis for the resulting disparate treatment.

***Finally***, Defendants suggest that the Court must defer to Defendants and find BOP's tainted decisionmaking process has a rational basis. But deference is due when prison officials exercise their correctional judgment and expertise, not when politicians intervene to punish a disfavored group. And courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Given the clear animus here, "under any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection." *Orr*, 778 F. Supp. 3d at 418.

### E. Categorical Redesignations to ADX Constitute Deliberate Indifference in Violation of the Eighth Amendment

Claims of deliberate indifference to serious healthcare needs require proof of a defendant's state of mind, often challenging to procure. Here, Defendants make it easy. They [redacted] They [redacted] They trumpeted on national media that all of President Biden's commutees will be sent to ADX to be housed "in conditions that match their egregious crimes," *supra* n.2, months after the *Taylor I* litigation made clear the harm that would befall those with serious health conditions. Here, the harm to Plaintiffs is not an unintended consequence: it is the entire point.

Defendants contest very few of Plaintiffs' facts and expert opinions describing those harms. They do not contest that the Medical and Mental Health Plaintiffs have serious medical and mental health needs, [redacted] or that transportation to ADX will involve severe restraints with no reprieve for as long as 16 hours or more. Mot. 30-33, 38-41. They do not contest that Care Level 2 Facilities such as ADX have lower staffing levels and sparser community resources such as hospitals and specialists. *See id.* 28-29. They do not contest the extensive case law demonstrating that placement of people with serious mental illness in solitary confinement causes profound injury and violates the Eighth Amendment, or the DOJ's own repeated acknowledgments of this harm and the resulting Eighth Amendment violations. *See id.* 35-37. They do not contest the specific, grave risks

that transportation presents to the Mental Health and Medical Plaintiffs. *See id.* 33-34, 40-41. And they do not contest the Attorney General's statements demonstrating the intent to keep Plaintiffs at ADX for the rest of their lives. *See id.* 7 n.8.

Defendants' deliberate indifference is clear: their actions intentionally subject the Medical and Mental Health Plaintiffs to substantial risk of serious harm. *Helling v. McKinney*, 509 U.S. 25, 32 (1993). Defendants' arguments to the contrary fail: they variously miss the point, are unsupported, and run contrary to the evidence.

***First***, Defendants cite several cases where judges found conditions at ADX constitutional for certain plaintiffs between nine and 22 years ago. Opp. 37-38. But Plaintiffs do not argue in this motion that conditions at ADX are (or were) unconstitutional for everyone confined there. Instead, Plaintiffs demonstrate that specific conditions at ADX would expose them to substantial risk of harm based on their individualized needs, as attested by multiple medical professionals, including a former ADX psychologist and former BOP prison clinical director.

***Second***, Defendants argue that ADX can safely house people who are Care Levels 1, 2, and 3. Their only evidence is the declaration of an Associate Warden who manages security, has no professional healthcare credentials, and has been in his current role for less than a year. Lazariuk Decl. ¶ 1. As such, he is unqualified to opine on the level and quality of healthcare at ADX or its capacity to provide adequate care to any particular patients. *See, e.g.*, *id.* ¶¶ 19 (ADX "provides . . . appropriate medical treatment" for Medical Care Level 3 patients), 29 (ADX "provid[es] appropriate treatment to each of" its Mental Health Care Level 2 and 3 patients).

Even if he were qualified, the Associate Warden's conclusory statements cannot counter the detailed, specific concerns raised for each of the Medical and Mental Health Plaintiffs by clinicians with deep expertise and experience, including Dr. Nicoletta Turner-Foster, a former

prison clinical director with decades of experience delivering and supervising medical care in the BOP system, ECF 3-11; Dr. Andrea Brockman, a former ADX psychologist with over a decade of experience providing and directing care in multiple BOP correctional environments, ECF 3-23; Dr. Hillary Steinhart, a gastroenterologist and renowned expert on Crohn's disease who has written over 180 peer-reviewed scientific papers, 21 medical textbook chapters, and three books on gastroenterology and inflammatory bowel disease, ECF 3-13; and Dr. Natalie Novick Brown, a national expert with decades of experience researching, treating, and evaluating people with fetal alcohol spectrum and other mental health disorders, ECF 3-17.

