**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

REJON TAYLOR, *et al.*,

                    *Plaintiffs,*

    and

DAVID RUNYON, *et al.*,

                 *Plaintiff-Intervenors,*

    v.

DONALD J. TRUMP, *et al.*, in their
official capacities,

                *Defendants.*

Case No. 25 Civ. 3742 (TJK)

**PLAINTIFFS AND PLAINTIFF-INTERVENORS'**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 3

    I.     BOP's May 6, 2026, Change Notice ....................................................................... 3

    II.    The Acting Attorney General Assumes Direct Control of ADX Redesignations ........... 3

    III.   BOP's Mandatory Procedures for ADX Placement ................................................ 4

    IV.   Blanche's New Process Discards BOP's Mandatory ADX Procedural Safeguards ........ 5

PROCEDURAL HISTORY.................................................................................................. 6

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ....................................................................................................................... 8

    I.     Plaintiffs Are Likely to Succeed on the Merits ...................................................... 8

        A.    Defendants Are Acting Ultra Vires Because Congress Assigned Designation Authority to BOP, Not to the Attorney General ....................................... 8

            1.    The Statutory Text Forecloses the Attorney General's Claimed Authority.. 9

            2.    *Giordano* Squarely Refutes Defendants' Argument .................................. 12

            3.    The Legislative and Regulatory History Confirm Congress Vested Designation Authority Exclusively in BOP ................................................ 13

            4.    Blanche's ADX-Specific Assertions of Authority Also Fail ...................... 14

            5.    The Ultra Vires Doctrine Forecloses Blanche's Claim to Redesignation Authority ............................................................................ 15

        B.    Blanche's New Redesignation Scheme Violates Procedural Due Process Protections.............................................................................................. 16

            1.    Plaintiffs Have a Recognized Liberty Interest in Avoiding ADX Placement.................................................................................... 17

            2.    ADX Procedures Were Built Through Litigation to Provide the Safeguards Defendants Have Now Eliminated ................................... 18

            3.    Due Process Requires Reliable, Structured Decisionmaking..................... 21

4.     The Blanche Process Removes Every Safeguard Designed to Promote Reliable ADX Determinations ...................................................................... 23

5.     The Blanche Process Fails Every Part of the *Mathews* Test ........................ 25

II.    Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief............................ 29

III.   The Balance of Equities and the Public Interest Overwhelmingly Favor Preliminary Relief ...................................................................................................................... 32

CONCLUSION.............................................................................................................................. 34

ii

# TABLE OF AUTHORITIES

**CASES**

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ................................................................................ 17

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ................................................................................................ 16

*Barnhart v. Peabody Coal Co.,*
    537 U.S. 149 (2003) ................................................................................................ 10

*Bell v. Wolfish,*
    441 U.S. 520 (1979) ................................................................................................ 25

*C.G.B. v. Wolf,*
    464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................ 33

*Clark v. Libr. of Cong.,*
    750 F.2d 89 (D.C. Cir. 1984) .................................................................................. 16

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ..................................................................................... 28, 29, 30

*Duncan v. Walker,*
    533 U.S. 167 (2001) ................................................................................................ 11

*Fuentes v. Shevin,*
    407 U.S. 67 (1972) ......................................................................................... 5, 30, 32

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ........................................................................... 30, 34

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 33, 34

*Louisiana Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ........................................................................................... 15, 31

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .......................................................................................... passim

*McKune v. Lile,*
    536 U.S. 24 (2002) .................................................................................................. 23

iii

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992)......................................................................................................... 9

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015)......................................................................................................... 15

*Propert v. District of Columbia*,
  948 F.2d 1327 (D.C. Cir. 1991) ................................................................................ 26, 29

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ................................................................................... 33, 34

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012)......................................................................................................... 9

*Sandin v. Conner*,
  515 U.S. 472 (1995)....................................................................................................... 17

*Simms v. District of Columbia*,
  872 F. Supp. 2d 90 (D.D.C. 2012) .................................................................................. 33

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)......................................................................................................... 11

*United States v. Giordano*,
  416 U.S. 505 (1974)................................................................................................. passim

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)....................................................................................................... 34

*Wilkinson v. Austin*,
  545 U.S. 209 (2005)................................................................................................. passim

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................................. 8

*Zinermon v. Burch*,
  494 U.S. 113 (1990)................................................................................................. passim

**STATUTES**

5 U.S.C. § 553................................................................................................................ 15

18 U.S.C. § 3621...................................................................................................... passim

18 U.S.C. § 2516(1) ....................................................................................................... 12

iv

28 U.S.C. § 509 ...................................................................................................... 8

**RULES & REGULATIONS**

28 C.F.R. § 0.96 .................................................................................................... 14

Fed. R. Civ. P. 65(c) ............................................................................................. 34

**OTHER AUTHORITIES**

57 Fed. Reg. 38,771 (Aug. 27, 1992)..................................................................... 14

Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 (1984) ............. 10

Holmes Lybrand, *Acting AG says 'Nobody has any idea why' Pam Bondi was fired
   except for Trump*, CNN (Apr. 7, 2026, at 14:57 ET), https://www.cnn.com/
   2026/04/07/politics/todd-blanche-nobody-knows-why-bondi-was-fired ......................... 25

S. Rep. No. 98-225, at 141 (1983) ......................................................................... 13

**INTRODUCTION**

This case presents a question the Court has effectively already answered: whether senior Department of Justice ("DOJ") officials may control ADX redesignation decisions through a process that denies Plaintiffs and Plaintiff-Intervenors (together, "Plaintiffs") a neutral decisionmaker and a meaningful opportunity to be heard. Four months ago, the Court held they may not. It halted Plaintiffs' transfer to the U.S. Penitentiary Florence Administrative Maximum Facility ("ADX") in Florence, Colorado, finding it "likely" that political pressure from senior DOJ leadership had so permeated the redesignation process that Plaintiffs were deprived of core procedural protections. That "likely" constitutional violation constituted irreparable harm, and the Court preliminarily enjoined any transfers to ADX while this suit proceeds.

In response to that order, Defendants announced on May 7, 2026, that Plaintiffs' ADX redesignations had been vacated—and then, that same day, sent letters to each Plaintiff stating that each had again been presumptively redesignated to ADX. This time the decision did not come from the Bureau of Prisons ("BOP"), the agency designated by Congress to make placement decisions. It came from DOJ's highest political official: Acting Attorney General Todd Blanche.

Only later did Plaintiffs learn why. The day before Blanche issued his letters, BOP quietly revised its central classification Program Statement to give the Attorney General sweeping authority to designate or redesignate incarcerated individuals at any time. Armed with that new authority, Blanche informed each Plaintiff that he—not BOP—would decide their placement. He had already made a "presumptive determination" to send each Plaintiff to ADX; he gave them 30 days to submit unspecified "applicable materials"; and he declared that his final determination would not be appealable through the Administrative Remedy Program. This newly announced redesignation regime—hereinafter, the "Blanche Process"—now governs Plaintiffs' placement.

The Blanche Process repeats the precise defect this Court condemned—only more directly.

1

Instead of heeding the Court's findings and removing the improper senior official influence that tainted the prior process—initiated by President Trump's animus-driven Executive Order and implemented by then-Attorney General Pam Bondi's Memorandum—Defendants have removed BOP altogether and vested redesignation authority in the very office whose interference created the problem. The Constitution does not allow as a cure a more concentrated dose of the disease. Under the logic of the Court's prior preliminary injunction decision, the Blanche Process is unlawful in its structure, its substance, and its execution.

Two independent defects compel that conclusion. *First*, the Blanche Process is ultra vires. Congress assigned designation authority to BOP, not to the Attorney General. That unambiguous statutory command forecloses any attempt to seize control of the function through a Program Statement or executive fiat. The Acting Attorney General cannot override Congress simply by declaring himself the decisionmaker. *Second*, the Blanche Process violates due process. For decades, BOP has used a multilayered system depending on the expertise of corrections professionals—refined through litigation and repeatedly defended in federal court—to allow accurate and lawful ADX placements. The Blanche Process discards every safeguard that system provided: no disclosure of evidence, no hearing, no neutral adjudicator, no written findings, no psychological evaluation, no multi-level review. It offers only a one-person, no-appeal process run by a political official with no corrections expertise—and no statutory authority. That is the antithesis of the reliable, meaningful, and unbiased decisionmaking process that Supreme Court jurisprudence and this Court's prior order demand.

