**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REJON TAYLOR, *et al.*,<br><br>     *Plaintiffs,*<br><br> and<br><br>DAVID RUNYON, *et al*.,<br><br>     *Plaintiff-Intervenors,*<br><br> v.<br><br>DONALD J. TRUMP, *et al.*, in their official capacities,<br><br>     *Defendants.* | Case No. 25 Civ. 3742 (TJK) |

<u>**SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

Plaintiffs Rejon Taylor, Brandon Basham, Brandon Council, Chadrick Fulks, Thomas Hager, Charles Hall, Norris Holder, Richard Jackson, Jurijus Kadamovas, Daryl Lawrence, Iouri Mikhel, James Roane, Julius Robinson, Ricardo Sanchez, Richard Tipton, Jorge Torrez, Daniel Troya, and Alejandro Umaña, and Plaintiff-Intervenors David Runyon, Ronald Mikos, and Wesley Coonce, by and through their attorneys, supplement the operative Complaint (ECF 1)[1] and Complaints-in-Intervention (ECF 72 and 73)[2] as follows:[3]

**<u>INTRODUCTION</u>**

1.    On May 6, 2026, Defendant Federal Bureau of Prisons ("BOP") issued a Change Notice to Program Statement 5100.08, titled "Inmate Security Designation and Custody Classification" (hereafter, the "Amended Program Statement"). The Amended Program Statement purports to give the Attorney General "[i]n certain circumstances" the choice to "exercise authority to designate or redesignate the place of a prisoner's imprisonment." ECF 87-1 at 2. One day later, on May 7, 2026, Defendant BOP issued a "Notice of Vacatur of ADX General Population Placement" for each Plaintiff other than Plaintiff Basham.[4] ECF 87-2. The Notice stated that each Plaintiff's redesignation to the U.S. Penitentiary Florence Administrative Maximum Facility ("ADX") was vacated "in light of the preliminary injunction" issued by this Court on February 11, 2026. Concurrently, Defendants began a second ADX redesignation process under a new policy

---

[1] ECF 1 was filed publicly with redactions. An unredacted version was filed under seal at ECF 3-2.

[2] ECF 72 and 73 were filed publicly with redactions. Unredacted versions were filed under seal with Plaintiff-Intervenors' motions to intervene at ECF 40-3 and 54-3, respectively.

[3] Unless otherwise noted, "Plaintiffs" refers to Plaintiffs and Plaintiff-Intervenors. As set forth in this Supplemental Complaint, Brandon Basham is added as a Plaintiff in this action.

[4] Plaintiff Basham was referred for redesignation to ADX but was not finally redesignated to ADX under the Redesignation Directive and therefore did not receive a Notice of Vacatur.

adopted by Defendant Acting Attorney General Todd Blanche. The new policy and process was announced in a letter from Defendant Blanche to each Plaintiff (hereafter, the "Blanche Letters"). *See* ECF 87-3. The Blanche Letters adopt a new, unlawful, across-the-board policy governing the process for redesignating Plaintiffs to ADX. Under the new policy and process set forth in the Blanche Letters, Defendant Blanche asserted that the Amended Program Statement "empowered" him to make redesignation decisions; that, acting on that "authority," he had made a "presumptive determination" that all Plaintiffs should be redesignated to ADX; and that, after allowing Plaintiffs 30 days to submit unspecified materials for consideration to their Unit Manager in the Special Confinement Unit ("SCU") at U.S. Penitentiary-Terre Haute ("USP-Terre Haute"), Defendant Blanche would make a final, non-appealable redesignation decision.[5]

2.      Plaintiffs who filed the original Complaint supplement the claims in paragraphs 160-293 of the Complaint (ECF 1), Plaintiff-Intervenors Runyon and Mikos supplement paragraphs 1-24 of their Complaint-in-Intervention (ECF 72), and Plaintiff-Intervenor Coonce supplements paragraphs 1-11 of his Complaint-in-Intervention (ECF 73). Plaintiffs and Plaintiff-Intervenors also supplement the prayers for relief in their respective pleadings to seek injunctive relief extending to the Amended Program Statement, the Blanche Letters, and Defendants' continued efforts to punish them for receiving commutations of their death sentences by transferring them to ADX.

## SUPPLEMENTAL PARTIES

3.      Plaintiff Brandon Basham is currently a plaintiff in *Taylor v. Trump*, No. 25 Civ. 1161 (D.D.C.) (TJK) ("*Taylor I*"). Plaintiff Basham is one of thirty-seven individuals whose death

---

[5] Each of the Blanche Letters contains the same representations regarding the Acting Attorney General's authority and the policy and process Defendant Blanche adopted for presumptively redesignating Plaintiffs to ADX.

sentences were commuted to life in prison without parole by President Biden. Plaintiff Basham, like the other original plaintiffs in *Taylor I*, challenged Defendants' unlawful plan categorically condemning them to ADX.[6] Like Plaintiffs, Plaintiff Basham received a letter from Defendant Acting Attorney General Todd Blanche that presumptively redesignates him to ADX. Like all Plaintiffs, Plaintiff Basham has responded (and objected to) the Acting Attorney General's letter. Consequently, the new events described in this pleading apply to Plaintiff Basham and warrant his addition to the current lawsuit.

4.      Defendant Todd Blanche is the Acting Attorney General of the United States. He is automatically substituted as a party under Fed. R. Civ. P. 25(d) and replaces former Defendant and Attorney General Pamela J. Bondi. Defendant Blanche oversees the U.S. Department of Justice ("DOJ"), including Defendant BOP, and is responsible for the enforcement and implementation of Executive Order 14164 ("EO 14164"). He issued the Blanche Letters to all Plaintiffs on May 7, 2026, purporting to empower himself to make redesignation decisions under the Amended Program Statement. The Blanche Letters further the unlawful objective of EO 14164 and former Attorney General Bondi's memorandum (the Bondi Memo) implementing EO 14164: to punish Plaintiffs by sending them to ADX. Defendant Blanche is an attorney by training, and he has worked as a prosecutor and in private practice, including serving as one of President Trump's personal attorneys. Upon information and belief, Defendant Blanche has never worked in a prison and does not have expertise in matters of prison administration and security. He is sued

---

[6] Three of the 37 individuals whose death sentences were commuted to life in prison have not been targeted for redesignation to ADX. None of the three were living in the SCU when their sentences were commuted. Two—Anthony Battle and Marvin Gabrion—were being housed at the Medical Center for Federal Prisoners in Springfield, Missouri (MCFP Springfield), receiving treatment for serious health issues, and one—Kaboni Savage—was already being housed at ADX under Special Administrative Measures. All three remain in those facilities today.

in his official capacity.

## SUPPLEMENTAL FACTS

### The Court's Preliminary Injunction

5. On October 21, 2025, Plaintiffs filed this lawsuit, bringing claims challenging the Redesignation Directive, the Bondi Memo, and the Mandatory ADX Policy.

6. On October 22, 2025, Plaintiffs filed a Motion for a Temporary Restraining Order. ECF 4. On October 25, 2025, Defendants filed their Opposition, which noted that, "Congress has tasked BOP with 'designat[ing] the place of the prisoner's imprisonment' and authorized it to 'designate any available penal or correctional facility' meeting 'minimum standards of health and habitability' that BOP 'determines to be appropriate and suitable.'" ECF 24 at 3; *see also* ECF 80-1 at 2 (same).

7. On February 11, 2026, this Court converted Plaintiffs' Motion for a Temporary Restraining Order into a Motion for a Preliminary Injunction and granted the motion. ECF 70. In doing so, the Court found that Plaintiffs were likely to succeed on the merits of their due process claim because it was "likely their redesignations were determined before their process even began, and that—despite their hearings and appeals—they had no meaningful opportunity to challenge them." ECF 71 ("PI Op.") at 2. The Court "preliminarily enjoin[ed] all Defendants except President Trump as well as their agents, representatives, and all persons or entities acting in concert with them, from transferring any Plaintiff to ADX Florence while this suit proceeds." *Id.* at 34.

### Defendant BOP's May 2026 Amended Program Statement and the Blanche Letters: The Blanche Process

8. Three months later, and without warning or notifying Plaintiffs or their counsel, Defendants BOP, William Marshall, and Joshua J. Smith issued a Change Notice to Program Statement 5100.08. *See* ECF 87-1.

4

9.      The Change Notice added the following new language to Program Statement 5100.08:

> Designation and redesignation of an inmate's place of imprisonment shall be consistent with the statutory authority contained in 18 U.S.C. § 3621(b), which requires the Bureau of Prisons to designate an inmate's place of imprisonment subject to consideration of several factors. 28 U.S.C. § 509 provides, "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General." In certain circumstances, the Attorney General may exercise authority to designate or redesignate the place of a prisoner's imprisonment, consistent with the requirements of 18 U.S.C. § 3621(b).

> Notice of the Attorney General's intention to exercise vested authority to designate or redesignate the place of a prisoner's imprisonment shall be provided to the Bureau of Prisons as soon as practicable. Absent such notification, procedures for making classification, designation and redesignation decisions as described herein should be followed by the Bureau of Prisons.

> Where authority to determine the place of a prisoner's imprisonment is invoked by the Attorney General, BOP may provide relevant information in order to facilitate the determination. BOP may also facilitate communication or correspondence between the inmate and the Office of the Attorney General.