***Third***, Defendants insist that the transfers do not pose a risk to Plaintiffs because BOP transfers so many people and because the recent transfers to ADX were "without significant incident." Opp. 36. They provide no details on the recent transfers, and no assurances to address the specific transportation concerns raised by Plaintiffs and their experts other than to say that BOP staff are able to bring medications and to drive to a medical facility in case of an emergency. *Id.* Notably, the declaration of BOP transportation staff simply states that people with conditions such as Plaintiffs' "are routinely transported," without describing any specific provisions that are made to protect them. ECF 24-3 (Stremmel Decl.) ¶ 13. The ability to drive to an emergency room does not justify placing vulnerable patients at serious risk of harm, such as [redacted]

***Fourth***, Defendants argue that Plaintiffs fail to show knowledge and disregard of excessive risks to Plaintiffs' health. Not so. Defendants' actions [redacted]

[redacted] their deliberate placement of patients at facilities outside of the appropriate Care Level, and their use of incorrect Care Levels to make it appear that patients have fewer healthcare needs were all set out and supported in Plaintiffs' papers. These actions serve one purpose: to get every Plaintiff to ADX, at whatever cost. As revealed by prior DOJ actions, undisputed case law, Mot. 37, and the above facts, Defendants ignore ADX's risks to seriously mentally ill and medically fragile Plaintiffs, proving deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) ("[C]laimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

## II. Plaintiffs' Imminent Transfer to ADX Constitutes Irreparable Harm

The loss of constitutional freedoms, even outside the context of the First Amendment, imposes an irreparable injury. Mot. 43 & n.28. So too does Defendants' violation of Plaintiffs' rights to individualized placement assessments. *Id.* And the loss of a right not to be placed in a supermax prison unjustly is irreparable the moment it occurs because Plaintiffs will be transferred to a facility with unquestionably worse conditions in violation of BOP's own procedures. Mot. 44.

Defendants brush those principles aside, but none of their arguments withstand scrutiny. Defendants urge that Plaintiffs have shown no harm because Defendants will prevail on the merits, Opp. 40, but that assumes the conclusion, and the evidence to date points in Plaintiffs' favor. Defendants also contend that they, as a general matter, take an incarcerated person's medical conditions into account when transferring to ADX, *id.*, but that is belied by the record and in any event does not refute the specific evidence that the Medical and Mental Health Plaintiffs who are medically fragile and/or have serious mental illness or cognitive disabilities will suffer injury through the transfer process. Mot. 7-8. And it defies credulity to contend that transfer of Plaintiffs,

done for the express purpose of, in Defendant Bondi's own words, forcing "monsters" to "spend the rest of their lives in conditions that match their egregious crimes," imposes no harm. Mot. 7.

## III. The Public Interest and the Balance of Equities Sharply Favor Plaintiffs

When the government violates the law and subjects plaintiffs to irreparable harm, the equities and public interest weigh in Plaintiffs' favor because "the Government cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (citation modified), and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (citation modified).

Defendants unpersuasively disagree. They ask this Court to assume they did not violate BOP policy, Opp. 41, but that again is assuming the conclusion on the merits. They also refer to the general deference courts provide to prison administrators, Opp. 42, but it is not the prison administrators who are making the decisions here. Instead, the public interest and balance of equities tilt decidedly in favor of a TRO where, as here, the government adopts a new, unlawful policy that exceeds any lawful discretion while concretely and imminently harming those subject to that policy.

## CONCLUSION

The TRO motion should be granted.

Dated: October 27, 2025
Washington, DC

Respectfully submitted,

*/s/ Maria V. Morris*

David C. Fathi, Wash. 24893****
Maria V. Morris, D.C. 1697904
Carmen Iguina González, D.C. 1644730
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org
mmorris@aclu.org
ciguinagonzalez@aclu.org

Brian Stull, N.C. 36002**
Claudia Van Wyk, Penn. 95130***
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, NC 27701
Tel: (919) 682-5659
bstull@aclu.org
cvanwyk@aclu.org

Corene T. Kendrick, Cal. 226642**
**ACLU FOUNDATION**
425 California St., Ste. 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Sara Norman, Cal. 189536**
**LAW OFFICES OF SARA NORMAN**
P.O. Box 170462
San Francisco, CA 94117
Tel: (415) 236-3763
sara@saranormanlaw.com

Laura Rovner, Colo. 35592*
Nicole Godfrey, Colo. 41546
Miriam Kerler, Colo. 56575
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

C.J. Sandley, Ala. 5317-S48R**
Kayla Vinson, Ala. 3664-S48Q***
D. Korbin Felder, Miss. 106643***
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

Martin Totaro*
**HECKER FINK LLP**
1050 K Street NW, Suite 1040
Washington, DC 20001
Tel: (202) 742-2661
mtotaro@heckerfink.com

*Attorneys for Plaintiffs*

* *Admitted pro hac vice.*
** *Pro hac vice motion pending.*
*** *Pro hac vice application forthcoming.*
**** *Not admitted in D.C.; practice limited to federal courts. Pro hac vice application forthcoming.*