Each defect independently warrants preliminary relief. The law has not changed since this Court issued its first injunction; Defendants' commitment to bypassing it has simply taken a new form. The same question the Court answered in February arises again—only in sharper form. And

it warrants the same answer. The Court should enjoin Defendants from enforcing an unlawful process and restore the statutory and constitutional protections that govern ADX redesignations.

## FACTUAL BACKGROUND

I.      **BOP's May 6, 2026, Change Notice**

On May 6, 2026, BOP issued a Change Notice to Program Statement 5100.08, which contains BOP's binding policies and procedures for designating and redesignating individuals in federal custody. ECF 87-1 ("Amended Program Statement"). That revision purports to authorize the Attorney General, "[i]n certain circumstances," to "exercise authority to designate or redesignate the place of a prisoner's imprisonment." ECF 87-1 at 2.[1] The Amended Program Statement offers no standards for when that authority may be exercised and provides no explanation for why BOP is relinquishing the very function Congress assigned to it in 18 U.S.C. § 3621. The Amended Program Statement effected a substantive shift: it transferred designation authority from BOP to the Attorney General and laid the foundation for the Acting Attorney General's exercise of that authority.

II.     **The Acting Attorney General Assumes Direct Control of ADX Redesignations**

On May 7, 2026, Acting Attorney General Blanche informed each Plaintiff via individual letters that he—not BOP—would conduct a new redesignation process. *See* ECF 87-3 ("Blanche Letters"). He asserted authority to make "individualized redesignation decisions pursuant to 18 U.S.C. § 3621(b) and BOP Program Statement P5100.8, CN-3," declared that he had "decided to exercise this authority" in every Plaintiff's case, and stated that he would issue "a final

---

[1] Citations to "ECF __ at __" use the file-stamped pagination in the document headers.

individualized determination" after receiving any submissions within 30 days. *Id.* at 2, 3.[2]

The letters revealed a predetermined outcome. Blanche announced a "presumptive determination" that each Plaintiff "should be transferred" to ADX—the most restrictive facility in the federal prison system—based not on BOP's current assessments but on decades-old prior convictions and capital sentencing.[3] *Id.* at 2. He directed Plaintiffs to route any materials to him through their Unit Managers at U.S. Penitentiary-Terre Haute and said he would consider the statutory criteria in § 3621(b). *Id.* at 3. But he identified no role for any BOP entity, no neutral hearing, no psychological or medical evaluation, and no appeal process. Instead, he made explicit that his final redesignation decisions "will not be appealable through the BOP Administrative Remedy Program." *Id.* at 4.

## III.    BOP's Mandatory Procedures for ADX Placement

BOP has long required a rigorous, multi-tiered process before any individual may be transferred to ADX's General Population. These procedures, set forth in the 2012 ADX Referral Memo are exhaustive. *See* ECF 4-9 (2012 ADX Referral Memo). They require:

- referral by institution staff, *id.* at 4-5;
- review and concurrence by the Warden and Regional Director, *id.* at 5;
- an initial assessment by the Designation and Sentence Computation Center ("DSCC"), *id.* at 5;
- simultaneous review by Psychology Services to determine individuals' psychological suitability to withstand the conditions at ADX, *id.*;[4]

---

[2] Each of the Blanche Letters contains the same representations regarding the Acting Attorney General's authority and the Blanche Process. *See* ECF 87-3 at 2-4, 5-7, 8-10, 11-13, 14-16, 17-19, 20-22, 23-25, 26-28, 29-31, 32-34, 35-37, 38-40, 41-43, 44-46, 47-49, 50-52, 53-55, 56-58, 59-61, 62-64.

[3] Many of the Blanche Letters included highly prejudicial and demonstrably false statements about Plaintiffs' convictions and behavior. *See* ECF 88-2 at 1.

[4] Per BOP Program Statement 5310.16 (entitled "Treatment and Care of Inmates With Mental Illness"), the "[p]lacement of a seriously mentally ill inmate in the ADX . . . will only occur if

4

- notice to the incarcerated person with "[s]pecific evidence which forms the basis for the referral," *id.* at 8;
- a hearing conducted by a neutral Hearing Administrator with correctional expertise and familiarity with BOP policies and operations, appointed by the National Discipline Hearing Administrator, *id.* at 2, 5, 8;
- an opportunity for the incarcerated person to review and respond to the evidence, *id.* at 8-9;
- a written recommendation by the Hearing Administrator with specific reasons, *id.* at 9;
- review and approval by the Assistant Director of the Correctional Programs Division, *id.* at 10; and
- a two-level administrative appeal, *id.*

At every stage—from the initial referral through final appeal—the procedures assign responsibility exclusively to BOP officials. They leave no role for the Attorney General, no mechanism for Attorney General-initiated referrals, and no avenue for political oversight.

## IV. Blanche's New Process Discards BOP's Mandatory ADX Procedural Safeguards

The Blanche Process discards the entire ADX referral and redesignation framework. It includes:

- no involvement of institution staff, Warden, Regional Director, or DSCC;
- no psychological-suitability review;
- no Notice identifying "specific evidence";
- no neutral Hearing Administrator with correctional expertise and experience in BOP designation and redesignation policies and procedures;
- no hearing of any kind;
- no written recommendation from BOP; and
- no administrative appeals.

*See* ECF 87-3.

Instead, Acting Attorney General Blanche offered Plaintiffs a single-step process: Plaintiffs were permitted to submit materials to him within 30 days of the date of his letter. *See id.* at 3.[5] He

---

extraordinary security needs are identified that cannot be managed elsewhere." ECF 4-7 (BOP PS 5310.16) at 19.

[5] Plaintiffs submitted materials to Blanche because the Blanche Process left them no meaningful choice. Under the new regime, Blanche had already issued "presumptive determinations"

will then issue a non-appealable final determination. *See id.* at 4. That unilateral process directly conflicts with—and wholly replaces—the mandatory, multilayered procedures Congress and BOP require for ADX placement.

## PROCEDURAL HISTORY

After President Biden commuted the death sentences of 37 individuals in December 2024, BOP began its ordinary redesignation process for each commuted individual, including the 21 Plaintiffs here. For Plaintiffs, that process initially unfolded as it always had: BOP professional penological staff conducted individualized assessments, discussed potential placements with Plaintiffs' post-conviction counsel, and indicated that ADX was not being considered for most Plaintiffs and had been considered but rejected for others due to serious mental illness. ECF 1 (Complaint),[6] ¶¶ 4, 79-85.

That changed when President Trump took office on January 20, 2025. His day-one Executive Order directed the Attorney General to reevaluate the commutees' placements and to ensure conditions reflecting "the monstrosity of their crimes." ECF 4-4 (EO 14164). Within days, a BOP lawyer advised Plaintiffs' post-conviction counsel that senior DOJ officials would now "approve" all redesignation recommendations—an unprecedented political intrusion into a historically administrative process. ECF 1 ¶ 87. BOP staff subsequently reported that the Attorney General and Deputy Attorney General had directed that all commutees be referred to ADX

---

redesignating each Plaintiff to ADX and stated that his final decisions would be unreviewable. Plaintiffs thus faced the prospect of a final, unappealable designation—and had to choose whether to submit substantive information or to reject the process entirely and leave standing false and illegal statements. Their compliance was compelled by the structure of the process and does not signal acquiescence in its legality. *See*, *e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 94-96 (1972) (participation in an unlawful procedure does not waive the right to challenge the procedure itself).