ECF 87-1 at 2-3.

10.      Defendants BOP, Marshall, and Smith did not explain why they issued the Amended Program Statement or abandoned BOP's prior policy.

11.      Defendants BOP, Marshall, and Smith also failed to provide any rationale for how the changes to BOP policy reflected in the Amended Program Statement are motivated by factors different from those that motivated the prior Mandatory ADX Policy, which Plaintiffs challenged when seeking a preliminary injunction.

12.      The Amended Program Statement strips Defendant BOP of its exclusive, congressionally delegated authority to designate, redesignate, and transfer people incarcerated in federal prisons despite statutes, regulations, and legislative intent to the contrary. *See* 18 U.S.C. § 3621(b); 28 C.F.R. §§ 0.95(d), 0.96(c).

5

13. The Amended Program Statement delegates designation authority to the Attorney General and has the force of law.

14. By transferring Defendant BOP's statutory authority to designate or redesignate incarcerated people to the Attorney General, the Amended Program Statement adopts a wholly new position and effects a substantive change from the prior version of Program Statement 5100.08 and the requirements of 18 U.S.C. § 3621(b) and 28 C.F.R. §§ 0.95(d) and 0.96(c).

15. Defendants BOP, Marshall, and Smith did not provide notice and an opportunity to comment before issuing the Amended Program Statement.

16. The Amended Program Statement is final agency action under the Administrative Procedure Act. The Amended Program Statement represents the consummation of the agency's decisionmaking process within Defendant BOP to adopt a new, unlawful, across-the-board policy governing redesignation decisions. The Amended Program Statement was adopted by the agency's leadership and does not contemplate any further consideration by the agency prior to implementation or enforcement.

17. The Amended Program Statement does not merely clarify existing duties. The Amended Program Statement determines Plaintiffs' legal rights, and it has direct and immediate legal consequences, including by vesting the Attorney General with designation and redesignation authority.

18. The Amended Program Statement is mandatory and binding on BOP officials. For example, BOP officials delivered the Blanche Letters to Plaintiffs, implementing the Acting Attorney General's new and unlawful redesignation authority under the Amended Program Statement, on May 7, 2026, one day after Defendants BOP, Marshall, and Smith issued the Amended Program Statement.

6

19.     In addition, on May 7, 2026, one day after issuing the Amended Program Statement, Defendant BOP issued Notices of Vacatur of ADX redesignations to all Plaintiffs, *see* ECF 87-2, except Plaintiff Basham, who had been referred for redesignation to ADX but had not yet been finally redesignated to ADX.

20.     Concurrently, and with the unlawful authority delegated to the Attorney General in the Amended Program Statement, Defendant Blanche issued a nearly identical letter to every Plaintiff—the Blanche Letters. *See* ECF 87-3. The Amended Program Statement and the Blanche Letters are hereinafter referred to as the "Blanche Process."

21.     The Blanche Letters and Vacatur Notices were hand-delivered by a BOP employee. Defendants only notified Plaintiffs' counsel of the Blanche Letters and Notices of Vacatur by filing them publicly on the docket in this case. *See* ECF 87-2, 87-3.

22.     Defendant Blanche acknowledges in the Blanche Letters "that the court found certain of [BOP's] redesignation decisions to be 'predetermined.'" Indeed, the Court found that:

> Plaintiffs have shown that it is likely that their redesignations were predetermined—and thus violated their due process rights—because *officials with authority over BOP* made it clear that they had to be sent to ADX Florence to punish them, no matter what result the ordinary BOP process might have yielded.

PI Op. 20 (emphasis added). In defiance of the Court's findings, Defendant Blanche doubled down on Defendant BOP's previous predetermination by stating that he had made a "presumptive determination" that all Plaintiffs "should be transferred from [their] current placement to the United States Penitentiary, Administrative Maximum Facility in Florence, Colorado"—the only federal supermax prison in the United States. There, Plaintiffs face potentially indefinite incarceration under the most oppressive conditions in the entire federal prison system, thereby re-effectuating the punitive intent of EO 14164, the Bondi Memo, and the Redesignation Directive.

23.     As the first step in this new, unlawful Blanche Process, the Blanche Letters adopted

7

a new policy and process for redesignating Plaintiffs. Under that new policy and process, which is mandatory and applies to all Plaintiffs, all Plaintiffs are categorically subject to a "presumptive determination" that they should once again be redesignated to ADX. Pursuant to the new policy and process, the Blanche Letters' presumptive determination occurred *before* Plaintiffs had submitted any materials for Defendant Blanche to consider in making his redesignation decisions.

24. The Blanche Letters' only deviation from their cookie cutter language pertains to the description of Plaintiffs' convictions. For many Plaintiffs, the descriptions are sensationalized and inaccurate, or include statements that are demonstrably false.

25. The Blanche Process does not discuss whether the newfound presumption it creates applies to other individuals convicted of violent offenses and incarcerated in Defendant BOP's custody who have not been referred to ADX.

26. The Blanche Letters also offer no evidence or discussion, as required by Defendant BOP in the 2012 ADX Referral Memo, that "placement in other correctional facilities creates a risk . . . to the safety of staff, inmates, others, or to public safety," or that a person's "status" is such that he "may not be safely housed in the general population of another institution." Nor do the Blanche Letters offer evidence or discussion regarding Defendant BOP's security concerns as required by 18 U.S.C. § 3621(b). Rather, despite evidence to the contrary for many Plaintiffs, Defendant Blanche states that "due to [Plaintiffs'] long-term confinement in the SCU at USP Terre Haute, there is a limited record on which to gauge [their] security risk in BOP confinement conditions in less restrictive environments," and that this limited record "informs [his] presumptive determination of redesignation to ADX Florence." The Blanche Letters' new policy and process for redesignating Plaintiffs to ADX therefore treat Plaintiffs as part of a class that categorically warrants redesignation and transfer to the harshest facility in the federal prison system—contrary

to statute, regulation, and longstanding BOP policy requiring individualized consideration of specific criteria.

27.    The Blanche Letters make clear that Plaintiffs' redesignations to ADX may now be imminent under the new policy and process adopted by the Acting Attorney General. The Blanche Letters allowed Plaintiffs only 30 days to submit materials and rebut Defendant Blanche's "presumptive determination." Under the new policy and process enacted in the Blanche Letters, once Defendant Blanche makes his redesignation decisions, Plaintiffs may not appeal them. The Blanche Letters state that Defendant Blanche's final redesignation determination "will not be appealable through the BOP Administrative Remedy Program."

28.    The Blanche Letters are final agency actions. The Blanche Letters represent the consummation of the agency's decisionmaking process within DOJ and ODAG to adopt a new, unlawful, across-the-board policy and process governing Plaintiffs' redesignations to ADX.

29.    The Blanche Letters are mandatory and binding on BOP officials, BOP officials have treated the Blanche Letters as mandatory and binding, and Defendants have already begun implementing the Blanche Letters in redesignation-related decisions affecting Plaintiffs.

**The Blanche Process Overrides Longstanding BOP**
**ADX Designation Policies and Procedures**

30.    The Blanche Process ignores and overrides Defendant BOP's longstanding, multi-layer review process that governs ADX designations as set forth in Program Statement 5100.08 and the 2012 ADX Referral Memo. Prior to the Blanche Process, Defendant BOP's longstanding ADX referral and redesignation process reflected constitutional safeguards to prevent the erroneous deprivation of individuals' liberty interests when sent to the harshest facility in the federal prison system.

31.    From 2007 to 2009, in the wake of the Supreme Court's decision in *Wilkinson v.*

9

*Austin*, 545 U.S. 209 (2005), the process for designating and redesignating incarcerated people to ADX was governed by memoranda published by Michael K. Nalley, Defendant BOP's then-North Central Regional Director ("NCRD") in 2007 and 2009.

32.     The 2007 Nalley Memo and the 2009 Nalley Memo set out a five-step process that included (1) a referral, (2) a hearing, (3) review and final decision, (4) an opportunity to appeal, and (5) a designation.