[6] ECF 1 was filed publicly with redactions. An unredacted version was filed under seal at ECF 3-2.

regardless of BOP's assessments. *Id.* ¶ 89. Between February and May 2025, the results followed: Defendants referred every Plaintiff for an ADX hearing; every hearing administrator recommended ADX; and the BOP Assistant Director adopted every recommendation and redesignated all Plaintiffs to ADX. *Id.* ¶¶ 91-101.[7]

After completing their administrative appeals, Plaintiffs filed this action, along with a motion for a temporary restraining order, in October 2025. ECF 1, 4. On February 11, 2026, the Court granted a preliminary injunction, finding Plaintiffs likely to succeed on their due process claim because the redesignation proceedings appeared predetermined. ECF 71 ("PI Op."). That injunction currently remains in effect through August 10, 2026. ECF 86 at 2. To date, Defendants have refused to consent to the injunction's renewal past that time.

On May 8, 2026, Defendants filed a Notice with this Court announcing vacatur of Plaintiffs' prior ADX redesignations and that Acting Attorney General Blanche had sent letters to Plaintiffs advising that he would personally conduct a new redesignation process. *See* ECF 87. His actions replicated the very defects the Court had already found likely unlawful. But instead of merely interfering with BOP's redesignation process, the Acting Attorney General is now outright displacing it. Now that Plaintiffs have submitted their materials for Blanche's consideration, final redesignation decisions are imminent. Plaintiffs seek preliminary injunctive relief to enjoin a process that is both ultra vires and unconstitutional.

---

[7] Brandon Basham—whom Plaintiffs seek to add to this action as a new party through a supplemental complaint filed contemporaneously with this motion—"was initially transferred to the Medical Center for Federal Prisoners in Springfield Missouri due to urgent mental health needs . . . . After Basham was transferred back to Terre Haute in December 2025, he was referred to ADX Florence the following month." PI Op. 6 n.2. He was not, however, ultimately redesignated under the prior process that was found likely illegal by the Court. He was presumptively redesignated under the Blanche Process.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must show that: (1) they will likely succeed on the merits; (2) they will likely be irreparably harmed if relief were withheld; (3) the balance of equities tilts their way; and (4) the public interest favors injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

The Blanche Process is ultra vires because Congress assigned designation authority to BOP, and under settled law, the Attorney General cannot commandeer a function Congress specifically vested elsewhere. The Blanche Process also violates due process because it strips away the expert, neutral, multilayered procedures that have long been required to ensure reliable ADX determinations and replaces them with a one-person, no-review process that the Constitution does not tolerate. Either one of these defects is enough to warrant an injunction.

I.    **Plaintiffs Are Likely to Succeed on the Merits**

A.    **Defendants Are Acting Ultra Vires Because Congress Assigned Designation Authority to BOP, Not to the Attorney General**

Blanche's claim to redesignation authority fails for a simple reason: Congress gave that power to BOP, not the Attorney General. Section 3621(b) names the actor and defines the task, and under settled canons, that specific assignment overrides any generalized authority that may exist under 28 U.S.C. § 509. *United States v. Giordano*, 416 U.S. 505 (1974), confirms the point, holding that when Congress designates who may perform a function, § 509 cannot expand or commandeer it. Legislative and regulatory history say the same thing: Congress moved custody and designation authority out of the Attorney General's hands and into BOP's. By asserting power Congress vested elsewhere, Blanche acts ultra vires, making Plaintiffs likely to succeed in their challenge.

BOP's Amended Program Statement purports to endow the Attorney General with

8

"authority to designate or redesignate" incarcerated individuals. ECF 87-1 at 2. But Congress already assigned designation authority to BOP alone in § 3621(b). BOP cannot divest itself of that statutory responsibility. Nor may it confer on the Attorney General a power Congress deliberately withheld. The Amended Program Statement thus exceeds statutory authority on its face. And because the Blanche Process depends entirely on this defective predicate, it rests on an ultra vires foundation.

### 1.    The Statutory Text Forecloses the Attorney General's Claimed Authority

Section 3621(b) specifies that "the Bureau of Prisons" shall designate the place of imprisonment and consider the enumerated statutory factors when determining a person's place of imprisonment. Congress's text is explicit and actor-specific.

Defendants' Amended Program Statement invokes § 509's general vesting clause to argue the Attorney General may assume designation authority so long as he follows § 3621(b)'s requirements. *See* ECF 87-1. That argument fails for multiple reasons.

For starters, it violates the fundamental canon that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). The canon applies when a general authorization sits beside a more focused, detailed one: in that scenario, the specific controls to prevent the general from swallowing it and rendering Congress's targeted instruction meaningless. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citing *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). That is exactly the situation here. Congress enacted a detailed scheme for designation decisions and deliberately assigned that responsibility to BOP. Section 3621(b)'s specific allocation cannot be displaced by § 509's broad grant of supervisory authority.

A neighboring canon—*expressio unius est exclusio alterius*—confirms the point. The

9

canon teaches that when a statute singles out specific actors or items it intends to include, it ordinarily signals that anything left unmentioned was purposefully excluded. The Supreme Court has explained that the canon applies "only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence," and only when it is "fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (citation modified). Here, § 3621(b) satisfies those conditions. Within DOJ, the relevant "associated group" consists of the Attorney General and the subordinate components to whom Congress might assign custodial functions. And Congress showed that it knew how to assign such functions to the Attorney General when it wished to: in the very same statute, § 3621(h) expressly charges "the Attorney General" with implementing a risk and needs-assessment system. Yet in § 3621(b), Congress identified only BOP as the entity that "shall designate" the place of imprisonment, selecting one member of that limited set and omitting the others. Under *Barnhart*'s framework, that intra-statutory contrast demonstrates an intentional choice: when Congress wanted the Attorney General to act, it said so; when it vested authority in BOP, it said that too. The express appearance of the Attorney General elsewhere in § 3621 strongly indicates that Congress did not intend for the Attorney General to share or assume the designation power that § 3621(b) assigns exclusively to BOP. That is precisely the circumstance in which the *expressio unius* inference is strongest: where Congress faced a discrete menu of institutional actors and conferred the authority in explicit terms to some and not others.[8]

---

[8] When Congress wrote § 3621 as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 (1984), it expressly identified BOP as the official actor that "shall designate" individuals' places of confinement, while simultaneously removing that authority from

10

Additionally, Defendants' reading would violate the surplusage canon. Courts avoid interpretations that render statutory text superfluous. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Allowing Defendants to replace BOP in designation decisions would nullify Congress's specific choice to place this authority in BOP. Indeed, if the Attorney General can take over that authority by invoking § 509's general vesting clause, then Congress's choice of BOP does no work at all, which leaves § 3621(b)'s actor-specific command as surplus.

The structure of § 3621(b) reinforces this point. Congress was intentional in assigning this work to BOP, an entity with a multilayered designation system staffed by specialists in corrections, classification, and institutional placement. For example, BOP's 2012 ADX-specific referral procedures require, among other things: (1) DSCC assessments; (2) a simultaneous clinical evaluation by Psychology Services; (3) a hearing before a neutral Hearing Administrator with corrections experience and knowledge of BOP policies and practices; and (4) a two-level administrative appeal. ECF 4-9 at 5, 8, 10. BOP Program Statement 5100.08 likewise reflects BOP's technical expertise in classification and designation. *See* ECF 4-8 (Program Statement 5100.08); *see also* PI Op. 3-4 (outlining ADX referral procedures and observing that "there are special procedures for transferring inmates there" because "ADX Florence is meant only for inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others" (quotations omitted)). These features underscore why Congress put designation authority in BOP: the task demands professional judgment grounded in corrections expertise, not political score-settling.

---

the Attorney General. *See infra* § I.B.3. That legislative history also confirms Congress *did* consider—and deliberately excluded—the Attorney General from the designation function.

The Amended Program Statement cannot change that result, and the Attorney General's attempted assumption of authority cannot override Congress's explicit choice of BOP as the sole decisionmaker.