33.     The 2009 Nalley Memo specifically provided as follows:

a.      **Referral.** Institution staff initiated the ADX referral process and submitted the referral to the institution's Warden for review. If the Warden concurred with the referral, the Warden signed the referral and forwarded it to the Regional Director in the region the incarcerated person was housed. If the Warden disagreed and concluded that ADX placement was inappropriate, the process terminated and the person was not placed at ADX.

b.      If the Regional Director concurred with the referral, the Regional Director signed the referral and submitted it to the NCRD. If the Regional Director disagreed and concluded that ADX placement was inappropriate, the process terminated and the person was not placed at ADX.

c.      The North Central Regional Office ("NCRO") staff conducted an initial assessment of the referral and purported need for placement at ADX.

d.      If the referral was incomplete, it was returned to the Regional Director with a check list of the missing information. The referral could be submitted again for reconsideration once completed.

e.      If the referral was complete, the NCRD designated staff in the NCRO to review the referral. If further consideration was warranted, the Regional Director designated a Hearing Administrator to conduct a hearing on the appropriateness of the inmate's placement at the ADX. If NCRO staff concluded that further consideration was not warranted, the process terminated and the person was not sent to ADX.

f.      **Hearing.** The BOP Hearing Administrator was required to "have correctional experience, including institution work with inmates, institutional experience in observing and evaluating inmate adjustment and disruptive behavior, and knowledge of the options available in the Bureau of Prisons (BOP) for dealing with such conduct." It also

10

mandated that "[t]he Hearing Administrator will be familiar with BOP policies and operations, including the criteria for placement of inmates in different institutions, with emphasis on the ADX."

g.    The BOP Hearing Administrator prepared a "Notice of Hearing on Referral for Transfer to ADX General Population." The Notice was required to include "[s]pecific evidence" forming "the basis for the referral" unless the information would jeopardize safety or security.

h.    The notice was delivered to the incarcerated person, and the incarcerated person was provided an opportunity to waive their appearance at the hearing. The notice was required to be delivered at least 24 hours prior to the hearing.

i.    If the incarcerated person was not present at the hearing, the Hearing Administrator was required to document the reason in the hearing record.

j.    If the incarcerated person did not waive their appearance at the hearing, they were present throughout the hearing, with an exception for security reasons. The incarcerated person could make an oral statement and present documentary evidence to the Hearing Administrator.

k.    At the conclusion of the hearing and reviewing all material, the Hearing Administrator prepared "a written recommendation on whether placement of the inmate at the ADX [was] warranted." BOP required that recommendation to summarize all information and indicate the specific reasons for the recommendation. The incarcerated person received the Hearing Administrator's written recommendation. A copy of the written recommendation was also forwarded to the NCRD, typically within 20 workdays following the hearing's conclusion.

l.    **Review and Final Decision.** The NCRD or a designee not below the North Central Deputy Regional Director reviewed the Hearing Administrator's written recommendation and supporting documentation. The NCRD or designee accepted or rejected the Hearing Administrator's recommendation typically within 60 calendar days of its receipt. The Hearing Administrator forwarded a copy of the decision to the institution for delivery to the incarcerated person.

m.    **Appeal.** The incarcerated person had a single-level appeal: they could appeal the decision of the NCRD through the Administrative Remedy Program by filing a Central Office Appeal (BP-11) to BOP's Office of General Counsel.

n.    **Designation.** If BOP approved the incarcerated person for ADX placement, they were placed on a waiting list, and the referring Warden was notified when ADX housing was available.

11

34.     In 2010, during litigation asserting a due process challenge to ADX confinement, Defendant BOP rescinded and replaced the 2009 Nalley Memo's ADX designation procedures with more robust procedures set forth in a new memorandum published by Scott Dodrill, Defendant BOP's then-Assistant Director of the Correctional Programs Division.

35.     In rescinding the 2009 Nalley Memo, Defendant BOP represented to the court that the Dodrill Memo's procedures were "materially different" from the Nalley Memo's procedures because, among other distinctions, there were "two levels of administrative review after their hearing (DSCC chief, then general counsel) instead of one (general counsel only)," and that under the Dodrill Memo, the BOP Assistant Director is the final decision-maker rather than the North Central Regional Director, thus ensuring that no BOP official had decision-making authority more than once in the process. Defendants-Appellees' Resp. Br. at 27, *Rezaq v. Nalley*, No. 11-1069 (10th Cir. July 4, 2011).

36.     Like the Nalley Memo, the Dodrill Memo detailed a five-step ADX designation process including (1) a referral to the NCRD, (2) a hearing, (3) review and final decision by a BOP official with correctional expertise, (4) an opportunity to appeal, and (5) a designation.

37.     However, under the more robust procedures of the Dodrill Memo, BOP's Designation and Sentence Computation Center ("DSCC") assumed responsibility for the processing of referrals to ADX's general population. Defendants-Appellees' Mot. to Dismiss for Mootness at 6, *Rezaq v. Nalley*, No. 11-1069 (10th Cir. Mar. 4, 2011), ECF 18-1. Additionally, the "hearing administrator, who conduct[ed] a hearing for the prisoner, [was] designated by the National Discipline Hearing Administrator, and inmates [had] a two-level administrative remedy process." *Id.* at 6-7. "The Assistant Director [was] the initial decision-maker for an ADX designation decision." *Id.* at 7. An incarcerated person could "seek administrative review of the

Assistant Director's decision to the DSCC chief, and then to the BOP's general counsel." *Id.*

38.    In short, the Dodrill Memo added a multi-level process to appeal an ADX designation, and mandated the involvement of several institutional actors, all with correctional expertise, before finalizing an ADX designation. *Id.* at 6-7.

39.    Defendant BOP represented to the court that the procedures outlined in the Dodrill Memo cured any alleged constitutional defects and that there was "no reasonable expectation" the agency would ever abandon them. Defendants-Appellees' Resp. Br. at 27, *Rezaq v. Nalley*, No. 11-1069 (10th Cir. July 4, 2011).

40.    In 2012, four months after individuals at ADX filed a putative class action challenging Defendant BOP's failure to properly treat and diagnose people with serious mental illness at ADX, *see* Complaint, *Cunningham v. Fed. Bureau of Prisons*, No. 12 Civ. 1570 (D. Colo. June 18, 2012), ECF 1, Defendant BOP replaced the Dodrill Memo with the 2012 ADX Referral Memo, which, along with Program Statement 5100.08, has governed the ADX designation process ever since. Although most of the procedures set forth in the 2012 ADX Referral Memo are functionally identical to the Dodrill Memo—providing multiple levels of review by BOP officials with correctional expertise before a person can be redesignated to ADX— Defendant BOP made two significant additions in the 2012 memo. The 2012 ADX Referral Memo requires:

a.    A psychological assessment of anyone considered for ADX placement, and a requirement that Defendant BOP's Central Office Psychology Services review that assessment and report their findings to the DSCC chief;

b.    A separate assessment by FCC Florence Health Services/Psychology for anyone classified as a Care Level 3 (medical or mental health) to determine whether ADX can meet the health care needs of the person.

These enhanced procedures reflect Defendant BOP's recognition of the potentially severe consequences for many incarcerated people subject to the extreme and harsh regimen of ADX.

13

41. In 2025, rather than genuinely utilizing the procedures outlined in Defendant BOP's 2012 ADX Memo, Defendant BOP instead adopted and engaged in a sham process that categorically determined that all Plaintiffs would be redesignated to ADX.

42. Following the Court's preliminary injunction, Defendants created a new and arbitrary process that supplanted the prior one entirely. The Blanche Process provides a single layer of cursory review by one individual: Defendant Blanche himself. All appeals are eliminated.

43. On information and belief, Defendant Blanche has no correctional expertise. Nor can it be said that he is impartial as to matters involving President Trump, as evidenced by his public statements. Indeed, Defendant Blanche, who previously served as President Trump's personal criminal lawyer, has repeatedly pledged his loyalty to President Trump. When asked whether he wanted to be nominated as Attorney General, he stated: "I love working for President Trump. It's the greatest honor of a lifetime." *See* Holmes Lybrand, *Acting AG says 'Nobody has any idea why' Pam Bondi was fired except for Trump*, CNN (Apr. 7, 2026), https://www.cnn.com/2026/04/07/politics/todd-blanche-nobody-knows-why-bondi-was-fired. Defendant Blanche continued: "If [President Trump] chooses to nominate somebody else and asks me to go do something else, I will say: 'Thank you very much, I love you, sir.'" *Id.*

### Effect of EO 14164, the Bondi Memo, the Redesignation Directive, and the Blanche Process on Plaintiffs

44. The new unlawful Blanche Process, designed to effectuate the punitive intent of EO 14164, the Bondi Memo, and the Redesignation Directive, has been adopted and all Plaintiffs are enduring the redesignation process for a second time.[7]

---

[7] Plaintiff Basham was referred for redesignation to ADX but was "initially transferred to the Medical Center for Federal Prisoners in Springfield, Missouri due to urgent mental health needs. After Basham was transferred back to Terre Haute in December 2025, he was referred to ADX Florence the following month." PI Op. 6 n. 2.

45.    Just like the prior Mandatory ADX Policy, the Blanche Process replaces the usual BOP redesignation process with a new policy and process for redesignating Plaintiffs to ADX.

46.    Defendants do not acknowledge or provide any reasoned explanation for why they abandoned longstanding BOP policy for redesignation decisions.

47.    Much like EO 14164's and the Bondi Memo's directive to "ensure that these offenders are imprisoned in conditions consistent with the monstrosity of their crimes and the threats they pose," the Blanche Process's new policy adopting a "presumptive determination" that all Plaintiffs should be sent to ADX purportedly stems from an evaluation of the nature of the Plaintiffs' offenses—an evaluation that, for some, is inaccurate.

48.    Defendants BOP, Marshall, Smith, Shane Salem, Erica Strong, and Andre Matevousian ("BOP Defendants") cleared a path to allow for Defendant Blanche's unlawful exercise of authority: Defendants BOP, Marshall, and Smith issued the Amended Program Statement, which unlawfully vests Defendant BOP's congressionally delegated authority to make designation and redesignation decisions in the Attorney General with unlimited discretion.

49.    In short, Defendants BOP, Marshall, and Smith issued the Amended Program Statement to transfer designation authority to Defendant Blanche, with no criteria as to when or how that authority may be invoked, and Defendant Blanche wielded the unlawful authority derived from the Amended Program Statement to initiate yet another predetermined process to determine Plaintiffs' placements. It will, in all likelihood, culminate in Plaintiffs' now "presumptive" ADX redesignations being made final once more, this time with no administrative appeal options. In instituting this unlawful process for Plaintiffs, Defendants have deprived all Plaintiffs of the procedures set forth in the 2012 ADX Referral Memo. The Blanche Process has come to fruition.