### 2.    *Giordano* Squarely Refutes Defendants' Argument

Defendants appear to believe that § 509 gives the Attorney General residual authority to exercise *any* DOJ function. *See* ECF 87-1 at 2 (invoking § 509). But that theory of § 509 cannot be squared with the Supreme Court's decision in *Giordano*. There, DOJ argued that § 509 vested all functions of the Department in the Attorney General, and that § 510 permitted him to delegate freely, meaning he could authorize wiretap applications through any official he chose. *See Giordano*, 416 U.S. at 513. The Supreme Court disagreed. It held that 18 U.S.C. § 2516(1) "expressly addressed" who could approve such applications and "specifically limited" that authority to the Attorney General and those Assistant Attorneys General he "specially designated" for that task. *Id.* at 514, 519 n.8.

The reasoning in *Giordano* is straightforward. Although §§ 509 and 510 may supply broad background principles, they give way where Congress has spoken with specificity. Thus, once Congress "specifically limited" the authority to named officials, the government could not rely on the general supervisory and delegation provisions in §§ 509 and 510 to trump the specific statutory directive in § 2516(1). *Id.* at 514. Section 2516(1) confined the power to the officials Congress identified, and §§ 509 and 510 could not expand or reassign that function.

*Giordano* also reflects that when Congress vests a sensitive, expert function in a specific DOJ component or officer, general vesting clauses such as those in §§ 509 and 510 cannot override that choice. There, the Court explained that when Congress assigns a sensitive function to a specific official, it does so because it wants the informed, expert judgment of that official—not *ad hoc* delegation to others. *See* 416 U.S. at 515-17, 520 (noting that Title III interposes "the mature

12

judgment of a particular, responsible [DOJ] official . . . as a critical precondition" to wiretap applications, and that Congress deliberately centralized this authority in officials with the "responsibility" necessary to exercise it).

This is precisely the structure of § 3621(b). Congress specifically assigned designation power to "the Bureau of Prisons," and nowhere authorized the Attorney General to exercise that function. Under *Giordano*, that specificity controls. Section 509 cannot override Congress's decision. Nor can the Attorney General confiscate authority Congress chose to vest in a different official or component.

The statute's design further emphasizes the point. Congress entrusted the expertise-driven designation function to an identified institutional actor with the professional capacity to carry it out. That is precisely the sort of targeted delegation *Giordano* protects from displacement by § 509's more general language. The nature of the task and the placement of the authority confirm that the statute fits squarely within *Giordano*'s rule: when Congress assigns a function to a specific official or entity, the Attorney General's general powers must yield.

### 3.     The Legislative and Regulatory History Confirm Congress Vested Designation Authority Exclusively in BOP

Both the legislative record and DOJ's own regulations tell the same story: when Congress enacted § 3621 as part of the Comprehensive Crime Control Act of 1984, it intentionally removed the Attorney General from designation decisions and placed that responsibility squarely in BOP.

The Senate Report could not have been clearer. The Act "places custody of Federal prisoners directly in the Bureau of Prisons rather than in the Attorney General" and states that "the authority to designate the place of confinement for Federal prisoners rests in the Bureau of Prisons." S. Rep. No. 98-225, at 141 (1983). Congress thus made a deliberate structural choice— not a technical edit—to assign these decisions to the agency with institutional expertise, rather than

13

to DOJ's political leadership.

DOJ's regulatory actions confirm Congress's design. Before 1984, 28 C.F.R. § 0.96 reflected the Attorney General's authority over placement decisions. *See* 28 C.F.R. § 0.96 (1983). The regulation operated as a delegation from the Attorney General to BOP: it provided that the BOP Director exercised designation authority because the Attorney General assigned it to him. *See id.* In other words, BOP's authority flowed from the Attorney General's supervisory power. Congress changed that framework in 1984. After Congress enacted § 3621(b), DOJ amended § 0.96 to recognize the legislative change: for offenses committed on or after November 1, 1987, the regulation no longer described designation authority as delegated from the Attorney General. Instead, it recognized that Congress itself had vested that authority directly in the BOP Director. The Federal Register explained the shift expressly: Congress had "vested certain authority in the [BOP] Director regarding the confinement of convicted persons," authority that "previously had been vested in the Attorney General and delegated to the Director." 57 Fed. Reg. 38,771 (Aug. 27, 1992). DOJ also clarified that earlier delegations of authority from the Attorney General to the BOP Director applied only to offenses committed before November 1, 1987. *Id.*

Taken together, this history underscores what the statutory text already makes plain: Congress chose BOP to exercise designation authority, not the Attorney General. And DOJ, in its own rulemaking, acknowledged that choice.

### 4.    Blanche's ADX-Specific Assertions of Authority Also Fail

Even if the Attorney General had some role in ordinary designation decisions—and he does not—the decision to redesignate individuals to ADX would still be wholly beyond the Attorney General's authority. BOP's ADX procedures assign every step of the process to BOP officials: institution-level referral; Warden and Regional Director concurrence; DSCC assessment; comprehensive psychological evaluation; a hearing before a neutral BOP Hearing Administrator;

14

written findings and recommendations; and two levels of administrative appeal review. ECF 4-9 at 4-10. These procedures reflect how BOP exercises the authority Congress vested exclusively in it. They leave no portion of the ADX designation function to the Attorney General.

Blanche's unilateral "presumptive determination," direct solicitation of submissions from Plaintiffs, and claim of "final" and non-appealable decisions cannot override Congress's allocation of authority. Agencies cannot nullify statutory requirements or create new adjudicative procedures without congressional authorization or valid rulemaking. *See* 5 U.S.C. § 553; *see also Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). And an agency program statement cannot amend an act of Congress or supply authority Congress expressly withheld from the Attorney General.

The Blanche Process therefore rests on an unlawfully assumed power. Because the Amended Program Statement could not lawfully transfer redesignation authority to him, Blanche's reliance on that revision renders the entire Blanche Process ultra vires from the outset.

### 5.    The Ultra Vires Doctrine Forecloses Blanche's Claim to Redesignation Authority

An official "literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That rule carries particular force where, as here, an official asserts authority that Congress expressly vested in a different entity. *Giordano* enforced precisely that limit: DOJ could not reassign a statutory function to an official Congress did not name, even for reasons of administrative convenience. 416 U.S. at 523. Blanche's claim goes further still. He asserts not a narrow approval function, but plenary redesignation power that § 3621(b) assigned exclusively to BOP.

Nothing in § 3621(b) authorizes the Attorney General—or anyone acting on his behalf— to designate or redesignate individuals, bypass BOP's Administrative Remedy Program, or create an entirely new, exclusive redesignation process by letter. And under *Giordano*, § 509 cannot fill

that gap where Congress "specifically limited" who may perform the function. 416 U.S. at 514.

This Court has inherent equitable jurisdiction to enjoin ultra vires action by federal officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Sovereign immunity poses no barrier, because "[i]t is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority." *Clark v. Libr. of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).

The ultra vires doctrine bars officials from exercising authority Congress gave to someone else. Because Blanche claims a power Congress vested exclusively in BOP, his redesignation regime is unlawful on its face. Plaintiffs are therefore likely to prevail on this claim.

**B.      Blanche's New Redesignation Scheme Violates Procedural Due Process Protections**

This due process claim is both straightforward and urgent. Plaintiffs challenge a wholesale replacement of the constitutional architecture that has long governed ADX referrals. For decades, BOP used a structured, expert-driven, multilayered process—refined through litigation and defended in federal courts—designed to ensure that ADX designations were appropriately limited to those who had "demonstrated an inability to function in a less restrictive environment without being a threat to others" and could not be placed in any other facility. ECF 4-8, ch. 7, p. 17. In fact, BOP made repeated representations that there was "no reasonable expectation" the agency would ever abandon that process. Exhibit A (Defendants-Appellees' Resp. Br., *Rezaq v. Nalley*, No. 11-1069 (10th Cir. July 4, 2011)) at 27. DOJ has now swept it aside and substituted a one-person, no-review process—overseen by a political official with no corrections experience or statutory authority—that discards every safeguard the Constitution requires.