50.    Plaintiffs reasonably relied on the process guaranteed in 18 U.S.C. § 3621(b), 28

15

C.F.R. §§ 0.95(d) and 0.96(c), Program Statement 5100.08, and the 2012 ADX Referral Memo regarding their redesignations.

51.    The Blanche Process, among other things, fails to provide multiple levels of review and an unbiased decisionmaker with correctional expertise. It thus risks erroneous deprivation of Plaintiffs' liberty interest in avoiding ADX confinement.

52.    As of the date of this Supplemental Complaint, all Plaintiffs have made submissions pursuant to the Blanche Process's 30-day submission requirement.[8]

53.    Given that there is no further stated process, Defendant Blanche may redesignate Plaintiffs to ADX *right now*.

54.    The Blanche Process eliminates the BOP-prescribed appeal process, thereby making any ADX redesignation final.

55.    On information and belief, Defendants will transfer Plaintiffs who have been redesignated to ADX as soon as the current preliminary injunction expires or is ordered dissolved by the Court.

### SUPPLEMENTAL FACTS RELATED TO HEALTH CARE PLAINTIFFS

**Plaintiffs' Serious Mental Health Conditions**

56.    ███████████████████████████████████████████████ ███████████████████████████████████ all have mental health conditions that either constitute serious mental illness under BOP policy or underlie their classification by Defendant BOP as Mental Health Care Level 3 or higher. Some of their conditions have persisted, or worsened, since filing their pleadings.

---

[8] In their responses to Defendant Blanche's 30-day submission process, Plaintiffs objected to the illegality of the process. Plaintiffs also noted, among other things, that Defendant Blanche's process is not a product of reasoned decision making and includes material errors.

16



17



**Plaintiffs' Serious Medical Conditions**

63. ███████████████████████████████████████████████████████

██████ all have complex chronic medical conditions requiring ongoing and vigilant care with

18

frequent visits to outside medical professionals. Some of their medical conditions have persisted, or worsened, since filing their pleadings.

19



**<u>SUPPLEMENTAL FACTS IN SUPPORT OF EXISTING CLAIMS FOR RELIEF</u>[9]**

**<u>COUNT 1</u>**
**Challenge to the Redesignation Directive, Mandatory ADX Policy, and Blanche Process**
**Fifth Amendment of the U.S. Constitution – Procedural Due Process**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

69.     The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V.

70.     Defendants' Redesignation Directive and Mandatory ADX Policy violate Plaintiffs' procedural due process rights under the Fifth Amendment.

71.     Applying due process principles to prisons, the Supreme Court held that incarcerated people have a liberty interest in avoiding confinement conditions that are an "atypical and significant" hardship compared to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Before the government may encroach on such a liberty interest, it must provide incarcerated people with an opportunity to be heard at a meaningful time and in a meaningful manner.

72.     Plaintiffs have a liberty interest in avoiding a "presumptive determination" that they will be redesignated to ADX, which is an "atypical and significant" hardship compared to the ordinary incidents of prison life. Conditions at ADX are more severe than those routinely imposed in USPs, because conditions at ADX are uniquely isolating and have no durational limit.

73.     For Plaintiffs, the conditions of confinement in ADX are more severe than the conditions of administrative segregation in USPs, both because of the deprivations inherent in ADX confinement and the lengthy and indefinite confinement in ADX. Plaintiffs' confinement is

---

[9] Plaintiffs have not included any supplemental allegations in support of Counts 6-11 of the original complaint.

also "atypical" because it is selective: ADX only houses approximately 0.29% of all people incarcerated in federal prisons,[10] and Plaintiffs, in particular, were hand-picked by Defendant Trump's Executive Order, the Bondi Memo, the Redesignation Directive, and now the Blanche Process for confinement at ADX.

74.    Plaintiffs' liberty interest in avoiding transfer to ADX entitles them to an opportunity to be heard at a meaningful time and in a meaningful manner. These procedural safeguards follow from Plaintiffs' weighty private interest in avoiding ADX's uniquely isolating conditions; the risk of erroneous deprivation from Defendants' replacement of ordinary procedures with the Redesignation Directive and Mandatory ADX Policy's pre-ordained outcomes; and the lack of a legitimate penological justification for Plaintiffs' placement at ADX. ECF 4-10, 4-11.

75.    But BOP Defendants did not provide Plaintiffs with a meaningful opportunity to be heard through its ordinary redesignation process. Defendants instead ordered a pre-ordained outcome: every Plaintiff would be sent to ADX. As a result, the ADX hearings conducted by BOP, the redesignations to ADX that followed, and the appeals of those redesignations were a sham. Plaintiffs' hearing notices contained rote language, pretextual assertions of security risks, and assigned them to a Security Threat Group of "Death Row Inmate" for the first time. Several Plaintiffs' Hearing Administrator Reports erroneously attributed statements to Plaintiffs that they never said or failed to include accurate representations of basic documented demographic information, such as age, incarceration history, and religious denomination. It did not matter what Plaintiffs said at or submitted for their hearings because the outcome was predetermined. Defendants were determined to achieve their desired outcome even if it required attributing false

---

[10] As of June 18, 2026, Defendant BOP's website reflects there are currently 138,907 individuals in BOP custody and only 405 of them are located at ADX.

statements to Plaintiffs, and the Hearing Administrators admitted to some Plaintiffs that they had no ability to change the outcome.

76. This hearing process was an attempt to justify—*post hoc*—Defendants' uncompromising decree to place every Plaintiff at ADX. In doing so, BOP Defendants relied on pretextual rationales for overriding its original and lawful redesignation decisions.

77. Because Defendants had predetermined that Plaintiffs would be sent to ADX, the ADX hearings conducted by Defendant BOP and the appeals of Defendant BOP's decisions redesignating them to ADX were a sham. Defendants denied Plaintiffs the opportunity to be heard in a meaningful time and in a meaningful manner.

78. The Blanche Process also violates Plaintiffs' procedural due process rights under the Fifth Amendment.

79. The Blanche Process suffers from fatal flaws: Defendant Blanche's decision to redesignate Plaintiffs to ADX is predetermined and solely vested in himself.

80. Defendant Blanche, by his own admission, ordered a preordained outcome: every Plaintiff was presumptively determined as appropriate for an ADX transfer *before* Plaintiffs received the Blanche Letters and engaged in the unlawful redesignation process.

81. Defendant Blanche, as the final and sole decisionmaker in this new process, predetermined each Plaintiff's redesignation outcomes—"that is, fully decided at the *beginning* of the process rather than the end." PI Op. 18 (emphasis added).

82. Regardless of intent or outcome, the Redesignation Directive, Mandatory ADX Policy, and Blanche Process deviate from Defendant BOP's prior policy without affording Plaintiffs the process to which they are entitled under BOP's prior, legitimate redesignation and transfer policy.

83.    For these reasons, Defendants have violated Plaintiffs' rights to procedural due process under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these due process violations.

### COUNT 2
**Challenge to the Redesignation Directive, Mandatory ADX Policy, and Blanche Process**
**Fifth Amendment of the U.S. Constitution – Equal Protection**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

84.    The Fifth Amendment's Due Process Clause incorporates a guarantee of equal protection of the laws against the United States equivalent to that guaranteed against States by the Equal Protection Clause of the Fourteenth Amendment.

85.    Defendants' Redesignation Directive, Mandatory ADX Policy, and the Blanche Process violate the Fifth Amendment's equal protection guarantee.

86.    Prior to the promulgation of the Redesignation Directive, Mandatory ADX Policy, and Blanche Process, people under sentence of death in the federal system who were resentenced to life without parole due to a commutation or court action were subject to redesignation by BOP to determine where they would be housed. Such redesignations had occurred 18 times prior to President Biden's commutations of Plaintiffs' death sentences. Each of those times, BOP's redesignation occurred according to the process required by statute and BOP policy, which requires an individualized consideration of the demands of public safety, institutional security, the particular needs of the incarcerated person, and the resources of the facility. Not one of the 18 people previously redesignated after having their death sentence reduced to life without parole was redesignated to ADX. All 18 were sent to USPs.

87.    Plaintiffs, whose death sentences were reduced to life without parole, are similarly situated to the 18 people who were resentenced from federal death sentences to life without parole prior to the Redesignation Directive, Mandatory ADX Policy, and Blanche Process.

24

88.     While President Biden remained in office, BOP began the normal redesignation process for all Plaintiffs and subsequently made determinations for where each would be housed, assuring a federal court that the housing decisions would "lead to similar outcomes" as in the past. Kadamovas Joint Mot. at 2, *Kadamovas v. Dir., Fed. Bureau of Prisons*, No. 23-cv-22 (S.D. Ind. Dec. 30, 2024), ECF 147.

89.     After Defendants promulgated the Redesignation Directive and Mandatory ADX Policy, the process changed completely. The intent of the Redesignation Directive and the Mandatory ADX Policy was clear: to send all Plaintiffs to ADX. As a result of the actions of Defendant Trump and former Attorney General Pamela Bondi, BOP Defendants abandoned their prior redesignation efforts and adopted a new policy that was implemented with the intent to redesignate every Plaintiff to ADX. Plaintiffs were thus subjected to a redesignation process profoundly different from that experienced by their similarly situated peers.