The Due Process Clause does not tolerate such a regime. Under foundational Supreme

16

Court jurisprudence, due process protects individuals from being subjected to unreliable decisionmaking machinery that creates an unacceptably high risk of erroneous, unjustified deprivation. *See Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). The violation occurs at the threshold, when the government forces a person into procedures incapable of producing reliable results. *See id.*

The claim proceeds in three steps. *First*, Plaintiffs have a recognized liberty interest in avoiding ADX placement, a form of confinement this Court has already found likely to impose an "atypical and significant hardship." PI Op. 13-17. *Second*, the history of the ADX referral system shows that BOP deliberately constructed multiple layers of expertise, neutrality, and evidentiary development to meet constitutional requirements—precisely the safeguards the Blanche Process eliminates. *Third*, applying well-established due process principles makes clear that the Blanche Process cannot produce reliable, lawful determinations. A system that removes expert decisionmakers, eliminates neutral review, discards pre-deprivation hearings, obscures evidence, and forecloses meaningful participation fails every part of the constitutional test.

### 1. Plaintiffs Have a Recognized Liberty Interest in Avoiding ADX Placement

This Court has already held that ADX placement likely imposes an "atypical and significant hardship" triggering constitutional protection. PI Op. 13. It found that ADX is "the most restrictive prison in the federal system," that its conditions are extraordinarily isolating, and that the deprivation is selective, severe, and potentially permanent. *Id.* at 2, 15-16. These conditions exceed those deemed sufficient to trigger a liberty interest in *Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016), and fall squarely within the *Sandin v. Conner*, 515 U.S. 472 (1995), and *Wilkinson v. Austin*, 545 U.S. 209 (2005), line of cases. *See* PI Op. 14-16.

With the liberty interest established, due process requires procedures proportionate to the

risk of error in a high-stakes determination.

### 2.    ADX Procedures Were Built Through Litigation to Provide the Safeguards Defendants Have Now Eliminated

To evaluate the new process, one must understand the history of the ADX-referral framework. That history shows that, in response to litigation, BOP strengthened its ADX procedures over time *specifically* to address due process vulnerabilities—the very vulnerabilities that the Blanche Process resurrects.

### a.    The 2007 Nalley Memo: The First Scaffold

Prior to 2007, ADX referrals lacked meaningful structure, and the process resulted in litigation. Individuals designated to ADX challenged their ADX confinement, alleging deprivation of a liberty interest and constitutionally insufficient process for ADX designation. *See* Exhibit B (Defendants-Appellees' Mot. to Dismiss for Mootness, *Rezaq v. Nalley*, No. 11-1069 (10th Cir. Mar. 4, 2011), ECF 18-1) at 4. In response to litigation, BOP issued a memorandum regarding ADX General Population Referral Criteria and Procedures ("Nalley Memo"), signed by Michael K. Nalley, BOP's Regional Director for the North Central Region. *Id*. at 5. The Nalley Memo required a five-step process including a: (1) referral, (2) hearing officer, (3) review and final decision, (4) opportunity to appeal, and (5) designation. *See id*. at 5-6. The process necessitated administrative review by BOP's general counsel of the Regional Director's decision. *See id*. at 6. These reforms acknowledged that ADX placement demands more process than ordinary transfers.

### b.    The 2010 Dodrill Memo & 2012 ADX Referral Memo: A Major Constitutional Redesign

As these lawsuits proceeded, BOP furthered its attempts to correct the Nalley Memo's constitutional defects. In 2010, it issued the Dodrill Memo, *see id.*, a sweeping overhaul that created exactly the kind of reliability-enhancing system designed to safeguard against the risk of erroneous deprivation of an individual's protected liberty interest:

18

- initiation of the referral by institution-level staff;
- Warden-level review of the referral for approval;
- Regional Director-level review of the referral for approval;
- centralized referral processing by DSCC;
- hearings conducted by neutral Hearing Administrators with correctional expertise;
- the opportunity to be present at, and participate in, hearings;
- disclosure of the specific evidence supporting referral;
- written findings providing "specific reasons for the recommendation with sufficient detail";
- final decisionmaking by the Assistant Director of the Correctional Programs Division; and
- a two-level Administrative Remedy appeal.

*See* Exhibit C ("Dodrill Memo") at 1-5. After the *Rezaq/Saleh* plaintiffs appealed, BOP disclosed the Dodrill Memo, arguing that its procedures mooted the plaintiffs' due process claims. *See* Exhibit B at 6, 11-12. That is, BOP crafted these reforms in direct response to the due process issues highlighted in the ongoing litigation. BOP added additional protections in the 2012 ADX Referral Memo, *see* ECF 4-9, which remains operational today.[9]

### c. BOP's 2011 Representations: These Safeguards Were Necessary and Permanent

In its 2011 motion to dismiss for mootness in *Rezaq*, BOP made four sweeping representations to the Tenth Circuit. In an express attempt to secure dismissal of live constitutional claims, it told the court that the Dodrill Memo's procedures were "materially different" from the earlier Nalley Memo's framework; that they governed every ADX referral; that they directly addressed the due process concerns raised in the ongoing litigation; and that BOP would not revert to the prior, less protective system. Exhibit B at 3, 11-12, 16-17. Those were categorical, litigation driven promises made directly to a federal court.

---

[9] On October 15, 2012, Blake R. Davis, Assistant Director of the Correctional Programs Division, issued the ADX Referral Memo, superseding the Dodrill Memo. As relevant here, it mandated an additional step in the ADX referral process: medical and mental-health screening by trained clinicians. *See* ECF 4-9 at 4.

BOP's representations amounted to an acknowledgment—and a commitment. In adopting the new procedures, BOP recognized that constitutionally reliable ADX referrals require expert judgment, neutral review, and multiple layers of correctional scrutiny, and it assured the courts that this structure would remain in place going forward. DOJ's decision now to abandon the very safeguards it previously advanced as necessary to prevent unconstitutional ADX placements undermines the credibility of its present position and reinforces the need for judicial intervention.

> **d.      The Blanche Process: Discarding the Constitutional Safeguards by Fiat**

Under the structural principles set out in *Zinermon v. Burch*, *Mathews v. Eldridge*, and *Wilkinson v. Austin*, as discussed in the following section, the government cannot discard the very forms of expertise, evidence development, and multilayered review that BOP adopted to ensure constitutionally reliable ADX designations. And BOP has already acknowledged the constitutional significance of these protections.

In the litigation that prompted the Dodrill Memo, BOP submitted a side-by-side table comparing each procedural safeguard the Supreme Court deemed essential in *Wilkinson* with the corresponding features of the ADX process. *See* Exhibit D (*Rezaq v. Nalley*, No. 07 Civ. 2483 (D. Colo. Dec. 24, 2009), ECF 112-7). Using that table, BOP represented to the court that the ADX framework mirrored *Wilkinson* at every stage: expert referral, multilayer review, evidence development and disclosure, a hearing before a neutral official, written findings, termination of the process if any reviewer disagreed, and two layers of appeal. *See id.* By abandoning each of these safeguards—safeguards BOP itself previously identified as passing constitutional muster— the Blanche Process is not simply less protective than the Dodrill system. It decimates the very structure the Supreme Court required in *Wilkinson* to avoid erroneous and arbitrary supermax placements.

### 3.    Due Process Requires Reliable, Structured Decisionmaking

Procedural due process protects individuals from unreliable decisionmaking, not merely from erroneous outcomes. The Supreme Court applied this structural principle in *Zinermon v. Burch*, 494 U.S. 113 (1990). There, the Court considered a challenge by a psychiatric patient who alleged state hospital staff admitted him as a "voluntary" patient even though he was incompetent to consent, thereby confining him for five months without the involuntary placement hearing Florida law required. *Id.* at 115-20. The Court held that this allegation stated a procedural due process claim because the constitutional injury arose not from the confinement alone, but from the staff's failure "to ensure that the proper procedures" for avoiding an unlawful deprivation "were followed." *Id.* at 137. The Court emphasized that procedural rules exist not merely to protect persons from the deprivation, "but from the *mistaken or unjustified* deprivation of life, liberty, or property." *Id.* at 125-26 (citation modified) (emphasis added). The deprivation alleged in *Zinermon* was "foreseeable," occurred at a "predictable point in the admission process," and depended on staff who were the "*only* persons in a position" to detect misuse of the voluntary admission procedure. *Id.* at 135-36, 139. The state had delegated "broad power" to admit patients without structuring that power with adequate procedural safeguards. *Id.* at 135. The Court therefore held that the patient had stated a sufficient claim seeking to "hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation." *Id*. at 136. The same is true here: the Acting Attorney General has discarded all procedural safeguards while abusing an uncircumscribed power he has assumed unlawfully.