90.     When those designations were thwarted by the Court's preliminary injunction, Defendants created a new, unlawful process—the Blanche Process.

91.     The Blanche Process is a continuation of the Redesignation Directive and Mandatory ADX Policy, and reflects Defendants' unceasing, punitive intent to ensure that Plaintiffs are designated to ADX.

92.     The motivation for the disparate treatment is, and has always been, animus: Defendant Trump has expressed clear animus toward Plaintiffs, telling them in a public social media posting to "GO TO HELL!" and referring to President Biden's "Abhorrent Pardon Decisions." Defendant Trump issued EO 14164 with the intent to punish them and make them suffer. The Bondi Memo was issued to carry out that improper intent, and former Attorney General Bondi's own statements substantiate it. The Blanche Process is merely Defendants' latest effort to

25

carry out the animus-driven policy.

93.    Animus is not a permissible reason under the equal protection clause to treat similarly situated groups differently. Defendants have no legitimate interests in their disparate treatment of Plaintiffs.

94.    As a result of Defendants' actions, all Plaintiffs have been denied Defendant BOP's longstanding redesignation procedures as set forth in PS 5100.08 and instead subjected to an extra-legal process fundamentally different from that experienced by their similarly situated peers and required by statute and properly promulgated, longstanding BOP policy.

95.    For these reasons, Defendants have violated Plaintiffs' rights to equal protection under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these equal protection violations.

**<u>COUNT 3</u>**
**Challenge to the Redesignation Directive, Mandatory ADX Policy, and Blanche Process**
**Eighth Amendment of the U.S. Constitution – Cruel and Unusual Punishment**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

96.    The Eighth Amendment prohibits cruel and unusual punishment. The Supreme Court has held that the Eighth Amendment thus prohibits the unnecessary and wanton infliction of pain, including those punishments that are without penological justification.

97.    The solitary confinement inflicted at ADX is objectively painful and harmful, and it constitutes the type of unnecessary and wanton infliction of pain that gives rise to an Eighth Amendment violation. The courts and scientific literature have long recognized the deleterious effects of prolonged solitary confinement. ADX imposes particularly oppressive conditions designed to eliminate environmental stimulation and meaningful human contact. The indefinite nature of ADX confinement only exacerbates the harm posed by these conditions.

98.    Defendants have no penological justification for isolating the Plaintiffs at ADX.

26

Before the Redesignation Directive, Mandatory ADX Policy, and Blanche Process, Defendant BOP officials followed BOP policy and federal statutes and determined that each Plaintiff would be placed at a high-security USP or medical facility. Following the Redesignation Directive, Mandatory ADX Policy, and now the Blanche Process, applicable only to the Plaintiffs and others whose death sentences were commuted by President Biden, Defendants overrode these determinations. Defendants implemented these overrides solely because Plaintiffs' sentences were commuted by the prior Administration, which advances no rational penological purpose.

99.    The Eighth Amendment also prohibits using prosecutorial power for arbitrary, partisan, or improper ends.

100.    Defendants seek to impose particularly harsh punishment on Plaintiffs due to Defendants' animus against Plaintiffs and President Biden's Administration.

101.    Defendants have therefore violated Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment. As a result of Defendants' actions, in the absence of injunctive relief, Plaintiffs will suffer irreparable harm.

**<u>COUNT 4</u>**
**Challenge to the Redesignation Directive, Mandatory ADX Policy, and the Blanche Process**
**Eighth Amendment of the U.S. Constitution – Deliberate Indifference to Serious Medical and/or Mental Health Needs**
**Plaintiffs Basham, Coonce, Council, Fulks, Hall, Kadamovas, Lawrence, Mikhel, Mikos, Roane, Runyon, Sanchez, and Umaña**
**Against All Defendants in Their Official Capacities**

102.    Under the Eighth Amendment, BOP Defendants must provide incarcerated people in their custody with adequate and necessary health care, for both medical and mental health needs, that meets accepted standards of care and practice within the medical community.

103.    The Eighth Amendment prohibits deliberate indifference by government officials to the serious health needs of people the government chooses to incarcerate. An official who has knowledge of an incarcerated person's health care needs that would place the person at substantial

risk of serious harm if not treated, and who denies, delays, or otherwise interferes with the provision of health care, violates the Eighth Amendment.

104. Plaintiffs Council, Fulks, Hall, Kadamovas, Mikhel, Sanchez, Basham, Runyon, Coonce, Umaña, Lawrence, Mikos, and Roane (hereafter "Health Care Plaintiffs") have each been diagnosed with serious medical and/or mental health conditions. Defendants are subjectively aware of the Health Care Plaintiffs' diagnoses and their need for higher levels of medical and/or mental health care than can be provided at ADX.

105. The standard classification and redesignation process used by Defendant BOP is designed to consider incarcerated people's medical and mental health needs in determining which federal prison institutions are suitable and capable of meeting their needs. According to BOP Defendants' own regulations and policies, ADX is not equipped to incarcerate people with serious medical or mental health conditions.

106. Without the appropriate level of necessary medical and mental health treatment at ADX, the Health Care Plaintiffs will predictably experience the gratuitous infliction of pain and serious and irreparable physical and psychological harm.

107. Additionally, Health Care Plaintiffs with documented diagnoses of serious mental illness and/or cognitive impairments are at heightened risk of irreparable psychological harm due to the severely harsh and punitive conditions of isolation at ADX.

108. Moreover, the extremely harsh transfer process itself—lengthy transportation in full restraints, minimal hygiene, and extremely limited access to medication and healthcare professionals—will inflict serious harm and expose the Health Care Plaintiffs to substantial risk of serious harm.

109. The Redesignation Directive and Mandatory ADX Policy promulgated and

implemented by Defendants required a categorical determination that all people who received clemency from President Biden should be placed in so-called "monstrous" conditions.

110. The plain language of EO 14164 and the Bondi Memo, as well as the public comments of Defendant Trump and former Attorney General Bondi, evince a desire and motivation by Defendant Trump and former Attorney General Bondi to cause harm to all the recipients of clemency, and a deliberate indifference to the impact of ADX placement on the Health Care Plaintiffs.

111. And, since Defendants' promulgation of the Redesignation Directive and Mandatory ADX Policy, some Health Care Plaintiffs' conditions have worsened.

112. The Blanche Process serves to effectuate Defendants' unceasing objective to designate each Plaintiff to ADX. In short, the Blanche Process is an extension of the Redesignation Directive and Mandatory ADX Policy.

113. The Blanche Process also removes any levels of review purportedly designed to consider whether Plaintiffs' medical and mental health conditions preclude an ADX designation. Unlike the process outlined in the 2012 ADX Referral Memo, the Blanche Process does not provide for psychological assessments of anyone considered for ADX placement or separate assessments for anyone classified as Mental Health Care Level 3 to determine whether ADX can meet their health care needs.

114. Defendants' deliberate actions of denying necessary and appropriate medical and mental health care to the Health Care Plaintiffs demonstrate that they have acted, and will continue to act, with deliberate indifference to the Health Care Plaintiffs' serious health needs, and to the substantial risk of serious harm to these Plaintiffs.

115. As a result of Defendants' actions described herein, in the absence of injunctive

relief, the Health Care Plaintiffs will continue to suffer irreparable harm.

## COUNT 5
**Challenge to the Redesignation Directive, Mandatory ADX Policy, and Blanche Process**
**Article I, § 9 of the U.S. Constitution – Bill of Attainder**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

116.    The Redesignation Directive, Mandatory ADX Policy, and Blanche Process constitute impermissible acts of attainder by all Defendants in violation of Article I, § 9 of the U.S. Constitution.

117.    By issuing and implementing the Redesignation Directive, Mandatory ADX Policy, and Blanche Process, Defendants intended to and did inflict retributive punishment on Plaintiffs, and such punishment constituted a bill of pain and penalties. In so doing, Defendants usurped the judicial role of fixing a degree of punishment for no reason other than retribution for President Biden's commutations of Plaintiffs' federal death sentences.

118.    The Redesignation Directive, Mandatory ADX Policy, and Blanche Process constitute legislative action by Defendants within the meaning of the Constitution's Bill of Attainder Clause.

119.    The Redesignation Directive, Mandatory ADX Policy, and Blanche Process apply to an identifiable, closed group of people, including Plaintiffs.

120.    The punishment imposed by the Redesignation Directive, Mandatory ADX Policy, and Blanche Process is vindictive and serves no legitimate penological purpose. But for the Redesignation Directive, Mandatory ADX Policy, and Blanche Process, all Plaintiffs would be transferred to other, less restrictive BOP facilities pursuant to decisions made under the statutory BOP process and its prior internal policies in its Program Statements.

121.    As a direct and proximate result of Defendants' constitutional violation, Plaintiffs will be irreparably injured. They will suffer irreparable harm unless Defendants are enjoined from

30

continuing their unlawful policies, practices, and customs which have directly and proximately caused these constitutional violations.

**<u>NEW CLAIMS FOR RELIEF</u>**

**<u>COUNT 12</u>**
**Challenge to the Blanche Process**
**Fifth Amendment of the U.S. Constitution – Procedural Due Process**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

122.    The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty or property, without due process of law." U.S. Const. amend V.