The structural principle animating *Zinermon* originates in the framework the Court established earlier in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Mathews* considered whether the government's procedures adequately guard against erroneous or unjustified deprivations, requiring a structure capable of reliably distinguishing between those who may lawfully be deprived of a

21

protected interest and those who may not. To make that assessment, the Court instructed that due process requires evaluating "the *risk of an erroneous deprivation . . .* through the procedures used, and the *probable value*, if any, of additional or substitute procedural safeguards," along with the gravity of the private interest and the governmental burden. *Id.* at 335 (emphasis added). The Court further emphasized that procedural due process rules are "shaped by the risk of error inherent in the truthfinding process." *Id.* at 344. Thus, in contexts where the deprivation is extreme and the risk of error substantial, *Mathews* requires a significantly more protective procedural structure than in routine administrative settings. That structural demand follows directly from the test's focus on severity of harm, length of deprivation, and the value of additional safeguards. *Id*. at 341. Procedural minimalism is constitutionally permissible only when embedded within a system engineered to produce reliable, accurate determinations.

The Supreme Court's decision in *Wilkinson* applies these principles directly to the supermax context. There, the Court upheld Ohio's supermax procedures precisely because the minimal steps of notice and rebuttal operated within a neutral, expert, multi-tiered administrative structure. *Wilkinson*, 545 U.S. at 225-27. Ohio disclosed the evidence supporting referral, provided a meaningful opportunity to contest it, and required multiple independent reviewers—each able to end the process—to examine the decision. *Id.* at 226-27. It also mandated a 30-day post-placement review and annual reassessments to maintain continuing accuracy. *Id.* at 227. Crucially, the Court emphasized that these procedures were constitutionally sufficient because they were administered by experienced prison administrators, whose professional expertise made informal procedures appropriate "where the inquiry draws more on the experience of prison administrators" and the safety of staff and incarcerated people is at stake. *Id.* at 228. These safeguards, the Court explained, reduce the risk of erroneous placement in conditions where the private interest is "more than

22

minimal." *Id.* at 225, 227. In short, *Wilkinson* upheld Ohio's process because of the surrounding institutional scaffolding: the constitutionality of the regime turned on the structure supporting the minimal procedural steps of notice and a hearing. Absent expertise, neutrality, evidence development, and multilayered review, the procedures in *Wilkinson* would not have passed constitutional muster.

*Zinermon* confirms what *Mathews* and *Wilkinson* imply: when the government creates a decisionmaking structure incapable of producing reliable results, the constitutional violation occurs at the procedural threshold. *Zinermon* teaches that due process protects individuals from being subjected to a framework engineered to yield arbitrary or erroneous outcomes; courts need not wait for downstream consequences when the process itself is defective.

### 4.    The Blanche Process Removes Every Safeguard Designed to Promote Reliable ADX Determinations

Against both the backdrop of litigation-driven reforms that shaped the ADX procedures and the Supreme Court's structural due process precedents requiring reliable, expert, multilayered safeguards, the Blanche Process is indefensible.

*First*, the Blanche Process strips away the very decisionmaker Congress selected to protect against arbitrary placement. Congress vested designation authority in BOP because it determined that BOP possesses the institutional expertise, professional judgment, and neutral administrative structure necessary to make these decisions. *See McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). Political officials receive no such deference. Yet the Blanche Process removes BOP entirely and places ADX redesignation decisions in the hands of a political appointee with no corrections background, operating from a framework that begins with a "presumptive" ADX determination. That inversion of both congressional design and constitutional necessity eliminates

the expert, neutral adjudicator that *Wilkinson*, *Mathews*, and *Zinermon* treat as foundational to due process.

*Second*, the Blanche Process eliminates the multilayered safeguards that rendered the prior system constitutionally sufficient—protections that BOP has affirmatively represented to federal courts as essential to minimizing error and securing reliable decisions. By abandoning every safeguard that made the process lawful, Defendants replaced a constitutionally sufficient framework with one that invites arbitrary and erroneous outcomes. It cannot reliably distinguish who should or should not be subjected to the most restrictive confinement in federal prison.

*Third*, the Blanche Process offers no meaningful opportunity to be heard. A meaningful opportunity requires disclosed evidence, a neutral adjudicator, and a genuine chance to persuade. This Court has already concluded that due process is violated, even where formalities exist, if the outcome is dictated before the process even began. *See* PI Op. 29. Here, Plaintiffs do not even receive the formalities. They were given little to rebut, no record to challenge, and no neutral decisionmaker to hear their arguments—only a sensationalized and at times inaccurate description of the nature and circumstances of their offense, a presumptive determination that an ADX designation is appropriate, and a bare invitation to submit "relevant" materials into a void.[10] That is not process. It is pretext.

The government may invoke the familiar refrain that courts owe "substantial deference" to

---

[10] Defendants may argue that the Blanche Letters' description of the nature and circumstances of each Plaintiff's offense provides adequate notice of the factual basis for the presumptive ADX designation. But BOP has long rejected offense conduct as a standalone basis for ADX placement—even before it created formal ADX-referral procedures in response to litigation. As one former ADX warden unequivocally stated in a sworn declaration: "The Bureau's classification system does not allow for an inmate to be housed at the ADX solely based on the nature of the crime he committed before incarceration." Exhibit E (*Saleh v. BOP*, No. 05 Civ. 2467 (D. Colo. Mar. 22, 2010), ECF 296-3) ¶ 10.

prison administrators, but that principle cuts decisively against the Blanche Process. Deference rests on one premise: complex decisions about prison security are "peculiarly within the province and professional expertise of corrections officials." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). The Blanche Process removes the very actors to whom courts defer, sidelining every correctional professional Congress charged with making these determinations and replacing them with a single political appointee with no prior prison administration experience who has publicly broadcast his fealty to President Trump and singular dedication to carrying out his policies.[11] When the predicates for deference disappear, so does any claim that deficient procedures should suffice.

### 5.    The Blanche Process Fails Every Part of the *Mathews* Test

The *Mathews* factors point decisively in one direction: the Blanche Process violates the Due Process Clause.

### a.    Plaintiffs' Private Interest Is Significant

The private interest at stake could not be more substantial. This Court has already recognized that ADX confinement likely imposes an "atypical and significant hardship," PI Op. 14-17, implicating Plaintiffs' liberty interests. The severity, duration, and extremity of ADX conditions place this case at the very top of the *Mathews* scale.

### b.    The Risk of Erroneous Deprivation Is Intolerable

The Blanche Process bakes error into the system. Under *Mathews*, procedures must be tailored to the risk of erroneous deprivation. A one-person, no-record, no-review process—run by

---

[11] *See* Holmes Lybrand, *Acting AG says 'Nobody has any idea why' Pam Bondi was fired except for Trump*, CNN (Apr. 7, 2026, at 14:57 ET), https://www.cnn.com/2026/04/07/politics/todd-blanche-nobody-knows-why-bondi-was-fired [https://perma.cc/UK49-KY3W] (Blanche noting "I love working for President Trump" and "[i]f he chooses to nominate somebody else and asks me to go do something else, I will say: 'Thank you very much, I love you, sir.'").

a political official with no corrections background—is the opposite of tailored. It institutionalizes error and invites inconsistency. *Wilkinson* underscores the point: Ohio's risk of error was tolerable only because incarcerated people received the evidence against them, possessed a fair opportunity for rebuttal, and—crucially—because "Ohio provides multiple levels of review." 545 U.S. at 227. Remove those safeguards, and the informal, non-adversarial procedures *Wilkinson* approved would have been unconstitutional. The Blanche Process removes all of them.