123.    The Blanche Process violates Plaintiffs' procedural due process rights under the Fifth Amendment.

124.    Applying due process principles to prisons, the Supreme Court held that incarcerated people have a liberty interest in avoiding confinement conditions that are an "atypical and significant" hardship compared to the ordinary incidents of prison life. *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Before the government may encroach on such a liberty interest, it must provide incarcerated people with an opportunity to be heard at a meaningful time and in a meaningful manner.

125.    Plaintiffs have a liberty interest in avoiding placement at ADX, which is an "atypical and significant" hardship compared to the ordinary incidents of prison life. *See* PI Op. 13 ("Plaintiffs have shown that they likely have a liberty interest in avoiding the conditions at ADX Florence"). Conditions at ADX are more severe than routinely imposed in USPs, because conditions at ADX are uniquely isolating and have no durational limit.

126.    For Plaintiffs, the conditions of confinement in ADX are more severe than the conditions of administrative segregation in USPs, both because of the deprivations inherent in ADX confinement and the lengthy and indefinite confinement in ADX. Plaintiffs' confinement is

31

also "atypical" because it is selective.

127. Plaintiffs' liberty interest in avoiding transfer to ADX entitles them to an opportunity to be heard at a meaningful time and in a meaningful manner by a neutral decisionmaker with correctional expertise. These procedural safeguards follow from Plaintiffs' weighty private interest in avoiding ADX's uniquely isolating conditions and the risk of erroneous deprivation from Defendants' replacement of ordinary procedures with the Blanche Process.

128. Due process requires evaluating "the risk of an erroneous deprivation . . . through the procedures used," "the probable value of additional or substitute procedural safeguards," and the gravity of the private interest and the governmental burden. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The Blanche Process falls short of meeting these due process requirements.

129. The Blanche Process institutes unlawful procedures that are directed by a political official with no corrections experience, devoid of appellate review, and supported by no record. Erroneous deprivation is baked into the Blanche Process.

130. Defendant Blanche is not a neutral decisionmaker. He is a senior-level Executive Branch officer subject to at-will removal by the President. The new process omits the multitiered ADX redesignation-and-transfer procedures and replaces them with a single Executive Branch official who has already presumptively determined that Plaintiffs should be transferred to ADX.

131. A one-person, no-review, supermax-designation process that provides no opportunity for Plaintiffs to plead their case to a neutral arbiter with corrections experience is not an adequate substitute for BOP's longstanding, multi-layered, appealable designation process involving multiple institutional actors with correctional expertise—nor is Defendants' elimination of due process protections permissible.

132. In short, the Blanche Process sidelines due process protections. Defendant BOP's

32

longstanding, previous ADX designation procedures do not. The value of upholding due process protections before designating Plaintiffs to indefinite confinement in a supermax facility is clear.

133.    Defendants' interest in abandoning BOP's longstanding ADX designation procedures is minimal compared to Plaintiffs' interest in avoiding indefinite incarceration under the most oppressive conditions in the entire federal prison system.

134.    Defendants denied, and continue to deny, Plaintiffs the opportunity to be heard in a meaningful time and in a meaningful manner.

135.    Regardless of intent or outcome, the new process substantially deviates from Defendant BOP's prior policy without affording Plaintiffs the process to which they are entitled under BOP's prior, legitimate redesignation and transfer policy.

136.    For these reasons, Defendants have violated Plaintiffs' rights to procedural due process under the Fifth Amendment. In the absence of injunctive relief, Plaintiffs will suffer irreparable harm from these due process violations.

## COUNT 13
**Challenge to the Amended Program Statement**
**Administrative Procedure Act, 5 U.S.C. § 706**
**Agency Action in Excess of Statutory Jurisdiction or Authority, and Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law**
**All Plaintiffs**
**Against Defendants BOP, Marshall, and Smith in Their Official Capacities**

137.    The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction [or] authority," or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

138.    The Amended Program Statement is final agency action. The Amended Program Statement represents the consummation of the agency's decisionmaking process within Defendant BOP to adopt a new, unlawful, across-the-board policy governing redesignation decisions. The

33

Amended Program Statement was adopted by the agency's leadership and does not contemplate any further consideration by the agency prior to implementation or enforcement. The Amended Program Statement does not merely clarify existing duties. The Amended Program Statement determines Plaintiffs' legal rights, and it has direct and immediate legal consequences, including by vesting the Attorney General with designation and redesignation authority. The Amended Program Statement is mandatory and binding on BOP officials, BOP officials have treated the Amended Program Statement as mandatory and binding, and Defendants BOP, Marshall, and Smith have already begun implementing the Amended Program Statement in designation and redesignation decisions affecting Plaintiffs.

139. The Amended Program Statement exceeds statutory authority and is not in accordance with law. 18 U.S.C. § 3621(b) expressly vests designation and redesignation authority exclusively in Defendant BOP and sets forth the criteria Defendant BOP is required to consider when exercising that exclusive designation and redesignation authority. Section 3621(b) does not authorize Defendant BOP to redelegate that exclusive designation or redesignation authority to the Attorney General, no other statute authorizes Defendant BOP to redelegate that exclusive designation and redesignation authority, and no statute vests the Attorney General with designation and redesignation authority. Nor does Defendant BOP have implied authority to redelegate that function to the Attorney General. The Amended Program Statement, which authorizes the Attorney General to designate and redesignate persons within the federal prison system, therefore exceeds Defendant BOP's statutory authority and is not in accordance with law.

140. The Amended Program Statement is also arbitrary and capricious and not in accordance with law. Under the *Accardi* doctrine, an agency must follow its own rules and regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), including

procedural rules that limit otherwise discretionary actions. Agency action is arbitrary and capricious and not in accordance with law where an agency fails to follow its own rules and regulations. In 28 C.F.R. § 0.95(d), the Attorney General delegated classification, commitment, and control of persons in federal custody to the BOP Director, and in 28 C.F.R. § 0.96(c), the Attorney General delegated the power to designate places of imprisonment or confinement and order transfers from one institution to another to the BOP Director. Sections 0.95(d) and 0.96(c) are binding regulations that impose mandatory duties on Defendant BOP and constrain the Attorney General's authority and Defendant BOP's discretion. Sections 0.95(d) and 0.96(c) do not authorize the BOP Director to redelegate classification, commitment, and control of persons in federal custody to the Attorney General. The Amended Program Statement, which authorizes the Attorney General to designate and redesignate persons within the federal prison system, does not follow and is contrary to §§ 0.95(d) and 0.96(c)'s delegation, and therefore it is arbitrary and capricious and not in accordance with law.

141.    Agency action is also arbitrary and capricious where an agency fails to provide a reasoned explanation for its action. Where an agency replaces an existing policy, it must provide a reasoned explanation for the change and for disregarding facts and circumstances that underlay or were engendered by the prior policy. The Amended Program Statement is arbitrary and capricious because it fails to provide a reasoned explanation, or any explanation at all, for adopting and implementing a new policy and process under which the Attorney General has authority to designate and redesignate persons within the federal prison system. Prior to the Amended Program Statement, Program Statement 5100.08 reflected longstanding agency policy that Defendant BOP has exclusive designation and redesignation authority in the federal prison system. The Amended Program Statement replaces that policy and does so without any explanation for the change or

disregarding the facts and circumstances underlying the prior policy. Nor does the Amended Program Statement acknowledge reliance interests created by the prior policy. On information and belief, Defendant BOP issued no contemporaneous memorandum, statement of basis, justification, or explanation accompanying the Amended Program Statement.

142.    Defendants' unlawful actions adopting the Amended Program Statement now subject Plaintiffs to a new process that has stripped them of procedural safeguards previously afforded to all persons in BOP's custody before referring and redesignating someone to ADX. Placement at ADX imposes atypical and significant hardship compared to ordinary federal prison conditions, giving Plaintiffs a protected liberty interest that Defendants' actions failed to consider. Plaintiffs reasonably relied on Defendant BOP's procedural safeguards to protect this important liberty interest in avoiding transfer to ADX, including participating in hearings, reviewing and responding to evidence, developing records, and pursuing administrative appeals. Plaintiffs have lost those procedural safeguards and are prejudiced by Defendants' unlawful actions.

### COUNT 14
**Challenge to the Blanche Letters**
**Administrative Procedure Act, 5 U.S.C. § 706**
**Agency Action in Excess of Statutory Jurisdiction or Authority, and Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law**
**All Plaintiffs**
**Against Defendants Blanche, Doe, and Perkins in Their Official Capacities**

143.    The APA directs a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction [or] authority," or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

144.    The Blanche Letters are final agency actions. The Blanche Letters represent the consummation of the agency's decisionmaking process within DOJ and ODAG to adopt a new, unlawful, across-the-board policy and process governing Plaintiffs' redesignations to ADX. The

Blanche Letters were issued by the agency's leadership and do not contemplate any further consideration by the agency prior to implementation or enforcement. The Blanche Letters do not merely clarify existing duties. The Blanche Letters determine Plaintiffs' legal rights, and they have direct and immediate legal consequences, including by adopting an across-the-board policy and process under which the Attorney General has unilateral authority to redesignate all Plaintiffs to ADX contrary to the requirements set by statute, regulation, and policy, and under which all Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX. The Blanche Letters are mandatory and binding on BOP officials, BOP officials have treated the Blanche Letters as mandatory and binding, and Defendants have already begun implementing the Blanche Letters in redesignation-related decisions affecting Plaintiffs.