No court has upheld anything resembling a one-person, no-review supermax-designation process—let alone one conducted by a political official with no statutory authority, no corrections expertise, and a self-reported goal of serving President Trump's interests and bias against the very people subject to the process. Reliability cannot emerge from a framework that lacks expertise, neutrality, evidence, and review. *See Propert v. District of Columbia*, 948 F.2d 1327, 1333 (D.C. Cir. 1991) (explaining that "at a minimum," due process requires "a meaningful opportunity to present [one's] case before a neutral decisionmaker").

Moreover, the Blanche Letters reveal a structural defect at the heart of Defendants' new regime: it inverts BOP's governing criteria for ADX designation. Under longstanding policy, ADX is reserved for individuals who present a demonstrable, evidence-based risk that no other facility can safely manage, or whose current status makes placement in any general population impossible. *See* ECF 4-9 at 3 (individual must meet at least one of two criteria to warrant referral to ADX: (1) his "placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, inmates, others, or to public safety"; or (2) his "status" is such that he "may not be safely housed in the general population of another institution."). Those standards demand affirmative proof; ADX is the end of the line, not the starting point. *See* ECF 4-8, ch. 7, p. 17 (explaining that other "high security institution[s] should be considered first" before

26

ADX).

But the Blanche Letters adopt the opposite presumption. They assert that the absence of evidence—an informational void created by years of highly controlled confinement—"informs" a presumptive ADX redesignation.[12] That reversal sets the stage for the two fundamental flaws that follow: the government discloses no evidence relevant to the ADX criteria, and it treats that lack of evidence as a reason to impose the system's harshest conditions.

*First*, the Blanche Letters supply no concrete, contemporary evidence showing that an individual's presence in other facilities would pose an actual security threat or that his current status makes him impossible to house elsewhere. They cite no incident reports, disciplinary findings, intelligence assessments, staff statements, or institutional evaluations—nothing addressing the governing criteria. Instead, they rely solely on decades-old convictions and former death row status, neither of which speaks to whether the individual *today* presents a risk in lower security settings or whether his *present* status prevents safe placement elsewhere. With no evidence disclosed, Plaintiffs cannot meaningfully rebut the basis for their "presumptive" redesignation to ADX.

*Second*, the Blanche Letters treat the government's lack of evidence as a reason to place individuals at ADX. By presuming that uncertainty justifies redesignation, Defendants invert the ADX criteria, which require evidence that lower security facilities cannot safely manage the person. Defendants claim that because they lack information about how Plaintiffs would behave outside highly controlled conditions—a purported informational gap of its own making—ADX

---

[12] Several Plaintiffs in fact do have records demonstrating they have been safely housed in less restrictive environments. The Blanche Letters do not acknowledge that history, nor do they explain how a presumptive ADX determination can be reconciled with evidence showing that at least some Plaintiffs have functioned appropriately outside supermax conditions.

must be the default. That reasoning collapses due process safeguards, converting an evidentiary requirement into a baseless evidentiary presumption and transforming ADX from a last resort into a first. *Mathews* and *Wilkinson* reject such speculation-driven deprivations. A system that treats the absence of evidence as a basis for the harshest confinement builds error into the process itself, ensuring it cannot reliably distinguish those who warrant ADX placement from those who do not.

### c.        The Government's Interest Weighs Against the Blanche Process

Defendants have no legitimate interest in discarding the expert-driven framework BOP built, refined, and defended through decades of litigation addressing the due process risks inherent in ADX placement. And because ADX designation imposes consequences more severe than most forms of confinement, with potential downstream implications that could carry on for years and decades, the government's institutional security interest points toward greater procedural rigor, not less.

Nor can the government lean on administrative convenience. When the liberty interest is this grave, the Supreme Court has demanded concrete, cognizable reasons for reducing procedural protections—not generalized appeals to efficiency. *Cleveland Bd. of Educ. v. Loudermill*, underscores the point: once due process attaches, the government may not pare back the procedures the Constitution requires. 470 U.S. 532, 541-42 (1985) (holding that due process required pretermination hearing prior to firing public employees, even though state had instituted a full post-termination hearing process). Efficiency may shape how procedures are implemented, but it cannot justify eliminating them. Yet the Blanche Process does exactly that. And because Congress vested designation authority in BOP to provide expert, evidence based, professionally grounded decisionmaking, *see* 18 U.S.C. § 3621(b), DOJ cannot invoke administrative burden to defend a process that abandons the very expertise Congress deemed essential.

Under every step of *Mathews*, and under the logic of *Wilkinson* and *Zinermon*, the Blanche

28

Process fails. The liberty interest is extraordinary. The risk of error is engineered into the system. The government's interests favor more safeguards, not fewer. And the violation is complete the moment Plaintiffs are forced into a process designed to produce unreliable results.

The Blanche Process entrenches every defect this Court previously identified and goes further still by eliminating every safeguard BOP spent years building to ensure accuracy. Plaintiffs have demonstrated a likelihood of success on their due process claim.

## II.    Plaintiffs Will Suffer Irreparable Harm Without Preliminary Relief

The irreparable harm analysis here begins—and largely ends—with this Court's prior ruling. In issuing the operative preliminary injunction, the Court made a set of determinations that, taken together, dictated the conclusion that Plaintiffs suffered an immediate and irreparable deprivation of due process. Each of those determinations applies with equal or greater force to the Blanche Process, which recreates the same constitutional defect the Court previously condemned, only in a more concentrated form.

The Court first held that Plaintiffs likely have a protected liberty interest in avoiding the conditions of confinement at ADX Florence. PI Op. 13-17. And once a liberty interest is at stake, the Constitution requires procedures that meaningfully guard against the risk of an erroneous deprivation. *Id*. at 17.

The Court then clarified what due process requires in this context. It explained that "due process is not satisfied simply because the government provides a pre-deprivation opportunity in some form." *Id*. at 18. Rather, the Constitution guarantees a "meaningful opportunity to present [one's] case before a neutral decisionmaker." *Id*. at 19 (quoting *Propert*, 948 F.2d at 1333). The hearing must be real, not perfunctory. *Id*. at 18. And the decisionmaker must be "neutral and detached" and must not prejudge the matter. *Id*. at 19.

Applying those standards, the Court found that Plaintiffs were likely denied due process because "their redesignations to ADX Florence were predetermined before they received any process at all, and they had no meaningful opportunity to be heard." PI Op. 29. The Court went further and made a factual finding—uncontested and never appealed—that "it strains credulity to believe that subordinate BOP officials carrying out this process felt free to disagree with what had been demanded at the start by officials far senior to them, with authority over their careers and livelihoods." *Id*. at 25. Because the process was shaped from the outset by pressure from senior officials—pursuant to vehement demand from the President himself—the Court held that Plaintiffs had likely been denied both a neutral decisionmaker and a meaningful hearing—two core requirements of procedural due process.

From those holdings, the irreparable-harm conclusion followed directly. The Court explained that "[w]hen constitutional harm is the basis for irreparable harm, the likelihood of success on the merits overlaps heavily with the irreparable harm inquiry." *Id*. at 31. And it held that "the precise harm complained of here—a violation of Fifth Amendment due process rights—supports irreparable harm even when the plaintiff stands to suffer only a procedural harm." *Id.* at 31 (quoting *Karem v. Trump*, 960 F.3d 656, 667-68 (D.C. Cir. 2020)). Thus, even "a prospective violation of a constitutional right constitutes irreparable injury" because "no later hearing and no damage award can undo" the loss of the process the Constitution requires. *Id*. at 31-32 (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972)).

That chain of reasoning dictates the result here. Plaintiffs' liberty interest is unchanged, as is their due process right to a meaningful opportunity to be heard by a neutral decisionmaker. But the Blanche Process did not cure the likely constitutional defect the Court identified in the previous process; it entrenched it. Instead of remedying the improper influence of senior DOJ leadership,

Defendants have now removed BOP from the process entirely and vested the redesignation authority in the same senior political leadership whose pressure tainted the first process. Under the reasoning of the Court's order, that step does not remedy the violation—it reenacts it in its most concentrated form. If Plaintiffs were denied due process because senior DOJ officials exerted improper influence over nominal BOP decisionmakers, then a process in which those same officials seize full control of the designation function necessarily reproduces that violation and the irreparable harm that flows from it.