145. The Blanche Letters exceed statutory authority and are not in accordance with law. 18 U.S.C. § 3621(b) expressly vests designation and redesignation authority exclusively in Defendant BOP and sets forth the criteria Defendant BOP is required to consider when exercising that exclusive designation and redesignation authority. Section 3621(b) does not authorize Defendant BOP to redelegate that exclusive designation or redesignation authority to the Attorney General, and no statute vests the Attorney General with designation and redesignation authority. The Attorney General does not have designation and redesignation authority. Defendant BOP does. The Blanche Letters, which adopt a new policy and process under which the Attorney General has unilateral authority to redesignate Plaintiffs to ADX contrary to the requirements set by statute, regulation, and policy, therefore exceeds the Attorney General's statutory authority and is not in accordance with law.

146. Under § 3621(b), Defendant BOP is also required to engage in an individualized determination that considers a person's individual circumstances and all the statutory criteria

37

before designating or redesignating a person within the federal prison system. The Attorney General does not have any statutory authority to create presumptive or categorical rules governing designations or redesignations to ADX, which would circumvent the individualized criteria mandated by § 3621(b). However, the Blanche Letters have adopted a policy and process for redesignating Plaintiffs to ADX that fails to consider Plaintiffs' individual circumstances and all the statutory criteria. The Blanche Letters adopt a policy and process under which all Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX. On information and belief, Defendants did not conduct any individualized review under § 3621(b) before applying the Blanche Letters' presumptive determination. Under the Blanche Letters, Plaintiffs therefore are once again treated as part of a class who categorically warrant redesignation and transfer to the harshest facility in the federal prison system, notwithstanding the statutory criteria and factors that counsel against redesignating and transferring them there.

147.    The Blanche Letters are also arbitrary and capricious and not in accordance with law. Under the *Accardi* doctrine, an agency must follow its own rules and regulations, *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), including procedural rules that limit otherwise discretionary actions. Agency action is arbitrary and capricious and not in accordance with law where an agency fails to follow its own rules and regulations. In 28 C.F.R. § 0.95(d), the Attorney General delegated classification, commitment, and control of persons in federal custody to the BOP Director, and in 28 C.F.R. § 0.96(c), the Attorney General delegated the power to designate places of imprisonment or confinement and order transfers from one institution to another to the BOP Director. Sections 0.95(d) and 0.96(c) are binding regulations that impose mandatory duties on Defendant BOP and constrain the Attorney General's authority and Defendant BOP's discretion. Having delegated those powers, the Attorney General cannot

38

exercise those powers here. The Blanche Letters, which adopt a new policy and process under which the Attorney General has unilateral authority to redesignate Plaintiffs to ADX and under which all Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX, do not follow and are contrary to §§ 0.95(d) and 0.96(c)'s delegation, and therefore they are arbitrary and capricious and not in accordance with law.

148.    The Blanche Letters also do not follow and are contrary to Program Statement 5100.08, which imposes binding and enforceable requirements that constrain Defendant BOP's discretion, including by prescribing procedures that Defendant BOP is required to follow before referring, redesignating, or redesignating and transferring a person in federal custody to ADX. Like all BOP Program Statements, Program Statement 5100.08 prescribes BOP policies and procedures that establish internal, agency-wide instructions and requirements with which the agency strictly complies. Under Program Statement 5100.08, ADX is reserved for persons in Defendant BOP's custody who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution. Program Statement 5100.08 also requires individualized consideration and mandates Defendant BOP to consider whether redesignation to another high security institution is appropriate before redesignating a person to ADX. The Blanche Letters violate Program Statement 5100.08's procedures and criteria, including by replacing those procedures and criteria with a new policy and process under which the Attorney General has unilateral authority to redesignate Plaintiffs to ADX and Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX.

149.    The Blanche Letters also do not follow and are contrary to the 2012 ADX Referral Memo, which imposes binding and enforceable requirements and which is treated by BOP as

mandatory and binding, including by prescribing procedures that constrain Defendant BOP's discretion and that Defendant BOP is required to follow before referring, redesignating, or redesignating and transferring a person in federal custody to ADX. For example, the 2012 ADX Referral Memo provides that a person referred to ADX will originally meet one or both of two criteria: (1) the person's placement in other correctional facilities creates a risk to institutional security and good order or poses a risk to the safety of staff, incarcerated people, others, or to public safety; and (2) as a result of the incarcerated person's status, either before or after incarceration, the incarcerated person may not be safely housed in the general population of another institution.

150.    The 2012 ADX Referral Memo also requires: referral by institution staff, review and concurrence by the Warden and Regional Director, an initial assessment by the DSCC, simultaneous review by Psychology Services to determine individuals' psychological suitability to withstand the conditions at ADX, notice to the incarcerated person with "[s]pecific evidence which forms the basis for the referral," a hearing conducted by a neutral Hearing Administrator with correctional expertise and familiarity with BOP policies and operations, appointed by the National Discipline Hearing Administrator, an opportunity for the incarcerated person to review and respond to the evidence, a written recommendation by the Hearing Administrator with specific reasons, review and approval by the Assistant Director of the Correctional Programs Division, a two-level administrative appeal,

151.    The Blanche Letters violate the 2012 ADX Referral Memo's procedures by discarding them, including by replacing those procedures with a new policy and process under which the Attorney General has unilateral authority to redesignate Plaintiffs to ADX and Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX. For example, the

Blanche Letters do not include any express provision for involvement of institution staff, the Warden, the Regional Director, or DSCC; a psychological-suitability review; notice identifying specific evidence; a neutral Hearing Administrator with correctional expertise and experience in BOP designation and redesignation policies and procedures; a hearing of any kind; written recommendation from BOP; or any administrative appeal. Under the policy and process adopted by the Blanche Letters, Defendant Blanche's redesignation decisions are final and cannot be appealed.

152. Agency action is also arbitrary and capricious where an agency fails to disclose the basis for its action. An agency may not offer a pretextual rationale for agency action that does not match what the record reveals about the agency's decisionmaking. The Blanche Letters are arbitrary and capricious because they are a pretext for another predetermined process, not permitted by statute, regulation, or policy, for referring, redesignating, and transferring Plaintiffs to ADX. On information and belief, Defendants adopted the Blanche Letters for the predetermined purpose of redesignating Plaintiffs to ADX irrespective of statutory and regulatory criteria and policy.

153. Agency action is also arbitrary and capricious where an agency fails to provide a reasoned explanation for its action. Where an agency replaces an existing policy, it must provide a reasoned explanation for the change and disregarding facts and circumstances that underlay or were engendered by the prior policy. The Blanche Letters are arbitrary and capricious because they fail to provide a reasoned explanation, or any explanation at all, for adopting and implementing a new policy and process under which the Attorney General has authority to redesignate Plaintiffs to ADX and under which all Plaintiffs are subject to a "presumptive determination" that they warrant transfer to ADX. Prior to the Blanche Letters, Program Statement 5100.08 reflected

longstanding agency policy that Defendant BOP has exclusive designation and redesignation authority in the federal prison system, and Program Statement 5100.08 and the 2012 ADX Referral Memo set forth the required procedures and criteria for referring, redesignating, and transferring persons to ADX. The Blanche Letters' new policy and process casts aside Program Statement 5100.08 and the 2012 ADX Referral Memo's scheme and does so without any explanation for the changes and disregards the facts and circumstances underlying the prior policies. On information and belief, Defendants issued no contemporaneous memorandum, statement of basis, justification, or explanation acknowledging reliance interests or addressing prior policy.

154.    The Blanche Letters subject Plaintiffs to a new process that has stripped them of procedural safeguards previously afforded to all persons in Defendant BOP's custody before referring and redesignating someone to ADX. Placement at ADX imposes an atypical and significant hardship compared to ordinary federal prison conditions, giving Plaintiffs a protected liberty interest that Defendants' actions failed to consider. Plaintiffs reasonably relied on Defendant BOP's procedural safeguards to protect this important liberty interest in avoiding transfer to ADX, including by participating in hearings, responding to evidence, developing records, and pursuing administrative appeals. Plaintiffs have lost those procedural safeguards and are prejudiced by Defendants' unlawful actions.

**COUNT 15**
**Challenge to the Amended Program Statement**
**Administrative Procedure Act, 5 U.S.C. § 553(b), (c), (d)**
**Notice and Comment**
**All Plaintiffs**
**Against Defendants BOP, Marshall, and Smith in Their Official Capacities**

155.    The APA requires notice and opportunity for comment prior to the promulgation of rules, 5 U.S.C. § 553(b), (c), and the Court must set aside agency action undertaken "without observance of procedure required by law," *id.* § 706(2)(D).

156.    The APA establishes the procedures federal administrative agencies use for rule making. Rulemaking is defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

157.    Program Statement 5100.08 derives from, and is based on, rules published in the Federal Register and codified in the Code of Federal Regulations. *See* 28 C.F.R. § 524.11.

158.    Program Statement 5100.08 is a generally applicable rule and prescribes BOP policies and procedures that establish internal, agency-wide instructions and requirements with which the agency strictly complies. Program Statement 5100.08 requires Defendant BOP to engage in an individualized determination that considers a range of enumerated factors when determining the placement of a person in the federal prison system.

159.    The Amended Program Statement is a substantive rule because it delegates new duties to the Attorney General, carries the force of law, and alters Program Statement 5100.08.