The logic is inescapable: this Court has already held that when senior DOJ leadership unlawfully overwhelms or supplants BOP's role in designation decisions, Plaintiffs suffer an immediate and irreparable deprivation of due process. The Blanche Process does exactly that. Under the Court's own analysis, the path is straightforward. The same reasoning that supported irreparable harm then compels the same conclusion now.

The ultra vires nature of the Blanche Process confirms irreparable harm. When Congress assigns a function to a specific official or component, action by a different, unauthorized official is void from the outset. *Louisiana PSC*, 476 U.S. at 374; *Giordano*, 416 U.S. at 514-16. The injury is complete the moment Plaintiffs are subjected to a redesignation process the Attorney General has no statutory authority to conduct, because no later proceeding can cure the fact that an unlawful decisionmaker exercised power Congress expressly withheld. This principle is narrowly limited to cases like this one, where the identity of the decisionmaker is a substantive statutory requirement.

Independent of the ultra vires defect, the Blanche Process also inflicts irreparable harm because it abandons the procedural safeguards *Mathews* and *Wilkinson* demand. Due process requires procedures tailored to the severity of the deprivation and the risk of error. PI Op. 13-17; *see Mathews*, 424 U.S. at 335; *Wilkinson*, 545 U.S. at 224-30. The Blanche Process provides none

31

of those protections. It offers no expert evaluation, no disclosure of the evidence, no opportunity to respond, no hearing, no neutral adjudicator, and no review—only a single political official, with no corrections expertise or statutory authority, whose decision is final and insulated from review. As *Zinermon* teaches, the constitutional injury arises when individuals are funneled into such a structure, not when the final decision arrives. 494 U.S. at 133-39. Plaintiffs are already in that structure, on a compressed timeline that ensures their procedural protections will be lost before this Court can act. And because "no later hearing and no damage award can undo" that loss, PI Op. 32 (quoting *Fuentes*, 407 U.S. at 82), the harm became immediate, concrete, and irreparable the moment Plaintiffs were compelled to proceed under the Blanche Process.[13]

### III.    The Balance of Equities and the Public Interest Overwhelmingly Favor Preliminary Relief

A preliminary injunction here preserves the lawful status quo: one in which BOP—not the

---

[13] Defendants may contend that this motion is premature because a preliminary injunction remains in place until August 10. Not so. The existing injunction bars only transfers to ADX under the now-vacated designations; it does not reach the distinct statutory and constitutional injuries created by the Blanche Process. Plaintiffs are already being subjected to that new process, and—as this Court has held—the due process violation occurs when individuals are funneled into an unlawful, predetermined procedure, not only when the transfer occurs. The injury is therefore ongoing and unremedied.

Practical considerations reinforce the need for timely judicial intervention. The current schedule—requiring a joint status report on July 31—was set before Defendants upended the landscape by vacating the prior redesignations and unveiling an ultra vires, 30-day, one-person redesignation scheme. Because that action created a new set of claims that will inevitably require resolution, addressing them now promotes orderly case management and avoids forcing the Court and the parties into emergency litigation during the ten days between July 31 and August 10. Moreover, Defendants have refused to say whether they will seek to dissolve the existing injunction or oppose its extension, leaving open the possibility that they will finalize redesignations and effectuate transfers immediately upon its expiration. That risk is not hypothetical—it is a function of the process Defendants created. They imposed a compressed timetable, stripped away the ordinary multi-layered ADX safeguards, and accelerated a months-long administrative process into 30 days. Plaintiffs must therefore move at the pace the government has set. For all these reasons, this motion is not premature; it is necessary to prevent the very irreparable harm the existing injunction does not and cannot reach.

Attorney General—exercises redesignation authority under § 3621(b) and implements that authority through its longstanding, mandatory classification and ADX-referral procedures; and one in which this Court's existing injunction bars predetermined outcomes in ADX referrals. The requested relief simply keeps that structure in place and prevents the unlawful Blanche Process from taking effect.

When plaintiffs sue the government, the balance of equities and public interest merge. *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Both cut decisively in one direction. This Court has already recognized that when the government threatens to impose an unconstitutional process—particularly one that predetermines outcomes and strips individuals of meaningful review—the equities favor preventing "the perpetuation of unlawful agency action." PI Op. 33.

The government, by contrast, has no legitimate interest in enforcing an unlawful scheme. It "cannot suffer harm from an injunction that merely ends an unlawful practice," *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmties. Alliance v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)), and "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Those principles align with this Court's prior conclusion that Defendants' asserted interest in immediate ADX placement was "modest," given Plaintiffs' stable housing and the disruptive and resource-intensive nature of transfers. PI Op. 33. Nothing strengthens the government's interests now; if anything, they are weaker because Defendants seek to bypass § 3621(b) and BOP's own binding procedures.

33

The public interest likewise favors preliminary relief. Courts consistently recognize the public's strong interest in lawful agency action, adherence to statutory limits, binding procedures, and constitutional norms. *See League of Women Voters*, 838 F.3d at 12; *Pursuing Am.'s Greatness*, 831 F.3d at 511; *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). Those interests are heightened here, where ADX placement imposes an "atypical and significant hardship" and the governing procedures constitute the constitutional minimum, not bureaucratic niceties. PI Op. 13.

Finally, an injunction here performs the core function of preliminary relief: preserving the lawful and stable status quo until the Court can determine the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). This Court previously halted ADX transfers to prevent irreversible harm and ensure that any redesignation rests on lawful procedures rather than predetermined outcomes. PI Op. 33. The Blanche Process amplifies the same constitutional defects, heightening the same risks. Because Plaintiffs face severe and imminent harm while the government faces none, and because constitutional compliance outweighs executive improvisation, the balance of equities and the public interest overwhelmingly support preliminary relief.

## CONCLUSION

Plaintiffs respectfully request that the Court grant the Motion, enjoin all Defendants except President Trump from implementing the Blanche Process or the Amended Program Statement, in whole or in part. Plaintiffs further ask the Court to retain jurisdiction to ensure the Blanche Process is not applied to Plaintiffs, and to waive any security bond under Rule 65(c). A proposed preliminary injunction order is attached.

34

Dated: June 19, 2026
New York, New York

David C. Fathi**
Maria V. Morris
Carmen Iguina González
**ACLU FOUNDATION**
915 15th Street NW
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org
mmorris@aclu.org
ciguinagonzalez@aclu.org

Corene T. Kendrick
**ACLU FOUNDATION**
425 California St., Ste. 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Brian Stull*
Claudia Van Wyk*
**ACLU FOUNDATION**
201 W. Main St., Ste. 402
Durham, NC 27701
Tel: (919) 682-5659
bstull@aclu.org
cvanwyk@aclu.org

Laura Rovner
Nicole Godfrey
Miriam Kerler
**STUDENT LAW OFFICE**
**UNIVERSITY OF DENVER**
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu

Respectfully submitted,

*/s/ David Patton*
David Patton*
Ian Robertson*
Krysta Kilinski*
**HECKER FINK LLP**
350 Fifth Ave, 63rd Floor
New York, NY 10118
Tel: (212) 763-0883
dpatton@heckerfink.com
irobertson@heckerfink.com
kkilinski@heckerfink.com

Sara Norman, Cal. 189536*
**LAW OFFICES OF SARA NORMAN**
P.O. Box 170462
San Francisco, CA 94117
Tel: (415) 236-3763
sara@saranormanlaw.com

C.J. Sandley, Ala. 5317-S48R*
Kayla Vinson, Ala. 3664-S48Q*
D. Korbin Felder, Miss. 106643*
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6443
csandley@ccrjustice.org
kvinson@ccrjustice.org
kfelder@ccrjustice.org

*Attorneys for Plaintiffs and Plaintiff-Intervenors*

*\* Admitted pro hac vice.*
*\*\* Not admitted in D.C.; practice limited to federal courts. Admitted pro hac vice.*

35