160.    The Amended Program Statement does not simply advise the public of Defendant BOP's construction of 18 U.S.C. § 3621(b) and 28 U.S.C. § 509. Rather, it has an independent legal effect. The Amended Program Statement creates an entirely new designation scheme by unlawfully vesting Defendant BOP's congressionally delegated authority to designate and transfer people incarcerated in federal prisons with the Attorney General. When Defendant BOP purported to transfer its statutory designation authority to the Attorney General, it did not interpret § 3621(b); it violated it. It created a new legal norm, effectively rewriting the statute's allocation of authority and binding the agency to a new legal framework.

161.    The Amended Program Statement has a determinative effect on who may exercise authority to decide Plaintiffs' place of imprisonment. This authority now rests with one senior-level Executive Branch officer and can be exercised on an ad hoc basis.

162.    Further, the Amended Program Statement's new designation scheme marks a significant departure from Defendant BOP's longstanding, multi-layered ADX designation procedures. Collectively, this new substantive rule altered Plaintiffs' rights, Defendants' obligations, and the decision-making framework.

163.    Defendants BOP, Marshall, and Smith amended Program Statement 5100.08.

164.    Defendants BOP, Marshall, and Smith failed to provide notice and an opportunity to comment in a timely manner before issuing the Amended Program Statement.

165.    The APA requires that a substantive rule be published in the Federal Register "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendants BOP, Marshall, and Smith failed to publish the Amended Program Statement 30 days before its effective date; indeed, they have failed to publish it in the Federal Register at all.

166.    Defendants BOP, Marshall, and Smith have not articulated reasons sufficient to show good cause why the requirements of 5 U.S.C. § 553(b)-(d) are inapplicable.

167.    Plaintiffs have been prejudiced by the failure of Defendants BOP, Marshall, and Smith to comply with the notice-and-comment provisions of the APA.

**COUNT 16**
**Challenge to the Blanche Letters**
**Administrative Procedure Act, 5 U.S.C. § 553(b), (c), (d)**
**Notice and Comment**
**All Plaintiffs**
**Against Defendants Blanche, Doe, and Perkins in Their Official Capacity**

168.    The APA requires notice and opportunity for comment prior to the promulgation of rules, 5 U.S.C. § 553(b), (c), and the Court must set aside agency action undertaken "without observance of procedure required by law," *id.* § 706(2)(D).

169.    The May 7, 2026, Blanche Letters, which supplant Defendant BOP's longstanding, required redesignation policies and procedures set forth in 18 U.S.C. § 3621(b), 28 C.F.R. §§

44

0.95(d) and 0.96(c), PS 5100.08, and the 2012 ADX Referral Memo, are a substantive rule.

170.    The Blanche Letters do not put the public on notice of pre-existing legal obligations or rights. Rather, they have an independent legal effect.

171.    The Blanche Letters have a determinative effect on who has the authority to determine Plaintiffs' place of imprisonment. That new substantive rule alters Plaintiffs' rights, Defendants' obligations, and the decisionmaking framework.

172.    The Blanche Letters further the Amended Program Statement's new, unlawful designation scheme and, concurrently, aggravate the scheme by (among other things) adding an additional unlawful element: extinguishing Defendant BOP's administrative appeals process. That independently alters Plaintiffs' rights, Defendants' obligations, and the framework for decisionmaking.

173.    The Blanche Letters also mark a significant departure from Defendant BOP's longstanding, multi-layered ADX designation procedures. The displacement of those ADX-specific procedures altered Plaintiffs' rights, Defendants' obligations, and the decision-making framework.

174.    The Blanche Letters state that Defendant Blanche is "empowered to make redesignation decisions pursuant to 18 U.S.C. § 3621(b) and BOP Program Statement P5100.8, CN-3," making it clear that, Defendant Blanche intends to exercise what he incorrectly believes is his delegated legislative power under 28 U.S.C. § 509.

175.    Defendant Blanche failed to provide notice and an opportunity to comment in a timely manner before publication of the Blanche Letters.

176.    The APA requires that a regulation be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendant Blanche failed to publish the Blanche Letters 30

45

days before their effective date. Indeed, Defendant Blanche failed to publish them in the Federal Register at all.

177.    Defendant Blanche has not articulated reasons sufficient to show good cause why the requirements of 5 U.S.C. § 553(b)-(d) are inapplicable.

178.    Plaintiffs have been prejudiced by the failure of Defendant Blanche to comply with the notice-and-comment provisions of the APA.

**<u>COUNT 17</u>**
**Challenge to Ultra Vires Acts**
**All Plaintiffs**
**Against All Defendants in Their Official Capacities**

179.    This Court has inherent equitable jurisdiction to hear ultra vires claims for "injunctive relief" against "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015). That inherent equitable jurisdiction is rooted in "a long history of judicial review of illegal executive action, tracing back to England," *id.* at 327, and no waiver of sovereign immunity is required for such claims, as "[i]t is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority," *Clark v. Libr. of Cong.*, 750 F.2d 89, 102 (D.C. Cir. 1984).

180.    By engaging in the conduct described above in ¶¶ 122-178, Defendants' actions violated 18 U.S.C. § 3621(b) and 28 C.F.R. §§ 0.95 and 0.96.

181.    As alleged in Count 12, Defendants violated due process by engaging in the processes and actions detailed in the Blanche Process, including under the Amended Program Statement and Blanche Letters.

182.    As alleged in Counts 13, 14, 15, and 16, Blanche, Doe, Perkins, BOP, Marshall, and Smith violated the APA.

46

183.    Because Defendants' actions are ultra vires, this Court should enjoin all Defendants in their official capacities except the President from engaging in the processes and actions detailed in the Blanche Process, including under the Amended Program Statement and Blanche Letters. If Defendants' actions are not declared unlawful, set aside, and enjoined, Plaintiffs will suffer substantial injury, including irreparable injury.

## SUPPLEMENTAL PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant the following relief, in addition to the relief set forth in the Complaint, ECF 1, and Complaints-in-Intervention, ECF 72 and 73:

(A)    Issue a judgment under 28 U.S.C. §§ 2201-02 declaring that the Blanche Process violates Plaintiffs' rights under the Fifth Amendment and Eighth Amendment to the United States Constitution; and that the Blanche Process violates federal regulatory law and the Administrative Procedure Act, for the reasons and on the Counts set forth above;

(B)    Enter preliminary and permanent injunctive relief against all Defendants but the President and declaratory relief against all Defendants, including but not limited to enjoining the Blanche Process, and ordering Defendants to assign Plaintiffs to housing locations based on the designation decisions that had been reached prior to the issuance of the Redesignation Directive;

(C)    Award Plaintiffs their costs and reasonable attorneys' fees under 28 U.S.C. § 2412, 5 U.S.C. § 504, and 42 U.S.C. § 12205, and any other applicable source of law; and

(D)    Grant any other and further relief this Court deems just, proper, and appropriate.

Dated: June 19, 2026                     Respectfully submitted,
          New York, New York

                                         /s/ David Patton
David C. Fathi**                         David Patton*
Maria V. Morris                          Ian Robertson*
Carmen Iguina González                   Krysta Kilinski*
**ACLU FOUNDATION**                      **HECKER FINK LLP**
915 15th Street NW                       350 Fifth Ave, 63rd Floor
Washington, DC 20005                     New York, NY 10118
Tel: (202) 393-4930                      Tel: (212) 763-0883
dfathi@aclu.org                          dpatton@heckerfink.com
mmorris@aclu.org                         irobertson@heckerfink.com
ciguinagonzalez@aclu.org                 kkilinski@heckerfink.com


Corene T. Kendrick                       Sara Norman, Cal. 189536*
**ACLU FOUNDATION**                      **LAW OFFICES OF SARA NORMAN**
425 California St., Ste. 700             P.O. Box 170462
San Francisco, CA 94104                  San Francisco, CA 94117
Tel: (202) 393-4930                      Tel: (415) 236-3763
ckendrick@aclu.org                       sara@saranormanlaw.com


                                         C.J. Sandley, Ala. 5317-S48R*
Brian Stull*                             Kayla Vinson, Ala. 3664-S48Q*
Claudia Van Wyk*                         D. Korbin Felder, Miss. 106643*
**ACLU FOUNDATION**                      **CENTER FOR CONSTITUTIONAL RIGHTS**
201 W. Main St., Ste. 402                666 Broadway, 7th Floor
Durham, NC 27701                         New York, NY 10012
Tel: (919) 682-5659                      Tel: (212) 614-6443
bstull@aclu.org                          csandley@ccrjustice.org
cvanwyk@aclu.org                         kvinson@ccrjustice.org
                                         kfelder@ccrjustice.org


Laura Rovner                             *Attorneys for Plaintiffs and Plaintiff-Intervenors*
Nicole Godfrey
Miriam Kerler                            *\* Admitted pro hac vice.*
**STUDENT LAW OFFICE**                   *\*\* Not admitted in D.C.; practice limited to federal*
**UNIVERSITY OF DENVER**                 *courts. Admitted pro hac vice.*
**STURM COLLEGE OF LAW**
2255 E. Evans Ave., Ste. 335
Denver, CO 80210
Tel: (303) 871-6140
laura.rovner@du.edu
nicole.godfrey@du.edu
miriam.kerler@du.edu